SIRI & GLIMSTAD LLP
Aaron Siri (Pro Hac Vice To Be Filed)
Email: aaron@sirillp.com
Elizabeth A. Brehm (Pro Hac Vice To Be Filed)
Email: ebrehm@sirillp.com
200 Park Avenue
Seventeenth Floor
New York, NY 10166
Telephone: 212-532-1091
Facsimile: 646-417-5967

Caroline Tucker (SBN 261377)
Email: ctucker@sirillp.com
700 S. Flower Street, Suite 1000
Los Angeles, CA 90017
Telephone 213-376-3739
Facsimile 646-417-5967

CHRIS WIEST ATTORNEY AT LAW, PLLC
Chris Wiest (Pro Hac Vice To Be Filed)
Email:  chris@cwiestlaw.com
25 Town Center Blvd, STE 104
Crestview Hills, KY 41017
Telephone: 513-257-1895
Facsimile: 859-495-0803

Attorneys for Plaintiff
AARON KHERIATY, M.D.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION

1

| | |
|---|---|
| AARON KHERIATY, M.D., | Case No. |
| Plaintiff, | **VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| v. | |
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, a corporation, and MICHAEL V. DRAKE, in his official capacity as President of the UNIVERSITY OF CALIFORNIA, | |
| Defendants. | |

Plaintiff, Aaron Kheriaty, M.D. ("**Plaintiff**") for his verified complaint, against THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, and MICHAEL V. DRAKE, in his official capacity as President of the University of California, (collectively "**Defendants**") by and through his attorneys, alleges as follows:

## INTRODUCTION

1.   The equal protection clause of the Fourteenth Amendment to the U.S. Constitution requires a state to treat an individual in the same manner as others in similar conditions and circumstances.   The Fourteenth Amendment further recognizes and guarantees fundamental rights and liberty interests of personal autonomy and bodily integrity.   Plaintiff brings this action because the University of California Irving ("**UCI**") will soon refuse to allow him back on campus and is thereby violating his liberty interests and treating him differently from other similarly situated individuals who are permitted back on campus.

2.   Over the eons of human development, our bodies have created a remarkable immune system capable of protecting us against a wide variety of pathogenic viruses. This system includes an enormously diverse repertoire of cells with a nearly unlimited capacity to recognize and 'adapt' to previously unseen viruses.   Rather than having to re-

create the same immunological response every time a virus attacks the body, our immune systems have an innate form of memory which prevents reinfection with the same virus. This memory system creates antibodies to all antigens of a given virus thereby providing previously infected individuals with neutralizing immunity to a previously encountered virus ("naturally immune individuals").

3.     While different vaccines for COVID-19 work in different ways, they are all designed to create immunity to a portion of the virus (specifically, the spike protein), without creating too many side effects, in the hope that this partial immunity to a portion of the virus will confer neutralizing immunity to the entire virus when encountered by the vaccinated individual.  Despite humanity's best efforts at mimicking the immune system's protection, the immunity generated after infection with a virus, including SARS-CoV-2 (the virus which causes the disease COVID-19, hereinafter the "virus" or the "COVID-19 virus"), creates a more robust and durable form of immunity to a virus than any vaccine can create.

4.     Recent studies related to COVID-19 vaccines demonstrate these weaknesses in vaccine-induced immunity.  While someone who has had the COVID-19 virus will typically immediately neutralize the virus upon re-exposure, thereby preventing reinfection and transmission, studies have found that an individual vaccinated for COVID-19 can still become infected with and have the same amount of virus in their nasopharynx as an unvaccinated individual with COVID-19.  The vaccinated individual should typically have fewer symptoms, however that individual can still transmit the virus to others.

5.     The University of California ("**UC**") recently enacted a new policy to "facilitate the protection of the health and safety of the University community" by ensuring that individuals who return to campus have immunity to the virus that causes COVID-19 (the "Mandate").  However, to reach this goal, UC decided that only vaccinated individuals will be permitted on a UC campus come this fall, ignoring those

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

who have natural immunity to the virus.  Thus, the policy provides "for a COVID-19 Vaccination Program under which any" student, faculty, or staff member "is required, subject to limited deferrals, exceptions, and associated non-pharmaceutical interventions, to be fully vaccinated against COVID-19 before physically accessing the University's Locations and Programs."  In enacting this policy, the University is treating naturally immune individuals differently from individuals whose immunity was created by one of the COVID-19 vaccines.

6.     Plaintiff is a physician and professor of Psychiatry and Human Behavior at the UCI School of Medicine ("**UCI**").  He is one of the estimated 3.9 million Californians[1] who are confirmed to have contracted the COVID-19 virus.  He was infected with the virus in July 2020 and experienced many of the common symptoms associated with COVID-19, including a cough and loss of taste and smell.  In fighting off the virus, his body created a robust natural immunity to every antigen on the COVID-19 virus, not just the spike protein of the virus as happens with the COVID-19 vaccines.  Nevertheless, UCI has told Plaintiff that he cannot return to his teaching position unless he receives a COVID-19 vaccine.  Thus, UC is treating him differently by refusing to re-admit him to campus when other individuals who are considered immune to the virus are being admitted back simply because their immunity was created by a vaccine.  This policy is illogical and cannot withstand strict scrutiny or even a rational basis test because naturally immune individuals, like Plaintiff, have at least as good or better immunity to the virus that causes COVID-19 than do individuals who are vaccinated.

7.     In the more than 19 months that the world has been transfixed by the COVID-19 pandemic, evidence shows that the reinfection rate after natural infection is less than 1%, and there are no documented cases of reinfection and transmission to others by naturally immune individuals.  In contrast, COVID-19 vaccination in the optimal

---

[1] *See* https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/Immunization/nCOV2019.aspx.

setting of a clinical trial has, at best, an estimated 67% to 95% efficacy (depending on the COVID-19 vaccine and the variant of the virus) and the vaccine manufacturers and public health agencies have made clear that booster doses will likely be needed, due to wanning immunity created by the vaccines.  Likewise, recent United States Centers for Disease Control and Prevention ("**CDC**") studies have been replete with reports of so-called "breakthrough cases" where individuals are infected after they are fully vaccinated.  Dr. Rochelle Walensky, Director of the CDC, and Dr. Anthony Fauci, Director of NIH's NIAID, have explained that the amount of virus in those individuals' noses is the same as the unvaccinated who have COVID-19.[2]  This has led to the CDC's revised guidelines recommending a return to masks for those who have been vaccinated and experts to conclude that "vaccination is now about personal protection" because "herd immunity is not relevant as we are seeing plenty of evidence of repeat and breakthrough infections."[3]

8.      As described more fully herein, UCI's refusal to readmit Plaintiff to campus unless he receives a vaccine is an equal protection violation.  The right of individuals to their bodily integrity, which includes a right to refuse medical treatment, has long been recognized as one of the fundamental liberty rights afforded under due process.  By forcing Plaintiff to receive a vaccine he does not want or need, and that may cause harm, in order to be treated equally as other individuals who are also immune, UCI's Mandate implicates Plaintiff's substantive due process rights, and the Court should analyze his equal protection claim under the strict scrutiny analysis, i.e., whether the Mandate is both satisfying a compelling government need and is implemented by the least restrictive

[2] *See* https://www.cdc.gov/mmwr/volumes/70/wr/mm7031e2.htm?s_cid=mm7031e2_w#contribAff; *see also* https://www.msnbc.com/all-in/watch/dr-fauci-explains-updated-cdc-mask-guidance-for-vaccinated-people-amid-covid-hotspots-117489221538 at 1:09; *see also* https://www.nytimes.com/2021/07/30/health/covid-cdc-delta-masks.html?smtyp=cur&smid=tw-nytimes.

[3] *See* https://www.cdc.gov/coronavirus/2019-ncov/vaccines/fully-vaccinated.html; *see also* https://www.washingtonpost.com/health/2021/07/29/cdc-mask-guidance/.

5

means.  Defendants cannot satisfy either of these prongs.  Even though a government entity has a compelling government interest in preventing the spread of COVID-19, that interest is not furthered by compelling Plaintiff to be vaccinated to satisfy this interest because he is already naturally immune and, unlike the vaccinated, if exposed to the virus, has neutralizing immunity.  By failing to acknowledge that naturally immune individuals are unlikely to spread the virus, and certainly far less likely than the vaccinated, the Mandate is not narrowly tailored.

9. Nor can the Mandate even satisfy rational basis analysis.  Plaintiff is already naturally immune to the virus.  He is therefore less likely to infect other individuals than are people who have been vaccinated.  As a result, requiring him to be vaccinated in order to return to campus is irrational.  In addition, by targeting people who have had the virus but remain unvaccinated, the Mandate unfairly singles out one unpopular group for disparate treatment.

10. For these reasons, more fully explained below, Plaintiff seeks a preliminary injunction and declaratory relief enjoining Defendants from enforcing the Mandate against him or any other naturally immune individual.

**PARTIES**

11. Plaintiff, AARON KHERIATY, M.D., is an individual who resides in Orange County, California.  Plaintiff is currently employed at the University of California, Irvine, School of Medicine.

12. Defendant THE REGENTS OF THE UNIVERSITY OF CALIFORNIA is a California Corporation empowered under Article IX, Section 9 of the California Constitution.  Defendant owns and operates the University of California, Irvine, School of Medicine.  This Defendant is responsible for the implementation, and enforcement, of the challenged policy and, since its enactment, has directed, implemented, and enforced the policy.

6

13.     MICHAEL V. DRAKE, is the president of the University of California. This Defendant is responsible for the implementation, and enforcement, of the challenged policy, and, since its enactment, has directed, implemented, and enforced the policy.

14.     Defendants are responsible for enforcing, have enforced, and will continue to enforce in the future, the challenged mandate against Plaintiff, as further explained herein.

## JURISDICTION AND VENUE

15.     This Court has subject-matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343(a).

16.     Venue is proper in this judicial district under 28 U.S.C. § 1391 because Defendants reside in this judicial district and a substantial part of the events or omissions giving rise to this action occurred in this judicial district.

## FACTUAL BACKGROUND

### I.     PLAINTIFF HAD COVID-19

17.     Plaintiff is a professor of Psychiatry and Human Behavior at the UCI School of Medicine and the director of the Medical Ethics Program at UCI Health.  Plaintiff's residency training was at UCI from 2003-2007.  In 2007, Plaintiff was hired by UCI as a Health Sciences Assistant Clinical Professor.  In 2013, Plaintiff was promoted to Health Sciences Associate Clinical Professor and in 2019, Plaintiff was promoted again to Health Sciences Clinical Professor and holds this position currently.

18.     Plaintiff contracted the COVID-19 virus in July 2020, which was confirmed by PCR testing, and he experienced many of the common symptoms associated with COVID-19, including loss of taste and smell.  Plaintiff fully recovered.

### II.     COVID-19 IN CALIFORNIA AND FAILED RESTRICTIVE MEASURES

19.     The first confirmed case of the COVID-19 virus in California was on

January 22, 2020.[4]   Governor Gavin Newsom ("**Newsom**") instituted aggressive stay at home orders in California on March 19, 2020, when there were approximately 900 cases within the state.[5]   Despite the aggressive stay at home orders, the virus continued to spread.

20.     The CDC has explained that even with protective measures as instituted in California, "most of the U.S. population will be exposed to this virus [SARS-CoV-2]."[6] The CDC estimates that, through May 2021, approximately 49% of those aged 18 to 49 years have been infected with SARS-CoV-2 despite lockdowns.   This means that approximately half of the individuals subject to the Mandate are likely to have already had the virus and have natural immunity and, as discussed herein, have a lower risk than vaccinated individuals of being re-infected with and transmitting the virus.

21.     UC is a public university intended to serve the residents of California and is open to students from around the world.  It currently has more than 280,0000 students and more than 227,000 faculty and staff.  UC is telling those that are naturally immune that unless they get vaccinated that they need not bother leaving their homes since they will be excluded from campus.

22.     If Defendants instituted the Mandate with the goal of having a student body and faculty that is immune to the COVID-19 virus, it would have exempted from the Mandate those who are already immune due to having had COVID-19.  Failure to do so means that Defendants' Mandate is not about immunity, it is only about vaccination status.

---

[4]   *See*   https://www.latimes.com/world-nation/story/2020-08-21/surprising-tale-first-la-covid-19-case.

[5]   *See*   https://www.politico.com/states/f/?id=00000170-f5a4-d209-af70-fdae4c930000; *see also*   https://www.ksla.com/2020/03/20/california-becomes-first-state-order-lockdown/.

[6] https://stacks.cdc.gov/view/cdc/86068/cdc_86068_DS1.pdf.

### III.   PLAINTIFF HAS A LOWER RISK OF BECOMING RE-INFECTED AND TRANSMITTING THE VIRUS THAN VACCINATED INDIVIDUALS

23.   Peer reviewed studies on COVID-19 demonstrate the durability of natural immunity following COVID-19 infection.  The scientific evidence is clear that COVID-19 recovered individuals have immunity that is far superior to vaccine-mediated immunity.  CDC and FDA data also shows that natural immunity has proved far more than 99% effective while vaccine immunity is at best between 67% and 95% effective, depending on the vaccine, and this is under the previous ideal conditions of a clinical trial.  Moreover, unlike those vaccinated for COVID-19 who can still become infected and have the same amount of virus in their nose as those unvaccinated and infected with COVID-19, there has never been a single documented case of a naturally immune individual becoming re-infected with and transmitting the virus to anyone.

**A. Infection with COVID-19 Virus Provides Robust Long-Term Immunity**

24.   The human body knows how to develop immunity to new viruses.  The adaptive immune system consists of an enormously diverse repertoire of B cells – precursors of antibody-secreting plasma cells – and T cells with a nearly unlimited capacity to recognize and 'adapt' to previously unseen pathogens.

25.   As explained by Dr. Ryan Cole, a Mayo Clinic-trained pathologist, "Yes, our antibody levels drop over time, however, scientifically, the memory B cells that make antibodies have been proven to be present in our lymph nodes and bone marrow."   Dr. Cole further explains, "They are primed and ready to produce a broad array of antibodies upon…exposure.  It would be physiologically, energetically impossible to maintain high antibody levels to all the pathogens we are constantly exposed to, and we would look like the 'swollen Stay-Puft marshmallow man' of lymph nodes, constantly, if the immune system were required to do that."

26.     In line with Dr. Cole's explanation, numerous immunologic studies of individuals that have had the COVID-19 virus demonstrate that they developed sustained, broad and durable immunity and robust B cell and T-cell memory to the virus which protect them from reinfection.  In other words, natural immunity to the COVID-19 virus continues to be present and effective even after antibody levels, detectable by lab tests, wane over time.  Similarly, in a study of monkeys that were deliberately re-exposed to the COVID-19 virus after having COVID-19, *none* of them were re-infected.

27.     Reflecting these findings, the natural immunity produced by the closely related virus, SARS-CoV-1, is lifelong, supporting that the immunity from SARS-CoV-2, the COVID-19 virus, is also lifelong.  As explained by an infectious-disease physician and professor at the UC: "Natural immunity after COVID-19 infection is likely lifelong, extrapolating from data on other coronaviruses that cause severe illness, SARS and MERS."[7]

28.     Consistent with these scientific studies, in the 19 months since the COVID-19 virus first appeared in the United States, doctors and scientists have not identified any naturally immune individual that was re-infected with and transmitted this virus to anyone.  This is despite the entire world's scientific community turning its attention to studying this virus.

**B.     Natural Immunity is Superior to Vaccine Immunity**

*i.     Natural Immunity – Great Than 99% Effective*

29.     The hunt for re-infections has been a nationwide effort and out of the estimated 120.2 million individuals in the United States who have been infected with SARS-CoV-2 as of May 2021,[8] there is not a single documented case of an individual being re-infected with the virus and transmitting it to another person.

---

[7]  https://www.wsj.com/articles/herd-immunity-is-near-despite-faucis-denial-11616624554.

[8]  *See* https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/burden.html.

30.     A five-month study looking at reinfection rates in employees of the Cleveland Clinic Health System previously infected with the COVID-19 virus found that not one of the 1,359 previously infected subjects who remained unvaccinated was reinfected with the virus despite a high background rate of COVID-19 in the hospital. Irish researchers recently published a review of eleven cohort studies with over 600,000 total recovered COVID-19 patients, not all of whom were well defined and may have had suspected COVID-19 with positive serologies later on who were followed up with over ten months.  They found the reinfection rate to be 0.27% "with no study reporting an increase in the risk of reinfection over time."  Based on this data, the researchers were able to assert that "naturally acquired SARS-CoV-2 immunity does not wane for at least 10 months post-infection."  Moreover, this study also did not document a single case of reinfection that then resulted in transmission to another person.

31.     Given that the current number of confirmed cases worldwide is approximately 200 million,[9] if reinfection was possible in even one percent of individuals, the world would have observed 2 million second and third cases with many requiring hospitalization and coming to clinical attention.  No such large volume of reinfection cases has come to clinical attention in any region of the world.

### ii.     Vaccine Immunity – Far Less than 99% Effective

32.     In contrast to greater than 99% efficacy from natural immunity, the efficacy from vaccine immunity in a clinical trial setting is admittedly no greater than between 67% and 95%, depending on the COVID-19 vaccine.  The Pfizer vaccine had initially, at best, efficacy of 95%,[10] the Moderna has efficacy of 94.5%,[11] and the J&J vaccine has efficacy of approximately 67%,[12] and that was under previous ideal conditions in a clinical trial, against the original wild-type variant of the virus.  The COVID-19 vaccines

---

[9] See https://covid19.who.int/.
[10] See https://www.fda.gov/media/144416/download.
[11] See https://www.fda.gov/media/144673/download.
[12] See https://www.fda.gov/media/146338/download.

have had considerably less efficacy in the real world which has been the case based on the data to date.  But even assuming the optimal clinical trial efficacy numbers, this is still far less than the efficacy from having had the COVID-19 virus, which is over 99%.

33.    Vaccines, by design, attempt to emulate the immunity created by a natural infection.  Nonetheless, they have never achieved the same level of protection afforded by natural infection from a virus.  Every single vaccine for a virus confers an inferior immunity to having had the actual virus.  Even the best vaccines do not confer immunity to all recipients.[13]  In those who do obtain some immunity from vaccination, the temporary immunity created by any vaccine typically wanes over time.  Hence, the warning in the Mandate that COVID-19 boosters will be needed.[14]  This has been confirmed by the pharmaceutical companies selling the COVID-19 vaccines and the CDC has echoed the likely need for boosters of the COVID-19 vaccines, as discussed at its advisory committee meeting on June 23, 2021.[15]

34.    Dr. Ryan Cole, who spent the last 16 months examining and culturing the COVID-19 virus specimens, recently explained why infection-induced immunity to this virus is much deeper and broader than vaccine immunity:

A natural infection induces hundreds upon hundreds of

---

[13]  Pfizer Recipient Fact Sheet can be viewed at https://www.fda.gov/media/144414/download ("The Pfizer-BioNTech COVID-19 Vaccine may not protect everyone"); Moderna Recipient Fact Sheet can be viewed at https://www.fda.gov/media/144638/download ("The Moderna COVID-19 Vaccine may not protect everyone"); and the J&J Recipient Fact Sheet can be viewed at https://www.fda.gov/media/146305/download ("The Janssen COVID-19 Vaccine may not protect everyone").

[14]  https://policy.ucop.edu/doc/5000695/SARS-Cov-2 at FAQ No. 4 which states, "Infectious disease experts anticipate that annual or more frequent boosters will be necessary and receipt of boosters will be required, consistent with product labeling, in the same way that the initial vaccination is required by this policy and subject to the same Exceptions and Deferrals."

[15]  See https://www.cdc.gov/vaccines/acip/meetings/downloads/slides-2021-06/06-COVID-Oliver-508.pdf; see also, e.g., https://www.nytimes.com/2021/04/16/world/pfizer-vaccine-booster.html.

12

> antibodies against all proteins of the virus, including the envelope, the membrane, the nucleocapsid, and the spike…Dozens upon dozens of these antibodies neutralize the virus when encountered again. Additionally, because of the immune system exposure to these numerous proteins (epitomes), our T cells mount a robust memory, as well. Our T cells are the 'marines' of the immune system and the first line of defense against pathogens. T cell memory to those infected with SARSCOV1 is at 17 years and running still….
>
> In vaccine-induced immunity…we mount an antibody response to only the spike and its constituent proteins … [and] this produces much fewer neutralizing antibodies, and as the virus preferentially mutates at the spike, these proteins are shaped differently and antibodies can no longer 'lock and key' bind to these new shapes. [16]

35.     Reflecting the foregoing, in an outbreak of COVID-19 among gold mine workers in French Guiana, 60% of the fully vaccinated gold mine workers were infected while none of the individuals with a prior COVID-19 infection were infected.  Studies analyzing the entire population of Israel has found that those with prior natural infection had a higher rate of protection from infection, hospitalization, and severe illness than those that had immunity from the COVID-19 vaccine.   Another report from Israel found a sixfold rate of COVID-19 infection among the vaccinated versus the naturally immune:

> With a total of 835,792 Israelis known to have recovered from the virus, the 72 instances of reinfection amount to 0.0086% of people who were already infected with COVID.  By contrast,

---

[16] https://www.theblaze.com/op-ed/horowitz-israeli-government-data-shows-natural-immunity-from-infection-much-stronger-than-vaccine-induced-immunity#toggle-gdpr.

1    Israelis who were vaccinated were 6.72 times more likely to get

2    infected after the shot than after natural infection.

3    36.    Internal official emails with the UC healthcare system reflect the reality that

4    natural infection provides for greater protection:

5    a.    In an email sent to the UCI School of Medicine on July 17, 2021, the

6    Associate Dean of Graduate Medical Education informed faculty and

7    residents, "[t]here has been a substantial increase in the number

8    of breakthrough infections [*i.e.*, infections in fully vaccinated individuals]

9    among our UCI health care workers, including residents and fellows."

10    b.    In an email sent to Medical Directors at UCI Health on July 22, 2021, the

11    CEO of UCI Health advised that "[t]he COVID-19 delta variant is now

12    responsible for the majority (75%) of UC cases, including several

13    breakthrough vaccine cases."

14    c.    In an email sent to directors at UCI on July 27, 2021 it explained that "due

15    to continued and increasing concerns about the spread of COVID-19,

16    even among vaccinated individuals, we will not be returning to the

17    classrooms as had been expected for the past several months."

18    37.    In contrast, there has been no such notice of increasing cases among those

19    who have recovered from COVID-19.  This indicates that there is a sufficiently alarming

20    number of vaccinated individuals that are acquiring symptomatic COVID-19 that it

21    necessitated notice to the entire UCI School of Medicine about this issue and protocol

22    changes, while no such notice has been necessary for naturally immune individuals.

23    38.    What is happening at UCI is similarly being seen nationwide as the number

24    of cases of COVID-19 in fully vaccinated individuals is rising precipitously.  That

25    number was growing so rapidly and burdening resources to such an extent that the CDC

26    changed its reporting criteria to only report breakthrough cases resulting in

27    hospitalization or death.

28

14

39.     But simply taking the FDA and CDC data at face value, the reality is that natural infection provides for greater than 99% protection while vaccine immunity provides for, at best, between 67% and 95% protection.

### iii.   COVID-19 Vaccines Do Not Prevent Infection and Transmission

40.     Natural immunity confers an additional benefit over vaccine immunity. Natural immunity will prevent a virus from being able to replicate and shed in the naturally immune individual.   In contrast, COVID-19 vaccines appear to reduce symptoms in some but still permit the vaccinees to become infected with and transmit the virus.[17]

41.     In animal studies, the COVID-19 vaccine candidates could *not* fully block viral infection and replication in the nose of monkeys upon viral challenge.  In contrast, natural COVID-19 infection of monkeys completely prevented further re-infection at any site tested – by nasal, throat, and anal swabs.

42.     Viral carriage by the vaccinated is reflected in the recent outbreak in Barnstable County, Massachusetts, which has a 69% vaccination coverage rate among its eligible residents.[18]  A recent CDC investigation found that 74% of those infected in the outbreak were fully vaccinated for COVID-19 and, even more alarming, the vaccinated had on average more virus in their nose than the unvaccinated that were infected.   The study reported zero cases of infection among those that previously had COVID-19.

43.     This forced the Director of the CDC, Rochelle Walensky, to admit that individuals vaccinated for COVID-19, while having less symptoms, can still become

---

[17] *See* https://www.cdc.gov/vaccines/covid-19/health-departments/breakthrough-cases.html ("There is some evidence that vaccination may make illness less severe for those who are vaccinated and still get sick.").

[18] *See* https://www.cdc.gov/mmwr/volumes/70/wr/mm7031e2.htm.

infected with and transmit the virus. [19]  Dr. Walensky admitted that "**what [the COVID-19 vaccines] can't do anymore is prevent transmission**."[20]  After this admission, Wolf Blitzer asks Dr. Walensky if "you get covid, you're fully vaccinated, but you are totally asymptomatic, you can still pass on the virus to someone else, is that right?" and Dr. Walensky answers "**that is exactly right**." [21]

44.    Defendants will nonetheless only allow individuals that have been vaccinated back on campus, despite the unequivocal data that proves that the COVID-19 vaccines cannot and do not prevent infection and transmission.  On the other hand, Defendants will *not* allow back on campus naturally immune individuals who, based on all available data to date, have a near zero risk of becoming reinfected with and transmitting SARS-CoV-2.  As explained by Dr. Marty Makary, a professor at Johns Hopkins School of Medicine, the failure to lift restrictions on naturally immune individuals is "one of the biggest failures of our current medical leadership."[22]

## IV.    COVID-19 VACCINES ARE NOT RISK-FREE AND THE RISK IS GREATER FOR THE PREVIOUSLY INFECTED

45.    Studies have also demonstrated legitimate safety concerns regarding the current COVID-19 vaccines, and heightened safety concerns when vaccinating naturally immune individuals.

### A. Vaccinating Naturally Immune Individuals Presents an Increased Risk

46.    Studies have found that naturally immune individuals have significantly higher rates of adverse reactions when receiving the COVID-19 vaccine.  For example, Raw, *et al.* reported that among 974 individuals vaccinated for COVID-19, the vaccinated

---

[19] https://twitter.com/CNNSitRoom/status/1423422301882748929.

[20] https://twitter.com/CNNSitRoom/status/1423422301882748929.

[21] https://twitter.com/CNNSitRoom/status/1423422301882748929.

[22] https://summit.news/2021/05/26/johns-hopkins-prof-half-of-americans-have-natural-immunity-dismissing-it-is-biggest-failure-of-medical-leadership/.

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

COVID-19 recovered patients had higher rates of vaccine reactions.  Mathioudakis, *et al.* found the same result in a study of 2,002 individuals vaccinated for COVID-19. Krammer et al. found the same result in a study of 231 volunteers vaccinated for COVID-19, concluding that, "Vaccine recipients with preexisting immunity experience systemic side effects with a significantly higher frequency than antibody naïve vaccines." In a paper published by Bruno, *et al.* the authors pose urgent questions on COVID-19 vaccine safety, highlighting the high number of reported serious adverse events and the shortcomings of the clinical trials, including the exclusion of those with prior SARS-CoV-2 infection.

**B.  The COVID-19 Vaccines Present Certain Risks for Everyone**

47.     There are also risks to receiving COVID-19 vaccines irrespective of prior infection.  The primary system for tracking adverse events after vaccination in the United States is the Vaccine Adverse Events Reporting System ("**VAERS**").   A three-year federal government funded study by Harvard researchers tracking 715,000 patients found that "fewer than 1% of vaccine adverse events are reported."

48.     Reports of serious adverse events from COVID-19 vaccines are similarly underreported to VAERS.  For example, according to the CDC, "Anaphylaxis after COVID-19 vaccination is **rare** and occurred in approximately **2 to 5 people per million** vaccinated in the United States based on events reported to VAERS."  This is in stark contrast to a recent study at Mass General Brigham that assessed anaphylaxis in a clinical setting after the administration of COVID-19 vaccines and found "severe reactions consistent with anaphylaxis occurred at a rate of **2.47 per 10,000 vaccinations**."  This is equivalent to 50 to 120 times more cases than what VAERS and the CDC are reporting. And this is for a serious, potentially life-threatening, adverse event that occurs almost immediately after vaccination and which vaccine providers are repeatedly advised to watch for and report.

17

49.     If anaphylaxis is being underreported, the level of underreporting for serious adverse events that do not occur immediately after vaccination or are not easily identified is likely far greater.  For example, on June 23, 2021, the CDC reported the alarming numbers of reported myocarditis and pericarditis cases occurring after COVID-19 vaccination.[23]  The long-term effects of myocarditis are not fully understood but can be very serious.    Cases of thrombocytopenia have also occurred after COVID-19 vaccination, as well as serious and sometimes fatal blood clots.[24]  These and numerous other serious adverse events are being recognized but the true rate of these serious adverse events is most certainly underreported.[25]

50.     Even if the risks from the COVID-19 vaccines are truly small, there is no reason to expose someone to *any* risk when they are already immune to COVID-19.

---

[23]  https://www.cdc.gov/vaccines/acip/meetings/downloads/slides-2021-06/03-COVID-Shimabukuro-508.pdf at page 27.

[24]  *See*  https://www.fda.gov/news-events/press-announcements/joint-cdc-and-fda-statement-johnson-johnson-covid-19-vaccine.

[25] Research shows that the coronavirus spike protein from COVID-19 vaccines enters the bloodstream and can be found throughout the body in almost all vital organs. https://academic.oup.com/cid/advance-article/doi/10.1093/cid/ciab465/6279075.    This would help explain the high rate of reported blood clots, heart disease, brain damage and reproductive issues.  Dr. Byram Bridle, a viral immunologist and associate professor at the University of Guelph, Ontario, recently stated: "We made a big mistake.  We didn't realize it until now…We thought the spike protein was a great target antigen, we never knew the spike protein itself was a toxin and was a pathogenic protein.  So by vaccinating people we are inadvertently inoculating them with a toxin."  https://omny.fm/shows/on-point-with-alex-pierson/new-peer-reviewed-study-on-covid-19-vaccines-sugge.  Recent data from Japan – data not required by the U.S. – reflects that lipid nano particles from the vaccine encapsuling the spike protein mRNA are being deposited into vital organs after vaccination.  Of concern are the data related to lipid nano particles depositing into the adrenal glands, bone marrow, liver, ovaries, brain, and spleen and increasing in quantity over time post-vaccination.  https://www.icandecide.org/wp-content/uploads/2021/06/Translation-of-Japanese-data.pdf at 16-17.

18

## V.    THE MANDATE IMPLEMENTED BY UC

51.    On July 15, 2021, the UC system released its final COVID-19 Vaccination Program Policy.[26]  Since that time, the UC system has systemically enforced the policy. The stated purpose of the policy "is to facilitate protection of the health and safety of the University community" by requiring the UC community to "be fully vaccinated against COVID-19 before physically accessing the University's Locations and Programs."

52.    The Mandate is clear that it is a permanent policy and that annual or more frequent boosters will be required: "compliance will require repeat vaccinations or boosters on an annual or recurring basis consistent with FDA-approved labeling and CDC recommendations."[27]    The Frequently Asked Questions section of the Mandate specifically addresses naturally immune individuals, stating:

> *I was recently diagnosed with COVID-19, and/or I had an antibody test that shows that I have natural immunity.  Does this support a Medical Exemption?*  You may be eligible for a temporary Medical Exemption (and, therefore, a temporary Exception), for up to 90 days after your diagnosis and certain treatments.    According to the US Food and Drug Administration, however, "a positive result from an antibody test does not mean you have a specific amount of immunity or protection from SARS-CoV-2 infection … Currently authorized SARS-CoV-2 antibody tests are not validated to evaluate specific immunity or protection from SARS-CoV-2 infection." For this reason, individuals who have been

---

[26] *See* https://policy.ucop.edu/doc/5000695/SARS-Cov-2.

[27] https://policy.ucop.edu/doc/5000695/SARS-Cov-2 at pages 4 and 10 of 14.

19

diagnosed with COVID-19 or had an antibody test are not permanently exempt from vaccination.[28]

("**temporary naturally immune exemption**").

53.    As discussed above, the immunity achieved following natural infection does not expire after 90 days and is, very likely, lifelong.  UC has not shared any data to show that immunity on day 89 following diagnosis differs from immunity on day 91 following diagnosis.  Plaintiff recovered from COVID-19 over one year ago and would not be entitled to this temporary naturally immune exemption even though his immunity is superior to an individual who was vaccinated 1 day or 91 days ago.  A temporary exemption for a 90-day period from the date of diagnosis is arbitrary and is not grounded in science.

54.    Plaintiff, along with his students and fellow faculty that have had the virus, will suffer great detriment if prevented from returning to campus.  Plaintiff is frustrated and negatively impacted by the prospect of being forced to choose between an invasion of his bodily integrity or continuing his employment at UCI.  Plaintiff merely wants the same right privileges afforded to others who are deemed immune through vaccination. Instead, he is being required, under threat of exclusion from UC, to violate his bodily integrity with an injection of a product that presents risks but no benefit to him or to others at UC.

55.    It is unscientific and lacks a rational basis, let alone a compelling reason, to allow vaccinated individuals to attend or work at UC in person when their immunity is less effective at preventing infection and spread of COVID-19 than those that have had COVID-19 while not allowing the naturally immune.

---

[28] *Id*. at page 11 of 14, ¶ 9.

## VI.   DEFENDANTS' RESTRICTIONS VIOLATE PLAINTIFF'S CONSTITUTIONAL RIGHTS

### A. Plaintiff's Right to Equal Protection of the Laws Has Been Violated

56.     Plaintiff is naturally immune to SARS-CoV-2.  Therefore, Plaintiff is at least as equally situated as those who are fully vaccinated with a COVID-19 vaccine, yet Defendants deny Plaintiff equal treatment and seek to burden Plaintiff with an unnecessary violation of bodily integrity to which Plaintiff does not consent in order to be allowed to continue to work at UCI.  Naturally Immune Individuals are Similarly Situated to Vaccinated Individuals

57.     The Mandate's express purpose is to protect members of the UCI community from COVID-19.[29]  Defendants seek to achieve this by ensuring that only people who theoretically have immunity to the virus return to campus.[30]  Both individuals with natural immunity, like Plaintiff, and individuals who are vaccinated are alike in that they have immunity to the virus that causes COVID-19.  As the foregoing shows naturally immune individuals have at least as good, and in fact superior, immunity when compared to vaccinated individuals.

58.     Nevertheless, the Mandate fails to treat these two groups of immune individuals similarly.  Individuals who have vaccine created immunity will be permitted to return to campus.[31]  However, with the exception of the temporary naturally immune exception, individuals who have natural immunity will not be allowed to return to campus.[32]

---

[29] *See* https://policy.ucop.edu/doc/5000695/SARS-Cov-2 ("The purpose of this policy is to facilitate protection of the health and safety of the University community.").

[30] *Id.* ("[T]his policy provides for a COVID-19 Vaccination Program under which any Covered Individual is required … to be fully vaccinated against COVID-19 before physically accessing the University's Locations and Programs.").

[31] *See* https://policy.ucop.edu/doc/5000695/SARS-Cov-2.

[32] *Id.* at 11.

21

## VII.   PLAINTIFF IS SUFFERING AND WILL SUFFER IRREPARABLE HARM

59.   Plaintiff will continue to suffer irreparable harm if the preliminary injunction requested is not granted.   It has long been established that the loss of constitutional freedoms constitute irreparable harm.   *Am. Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046, 1059 (9th Cir. 2012); *Monterey Mech. Co. v. Wilson*, 125 F.3d 702, 715 (9th Cir. 1997).

60.   Moreover, without a preliminary injunction preserving the status quo, Plaintiff will suffer an impending loss of employment and of his professional reputation. Indeed, "the loss of one's job does not carry merely monetary consequences; it carries emotional damages and stress, which cannot be compensated by mere back payment of wages." *Nelson v. Nat'l Aeronautics and Space Admin.*, 530 F.3d 865, 877-78 (9th Cir. 2008), *rev'd on other grounds, Nat'l Aeronautics and Space Admin. v. Nelson*, 131 S. Ct. 746 (2011).

61.   If Plaintiff is not permitted on campus as a result of this mandate, his practice and roles at UC will be drastically and adversely affected, including in the following ways:

a.   He will not be able to attend in-person meetings with his team or with patients and families in the hospital and so his role as ethics committee chair and director of the ethics consult service will be impacted;

b.   He will not be able to hold Monday and Tuesday afternoon Resident Clinic;

c.   He will not be able to see his own patients from his practice as his faculty practice is located at the Department of Psychiatry clinic;

d.   He will not be able to do his Resident in-person teaching;

e.   He will not be able to do on-site ethics consultations in the hospital; and

f.   He will not be able to teach the Ethics and Behavioral Science course for first-year students.

22

62.    Treating naturally immune individuals differently from the fully vaccinated, when both have immunity, by demanding Plaintiff violate his right bodily integrity presents only a risk of harm and is unconstitutional.

## COUNT I

### For Declaratory and Injunctive Relief

### (Fourteenth Amendment of the U.S. Constitution, Equal Protection)

63.    Plaintiff re-alleges and incorporates by reference all of the allegations contained in all of the preceding paragraphs.

64.    The Fourteenth Amendment, Section 1, to the United States Constitution provides:

> No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

65.    Pursuant to the mandate, all, "personnel, students or trainees who physically access a University Facility or Program in connection with their employment, appointment or education/training" are required receive a covid-19 vaccination to be able to continue to physically access a University Facility or Program. The natural immune are not exempted from the mandate aside from the temporary natural immune exception.

66.    The naturally immune have at least the same level of immunity to SARS-CoV-2 as do the fully vaccinated. Plaintiff has had a confirmed case of SARS-CoV-2 within. Plaintiff's immunity to SARS-CoV-2 is at least as robust and durable as that of a person fully vaccinated with a Covid-19 vaccine.

67.    Defendants' mandate violates the Fourteenth Amendment to the U.S. Constitution, which includes clearly established fundamental rights and liberty interests

23

of personal autonomy and bodily integrity, see, e.g., *Griswold v. Connecticut*, 381 U.S. 479 (1965); *Roe v. Wade*, 410 U.S. 113 (1973); *Planned Parenthood v. Casey*, 505 U.S. 833 (1992); *Rochin v. California*, 342 U.S. 165 (1952); *Obergefell v. Hodges*, 576 U.S. 644 (2015); and the right to reject medical treatment, *Cruzan v. Director, Missouri Dep't Health*, 497 U.S. 261 (1990) and *Riggins v. Nevada*, 504 U.S. 127 (1992).

68.     In modern jurisprudence, burdens upon fundamental rights require strict scrutiny. *Washington v. Glucksberg*, 521 U.S. 702 (1997) ("narrowly tailored to serve a compelling state interest").

69.     As mandated vaccinations are a substantial burden, Defendants must prove narrow tailoring to a compelling interest that justifies mandatory vaccinations, not any more general interest.  But while government may have a general interest in mitigating COVID, the following problems reveal no narrow tailoring to any compelling interest exists.

70.     Critically, naturally acquired immunity from COVID is as robust as vaccine-acquired immunity, so there is no compelling interest (nor any rational basis) in vaccinating or requiring the vaccination of those who have already had COVID.

71.     Further, given natural and vaccine immunity, California has COVID herd immunity.  The California Department of Public Health estimates that as of June 2021, 85.9% of adults age 18 and older in California have antibodies to SARS-CoV-2.33 So Defendants have no compelling interest in mandating COVID vaccination.

72.     The same evidence establishes that, assuming a compelling interest in preventing the spread of COVID-19, Defendants' Mandate is not narrowly tailored to such an interest since his immunity and that of the naturally immune is more protective than vaccine immunity.

---

[33] https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/COVID-19/Sero-prevalence-COVID-19-Data.aspx.

73.     Furthermore, even absent the fundamental rights at issue, the Mandate also violates the Fourteenth Amendment under modern rational basis scrutiny, since the Mandate is unreasonable and has no real or substantial relationship towards protecting the public health, particularly as applied to those with robust natural immunity. Defendants may not irrationally single out one class of individuals for discriminatory treatment.  The Mandate irrationally singles out the convalescent and discriminates against them.

74.     The Equal Protection Clause requires that persons who are similarly situated receive like treatment under the law.

75.     The fully vaccinated and the convalescent are similarly situated and the Mandate affects them in an unequal manner, permitting admission to the fully vaccinated and denying admission to the convalescent.

76.     The Mandate treats Plaintiff differently, and negatively, from other similarly situated persons based on the manner in which Plaintiff acquired immunity to SARS-CoV-2.

## <u>COUNT II</u>

### For Declaratory and Injunctive Relief

### (Fourteenth Amendment of the U.S. Constitution, Substantive Due Process)

77.     "The Fourteenth Amendment's due process clause 'provides heightened protection against government interference with certain fundamental rights and liberty interests.'" *Sanchez v. City of Fresno*, 914 F. Supp. 2d 1079, 1100-01 (E.D. Cal. 2012) (quoting *Glucksberg*, 521 U.S. 702, 720 (1997)).  Plaintiff's constitutional right to bodily integrity is impinged by the Mandate.

78.     It is well established that individuals have a fundamental liberty interest in and right to bodily integrity and informed consent.  See *Benson v. Terhune*, 304 F.3d 874, 884 (9th Cir. 2002) ("The due process clause of the Fourteenth Amendment substantively

protects a person's rights to be free from unjustified intrusions to the body"). "This notion of bodily integrity has been embodied in the requirement that informed consent is generally required for medical treatment." *Cruzan*, 497 U.S. 261, 277–78 (1990). See also Benson, 304 F.3d at 884 (a person has a right "to refuse unwanted medical treatment and to receive sufficient information to exercise these rights intelligently"). This means that the right to bodily integrity includes the concept that a "competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment." Galvan v Duffie, 807 Fed. Appx. 696, 697 (9th Cir 2020) (quoting Cruzan, 497 U.S. at 277–78).

79.     The United States Constitution guarantees that state governments shall not "deprive any person of life, liberty, or property without due process of law," U.S. CONST. amend. XIV § 1, and "forbids the government to infringe certain 'fundamental' liberty interests at all, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest." *Reno v. Flores*, 507 U.S. 292, 301-302 (1993). Defendants lack a compelling interest to impinge on Plaintiff's fundamental rights.

80.     Plaintiff has constitutional and fundamental liberty interests in bodily integrity and informed consent, and the substantive due process rights to liberty and to life.

81.     Plaintiff also has a constitutional and fundamental liberty interest in not being compelled to provide private medication information to the state, which is also being infringed by the mandates at issue.

82.     Defendants cannot show that the Mandate serves a compelling state interest. While prior court decisions have found that a compelling state interest to control the spread of infection from person-to-person can trump certain constitutional rights in certain situations, see generally *Whitlow v. Cal. Dep't of Educ.*, 203 F. Supp. 3d 1079, 1089 (S.D. Cal. 2016), this interest is non-existent with respect to the COVID-19 vaccine

26

since this vaccine does not prevent vaccinated individuals from becoming infected and transmitting COVID-19.

83.   Professor Sir Andrew Pollard, director of the Oxford Vaccine Group, has explained: "Herd immunity is not a possibility because [the Delta variant] still infects vaccinated individuals."34   The vaccinated, when infected, can transmit the virus to others, and are more likely to do so because they have less symptoms and hence are more likely to interact with others not knowing they are contagious.  On the other hand, those who have had the COVID-19 virus and recovered have not been shown to become re-infected and transmit the virus to others.  Therefore, there is no compelling interest in requiring the COVID-19 vaccine.

84.   Hence, excluding individuals from the UC locations as a means to compel such individuals to receive an injection of a COVID-19 vaccine does not pass strict scrutiny.

85.   There is not even a rational basis to exclude the unvaccinated, recovered individuals from UC since those vaccinated are at least as likely to spread COVID-19 and, in reality, are more likely.

86.   Plaintiff hereby seeks declaratory and injunctive relief to prevent Defendants from depriving Plaintiff of the protections afforded to him under the Fourteenth Amendment of the U.S. Constitution. (U.S. Const., amend. XIV, § 1.) These Counts I and II are also brought pursuant to 42 U.S.C. §1983 and §1988(b), as well as for declaratory relief under 28 U.S.C. 2201.

---

34   https://twitter.com/Channel4News/status/1425086490002997248.   Professor Pollard also stated that, "And what I suspect the virus will throw up next is a variant which is perhaps even better at transmitting in vaccinated populations.  And so that's even **more of a reason not to be making a vaccine program around herd immunity**…We have now over four billion doses deployed of the vaccine globally and that is now enough doses to have prevented almost all of those [65,000 deaths expected this week globally from COVID-19] deaths and yet they are continuing." (emphasis added).

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

87.     Defendants' enforcement of the Mandate as announced will cause Plaintiff to suffer irreparable harm for which he has no adequate remedy at law.  The Mandate denies Plaintiff his rights under the Fourteenth Amendment and Plaintiff seeks a permanent injunction preventing Defendants from implementing and enforcing the Mandate against the naturally immune.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests the following relief:

1.     Declare the Mandate unconstitutional as applied to the naturally immune;

2.     Enjoin Defendants from enforcing the Mandate as against the naturally immune;

3.     Grant Plaintiff his costs and attorneys' fees under 42 U.S.C. § 1988, and any other applicable authority; and

4.     For such and other and further relief as this Court deems just and proper.

Dated: August 18, 2021

SIRI & GLIMSTAD LLP

By:  /s/ Caroline Tucker
        Aaron Siri (Pro Hac Vice to be filed)
        Elizabeth Brehm (Pro Hac Vice to be filed)
        Caroline Tucker

CHRIS WIEST ATTORNEY AT LAW, PLLC
        Chris Wiest (Pro Hac Vice to be Filed)

        Attorneys for Plaintiff
        AARON KHERIATY, M.D.

**VERIFICATION**

I, AARON KHERIATY M.D., declare and state as follows:

I am a citizen of the United States and of California.  I have read the foregoing Complaint and know the contents thereof as to myself, that the same is true to my own knowledge, and as to all other matters on information and belief and I believe them to be true.

I verify under penalty of perjury that the foregoing is true and correct.

Executed on this _13_ day of August 2021 in San Juan Capistrano, California.


AARON KHERIATY M.D.