SIRI & GLIMSTAD LLP
Aaron Siri (Pro Hac Vice To Be Filed)
Email: aaron@sirillp.com
Elizabeth A. Brehm (Pro Hac Vice To Be Filed)
Email: ebrehm@sirillp.com
200 Park Avenue
Seventeenth Floor
New York, NY 10166
Telephone: 212-532-1091
Facsimile: 646-417-5967

Caroline Tucker (SBN 261377)
Email: ctucker@sirillp.com
700 S. Flower Street, Suite 1000
Los Angeles, CA 90017
Telephone 213-376-3739
Facsimile 646-417-5967

CHRIS WIEST ATTORNEY AT LAW, PLLC
Chris Wiest (Pro Hac Vice To Be Filed)
Email:  chris@cwiestlaw.com
25 Town Center Blvd, STE 104
Crestview Hills, KY 41017
Telephone: 513-257-1895
Facsimile: 859-495-0803

Attorneys for Plaintiff
AARON KHERIATY, M.D.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION

| | |
|---|---|
| AARON KHERIATY, M.D., <br><br> Plaintiff, <br><br> v. | Case No.  8:21-cv-01367 JVS (KESx) <br><br> **PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF** |

THE REGENTS OF THE UNIVERSITY
OF CALIFORNIA, a corporation, et al.,

                    Defendants.

**MOTION FOR
PRELIMINARY
INJUNCTION**

Date: September 27, 2021
Time:  1:30 pm
Place: Courtroom 10C
Judge: Hon. James V. Selna

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ii

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ....................................................................................... 1

FACTS ........................................................................................................................... 4

I.    THE PLAINTIFF HAD COVID-19 ................................................................... 4

II.   COVID-19 IN CALIFORNIA AND FAILED RESTRICTIVE MEASURES ............... 5

III.  PLAINTIFF HAS A LOWER RISK OF BECOMING RE-INFECTED
      AND TRANSMITTING THE VIRUS THAN VACCINATED
      INDIVIDUALS ................................................................................................ 6

A.    Infection with COVID-19 Virus Provides Robust Long-Term Immunity .......... 6

B.    Natural Immunity is Superior to Vaccine Immunity ....................................... 7

      i.    Natural Immunity – Great Than 99% Effective ................................. 7

      ii.   Vaccine Immunity – Far Less than 99% Effective ............................ 8

      iii.  COVID-19 Vaccines Do Not Prevent Infection and Transmission ........... 11

IV.   COVID-19 VACCINES ARE NOT RISK-FREE AND THE RISK IS
      GREATER FOR THE PREVIOUSLY INFECTED ................................................ 12

A.    Vaccinating Naturally Immune Individuals Presents an Increased Risk ........... 12

B.    The Covid-19 Vaccines Present Certain Risks for Everyone ......................... 12

V.    THE MANDATE IMPLEMENTED BY UC ...................................................... 13

ARGUMENT ................................................................................................................ 15

I.    PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS OF HIS
      CLAIM BECAUSE DEFENDANTS' RESTRICTIONS VIOLATE HIS
      CONSTITUTIONAL RIGHTS ......................................................................... 15

A.    Plaintiff's Right to Equal Protection of the Laws Has Been Violated ............. 15

      i.    Naturally Immune Individuals are Similarly Situated to
            Vaccinated Individuals ...................................................................... 16

      ii.   The Court Should Apply Strict Scrutiny Because the Mandate
            Implicates Plaintiff's Fundamental Liberty Interest in Bodily
            Integrity ........................................................................................... 17

PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

iii.     The Mandate Cannot Satisfy Strict Scrutiny Analysis Because It
Does Not Satisfy a Compelling Government Interest When
Applied to Naturally Immune Individuals .............................................. 18

iv.     The Mandate Cannot Satisfy Strict Scrutiny Analysis Because It
is Not Narrowly Tailored ...................................................................... 18

v.      The Mandate, Which Conditions Employment on the Invasion of
Bodily Integrity, Triggers the Unconstitutional Conditions
Doctrine ................................................................................................ 19

vi.     The Mandate Does Not Pass Rational Basis ........................................... 19

B.   Plaintiff's Fundamental Liberty Right to Bodily Integrity Has Been Violated ................... 20

C.   Plaintiff's Fundamental Liberty Right to Informational Privacy Has Been
Violated ............................................................................................................ 22

II.     PLAINTIFF IS SUFFERING AND WILL SUFFER IRREPARABLE
HARM, THE BALANCE OF THE EQUITIES TIP IN HIS FAVOR, AND
THE PUBLIC INTEREST WEIGHS IN FAVOR OF A PRELIMINARY
INJUNCTION ........................................................................................... 23

CONCLUSION ............................................................................................... 24

iv

# TABLE OF AUTHORITIES

**Cases**

*Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 570 U.S. 205 (2013)............................................................................................ 19

*Am. Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046 (9th Cir. 2012) ............................................................................................ 23

*Benson v. Terhune*, 304 F.3d 874 (9th Cir. 2002) ...................................... 21

*County of Santa Cruz v. Ashcroft*, 279 F. Supp. 2d 1192 (N.D. Cal. Aug. 28, 2003)............................................................................................ 17

*Cruzan v. Dir., Mo. Dept. of Health*, 497 U.S. 261 (1990) ................ 17, 21

*Doe v. Att'y Gen.*, 941 F.2d 780 (9th Cir. 1991) ........................................ 23

*Galvan v Duffie*, 807 Fed. App'x 696 (9th Cir 2020) ......................... 17, 21

*Golinsky v. United States Office of Pers. Mgmt.*, 824 F. Supp. 2d (N.D.Cal. Feb. 22, 2012) ...................................................................... 16

*In re Crawford*, 194 F.3d 954 (9th Cir. 1999)..................................... 22, 23

*Keyishian v. Board of Regents of Univ. of State of N. Y.*, 385 U.S. 589 (1967)............................................................................................... 19

*L.A. Mem'l Coliseum Comm'n v. NFL*, 634 F.2d 1197 9th Cir. 1980) .................... 15

*Lazy Y Ranch LTD v. Behrens*, 546 F.3d 580 (9th Cir. 2008)................... 16

*Lockary v Kayfetz*, 917 F.2d 1150 (9th Cir 1990) ..................................... 19

*Monterey Mech. Co. v. Wilson*, 125 F.3d 702 (9th Cir. 1997) ................... 23

*Nelson v. Nat'l Aero. & Space Admin.*, 530 F.3d 865 (9th Cir. 2008), *rev'd on other grounds*, 131 S. Ct. 746 (2011) .................................. 22

*Norman-Bloodsaw v. Lawrence Berkeley Lab.*, 135 F.3d 126 (9th Cir. 1998)............................................................................................... 22

*Perry v. Sindermann*, 408 U.S. 593 (1972) .............................................. 19

*Reno v. Flores*, 507 U.S. 292 (1993) ........................................................ 21

v

*Romer v. Evans*, 517 U.S. 620 (1996) ........................................................ 20

*Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115 (1989).................................... 18

*Sanchez v City of Fresno*, 914 F. Supp. 2d 1079 (E.D. Cal. 2012) .................... 16, 17

*Saulsberry v. Maricopa Cnty.*, 151 F. Supp. 2d 1109 (D. Ariz. 2001) .................... 17

*U.S. v. Playboy Entm't Grp.*, 529 U.S. 803 (2000) .................................... 18

*Wash v. Glucksberg,* 521 U.S. 702 (1997) ........................................ 17, 20

*Washington v. Harper*, 494 U.S. 210 (1990)............................................ 17

*Whitlow v. Cal. Dep't of Educ.*, 203 F. Supp. 3d 1079 (S.D. Cal. 2016)................. 21

## Constitutional Provisions

U.S. CONST. amend. XIV § 1 .............................................................. 21

vi

Plaintiff AARON KHERIATY, M.D., by and through his attorneys, respectfully submits this memorandum of law in support of his motion for preliminary injunction against Defendants, THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, and MICHAEL V. DRAKE, in his official capacity as President of the University of California (collectively, "**Defendants**").

## I.   PRELIMINARY STATEMENT

As confirmed by recent data and studies, the Director of the Centers for Disease Control and Prevention ("**CDC**") recently explained that individuals vaccinated for COVID-19, while having less symptoms, can still become infected with and transmit the virus, and that the amount of virus in those individuals' noses is the same as the unvaccinated who have COVID-19.   In contrast, those that have had COVID-19, upon reexposure to the virus, have neutralizing immunity, that not only prevents symptoms but also reinfection and transmission.

The Plainitff, Aaron Kheriaty, M.D., Professor of Psychiatry and Human Behavior at the University of California Irvine School of Medicine (the "**Plaintiff**"), who has had COVID-19 and hence is immune to this virus, brings this action because the University of California Irving ("**UCI**") will soon refuse to allow him back on campus, while permitting those with vaccine immunity back on campus and is thereby violating his liberty interests and treating him differently from other similarly situated individuals who are permitted back on campus. The Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution requires a state to treat an individual in the same manner as others in similar conditions and circumstances, and Plaintiff has at least as good immunity to COVID-19 as his vaccinated peers but yet will be excluded from campus.

Over the eons of human development, our bodies have created a remarkable immune system capable of protecting us against a wide variety of pathogenic viruses.

1

This system includes an enormously diverse repertoire of cells with a nearly unlimited capacity to recognize and 'adapt' to previously unseen viruses.  Rather than having to re-create the same immunological response every time a virus attacks the body, our immune systems have an innate form of memory which prevents reinfection with the same virus.  This memory system creates T cells and memory B-cells which in the future are capable of making antibodies to all antigens of a given virus thereby providing previously infected individuals with neutralizing immunity to a previously encountered virus ("**naturally immune individuals**").

While different vaccines for COVID-19 work in different ways, they are all designed to create immunity to a portion of the virus (specifically, the spike protein), without creating too many side effects, in the hope that this partial immunity to a portion of the virus will confer neutralizing immunity to the entire virus when encountered by the vaccinated individual.  Despite humanity's best efforts at mimicking the immune system's protection, the immunity generated after infection with a virus, including SARS-CoV-2 (the virus which causes the disease COVID-19, hereinafter the "**virus**" or the "**COVID-19 virus**"), creates a more robust and durable form of immunity to a virus than any vaccine can create.

The University of California ("**UC**") recently enacted a policy to "facilitate the protection of the health and safety of the University community" by ensuring that individuals who return to campus have immunity to the virus that causes COVID-19 (the "**Mandate**").  *See* Declaration of Plaintiff Aaron Kheriaty (hereinafter, "**A.K. Dec.**") ¶ 3.  However, to reach this goal, UC decided that only vaccinated individuals will be permitted on a UC campus, ignoring those who have natural immunity to the virus.  In enacting this policy, the University is treating naturally immune individuals differently from individuals whose immunity was created by one of the COVID-19 vaccines.

Plaintiff was infected with the virus in July 2020 and had COVID-19.  In fighting off the virus, his body created a robust immunity to every antigen on the COVID-19 virus,

2

not just the spike protein of the virus as happens with the COVID-19 vaccines. Nevertheless, UCI has told Plaintiff that he cannot return to campus unless he receives a COVID-19 vaccine. Thus, the school is treating him differently by refusing to re-admit him to campus when other individuals who are considered immune to the virus are being admitted back simply because their immunity was created by a vaccine. This policy is illogical and cannot withstand strict scrutiny or even a rational basis test because naturally immune individuals, like Plaintiff, have at least as good or better immunity to the virus that causes COVID-19 than do individuals who are vaccinated.

In the more than 19 months that the world has been transfixed by the COVID-19 pandemic, evidence shows that the reinfection rate after natural infection is less than 1%, and there are no documented cases of reinfection and transmission to others by naturally immune individuals. In contrast, COVID-19 vaccination in the optimal setting of a clinical trial has, at best, an estimated 67% to 95% efficacy (depending on the COVID-19 vaccine and the variant of the virus) and the vaccine manufacturers, public health agencies, and the Biden adminsitration have made clear that booster doses will be needed, due to wanning immunity created by the vaccines. Likewise, CDC studies are replete with reports of so-called "breakthrough cases" where fully vaccinated individuals are infected and, in those cases, the amount of virus in those individuals' noses is the same as the unvaccinated who have COVID-19. This has led to the CDC's revised guidelines recommending a return to masks for those who have been vaccinated and experts to conclude that "vaccination is now about personal protection" because "herd immunity is not relevant as we are seeing plenty of evidence of repeat and breakthrough infections."[1]

As described more fully herein, UCI's refusal to readmit Plaintiff to campus unless he receives a vaccine is an equal protection violation. The right of individuals to their bodily integrity, which includes a right to refuse medical treatment, has long been

---

[1] *See* https://www.cdc.gov/coronavirus/2019-ncov/vaccines/fully-vaccinated.html; *see also* https://www.washingtonpost.com/health/2021/07/29/cdc-mask-guidance/.

recognized as one of the fundamental liberty rights afforded under due process. By forcing Plaintiff to receive a vaccine he does not want or need, and that may cause him harm, in order to be treated equally as other individuals who are also immune, UCI's Mandate implicates Plaintiff's substantive due process rights, and the Court should analyze his equal protection claim under the strict scrutiny analysis, i.e., whether the Mandate is both satisfying a compelling government need and is implemented by the least restrictive means. Defendants cannot satisfy either of these prongs. Even though a government entity may have a compelling government interest in preventing the spread of COVID-19, that interest is not furthered by compelling Plaintiff to be vaccinated to satisfy this interest because he is already immune and, unlike the vaccinated, if exposed to the virus, has neutralizing immunity. By failing to acknowledge that "naturally" immune individuals are unlikely to spread the virus, and certainly far less likely than the vaccinated, the Mandate is not narrowly tailored.

Nor can the Mandate satisfy rational basis analysis. Because Plaintiff is already immune and less likely to infect other individuals than are people who have been vaccinated, requiring him to be vaccinated in order to return to campus is irrational. In addition, by targeting people who have had the virus but remain unvaccinated, the Mandate unfairly singles out one unpopular group for disparate treatment.

For these reasons, more fully explained below, Plaintiff seeks a preliminary injunction enjoining Defendants from enforcing the Mandate against him or any other "naturally" immune individual.

## FACTS

## I.   THE PLAINTIFF HAD COVID-19

Plaintiff is a professor of Psychiatry and Human Behavior at the UCI School of Medicine and the director of the Medical Ethics Program at UCI Health. *See* A.K. Dec. ¶ 7. Plaintiff's residency training was at UCI from 2003-2007. *Id.* ¶ 6. In 2007, Plaintiff was hired by UCI as a Health Sciences Assistant Clinical Professor. *Id.* Plaintiff was

4

promoted to Health Sciences Associate Clinical Professor in 2013 and to Health Sciences Clinical Professor in 2019 and holds this position currently.  *Id*. ¶ 6-7.

Plaintiff contracted the COVID-19 virus in July 2020, which was confirmed by PCR testing, and he experienced many of the common symptoms associated with COVID-19, including loss of taste and smell.  *Id*. ¶ 2.  Plaintiff fully recovered.  *Id*.

## II.   COVID-19 IN CALIFORNIA AND FAILED RESTRICTIVE MEASURES

The first confirmed case of the COVID-19 virus in California was on January 22, 2020.[2]  Governor Gavin Newsom ("**Newsom**") instituted aggressive stay at home orders in California on March 19, 2020, when there were approximately 900 cases within the state.[3]  Despite the aggressive stay at home orders, the virus continued to spread.

The CDC has explained that even with protective measures as instituted in California, "most of the U.S. population will be exposed to this virus [SARS-CoV-2]."[4] The CDC estimates that, through May 2021, approximately 49% of those aged 18 to 49 years have been infected with SARS-CoV-2 despite lockdowns.  *See* Declaration of Joseph Ladopo, MD, PhD; John Patrick Whelan MD, PhD; Lazlo Boros, MD; Carole Browner PhD, MPH; Aditi Bhargava, PhD; and Gabriel Vorobiof, Bachelor of Medicine and Bachelor of Surgery (hereinafter, "**UC Faculty Dec.**") ¶ 3.

UC is a public university intended to serve the residents of California and is open to students from around the world.  It currently has more than 280,0000 students and more than 227,000 faculty and staff.  *Id*. ¶ 2.  UC is telling those that are immune from prior infection that unless they get vaccinated that they need not bother leaving their homes since they will be excluded from campus.

If Defendants instituted the Mandate with the goal of having a student body and

---

[2]  *See*  https://www.latimes.com/world-nation/story/2020-08-21/surprising-tale-first-la-covid-19-case.

[3]  *See* https://www.politico.com/states/f/?id=00000170-f5a4-d209-af70-fdae4c930000; *see also* https://www.ksla.com/2020/03/20/california-becomes-first-state-order-lockdown/.

[4]  https://stacks.cdc.gov/view/cdc/86068/cdc_86068_DS1.pdf.

faculty that is immune to the COVID-19 virus, it would have exempted from the Mandate those who are already immune due to having had COVID-19.  Failure to do so means that Defendants' Mandate is not about immunity, it is only about vaccination status.

## III.   PLAINTIFF HAS A LOWER RISK OF BECOMING INFECTED AND TRANSMITTING THE VIRUS THAN VACCINATED INDIVIDUALS

Peer reviewed studies on COVID-19 demonstrate the durability of natural immunity following COVID-19 infection.  A.K. Dec. ¶¶ 12-14.  CDC and FDA data also shows that natural immunity has proved far more than 99% effective while vaccine immunity is at best between 67% and 95% effective, depending on the vaccine, and this is under the previous ideal conditions of a clinical trial.  UC Faculty Dec. ¶ 14.  Moreover, unlike those vaccinated for COVID-19 who can still become infected and have the same amount of virus in their nose as those unvaccinated and infected with COVID-19, there has never been a single documented case of a naturally immune individual becoming re-infected with and transmitting the virus to anyone.

### A.   Infection with COVID-19 Virus Provides Long-Term Immunity

The human body knows how to develop immunity to new viruses.  The adaptive immune system consists of an enormously diverse repertoire of B cells—precursors of antibody-secreting plasma cells—and T cells with a nearly unlimited capacity to recognize and 'adapt' to previously unseen pathogens.  UC Faculty Dec. ¶ 5.

As explained by Dr. Ryan Cole, a Mayo Clinic-trained pathologist, "Yes, our antibody levels drop over time, however, scientifically, the memory B cells that make antibodies have been proven to be present in our lymph nodes and bone marrow."  A.K. Dec. ¶ 13.  Dr. Cole further explains, "They are primed and ready to produce a broad array of antibodies upon…exposure.  It would be physiologically, energetically impossible to maintain high antibody levels to all the pathogens we are constantly exposed to, and we would look like the 'swollen Stay-Puft marshmallow man' of lymph nodes, constantly, if the immune system were required to do that."  *Id*.

6

In line with Dr. Cole's explanation, numerous immunologic studies of individuals that have had the COVID-19 virus demonstrate that they developed sustained, broad and durable immunity, and robust B cell and T cell memory to the virus which protect them from reinfection.  UC Faculty Dec. ¶¶ 5, 7-8.  In other words, "natural" immunity to the COVID-19 virus continues to be present and effective even after antibody levels, detectable by lab tests, wane over time.  *Id.*  Similarly, in a study of monkeys that were deliberately re-exposed to the COVID-19 virus after having COVID-19, *none* of them were re-infected.  *Id.* ¶ 18.

Reflecting these findings, the immunity produced by the closely-related virus, SARS-CoV-1, is lifelong. Declaration of Peter A McCullough, MD, MPH (hereinafter "**McCullough Dec.**") ¶ 14. As explained by an infectious-disease physician and professor at the UC: "Natural immunity after COVID-19 infection is likely lifelong, extrapolating from data on other coronaviruses that cause severe illness, SARS and MERS."[5]

**B.     Natural Immunity is Superior to Vaccine Immunity**

*i.     Natural Immunity – Great Than 99% Effective*

The hunt for re-infections has been a nationwide effort and out of the estimated 120.2 million individuals in the United States who have been infected with SARS-CoV-2 as of May 2021,[6] there is not a single documented case of an individual being re-infected with the virus and transmitting it to another person.  UC Faculty Dec. ¶ 11, 12, 14, 2; McCullough Dec. ¶ 17.

A five-month study looking at reinfection rates in employees of the Cleveland Clinic Health System previously infected with the COVID-19 virus found that not one of the 1,359 previously infected subjects who remained unvaccinated was reinfected with the virus despite a high background rate of COVID-19 in the hospital. UC Faculty Dec ¶ 11.  Irish researchers recently published a review of 11 cohort studies with over 600,000

---

[5] https://www.wsj.com/articles/herd-immunity-is-near-despite-faucis-denial-11616624554.
[6] *See* https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/burden.html.

total recovered COVID-19 patients (not all of whom were well defined and may have had suspected COVID-19) who were followed up with over 10 months. *Id.* They found the reinfection rate to be 0.27% "with no study reporting an increase in the risk of reinfection over time." *Id.* ¶ 13. Based on this data, the researchers were able to assert that "naturally acquired SARS-CoV-2 immunity does not wane for at least 10 months post-infection." *Id.* Moreover, this study also did not document a single case of reinfection that then resulted in transmission to another person.

Given that the current number of confirmed cases worldwide is approximately 200 million,[7] if reinfection was possible in even one percent of individuals, the world would have observed 2 million second and third cases with many requiring hospitalization and coming to clinical attention. *Id.* ¶ 12; McCullough Dec. ¶ 17. No such large volume of reinfection cases has come to clinical attention in any region of the world. *Id.*

### ii. *Vaccine Immunity – Far Less than 99% Effective*

In contrast to greater than 99% efficacy from natural immunity, the efficacy from vaccine immunity in a clinical trial setting is admittedly no greater than between 67% and 95%, depending on the COVID-19 vaccine. The Pfizer vaccine had initially, at best, efficacy of 95%,[8] the Moderna has efficacy of 94.5%,[9] and the J&J vaccine has efficacy of approximately 67%,[10] and that was under previous ideal conditions in a clinical trial, against the original wild-type variant of the virus. The COVID-19 vaccines have had considerably less efficacy in the real world. UC Faculty Dec. ¶ 14. But even assuming the optimal clinical trial efficacy numbers, this is still far less than the efficacy from having had the COVID-19 virus, which is over 99%. *Id.* ¶ 14.

Vaccines, by design, attempt to emulate the immunity created by a natural infection. Nonetheless, they have never achieved the same level of protection afforded

---

[7] *See* https://covid19.who.int/.
[8] *See* *https*://www.fda.gov/media/144416/download.
[9] *See* https://www.fda.gov/media/144673/download.
[10] *See* https://www.fda.gov/media/146338/download.

by natural infection from a virus.  Every single vaccine for a virus confers an inferior immunity to having had the actual virus.  Even the best vaccines do not confer immunity to all recipients.[11]   In those who do obtain some immunity from vaccination, the temporary immunity created by any vaccine typically wanes over time.  Hence, the warning in the Mandate that COVID-19 boosters will be needed.[12]   This has been confirmed by the pharmaceutical companies selling the COVID-19 vaccines and the CDC has echoed the likely need for boosters of the COVID-19 vaccines, as discussed at its advisory committee meeting on June 23, 2021.[13]

Reflecting the fact that infection-induced immunity to this virus is much deeper and broader than vaccine immunity (*see* UC Faculty Dec. at 16), in an outbreak of COVID-19 among gold mine workers in French Guiana, 60% of the fully vaccinated gold mine workers were infected while none of the individuals with a prior COVID-19 infection were infected.  *Id*. ¶ 11.  Studies analyzing the entire population of Israel has found that those with prior natural infection had a higher rate of protection from infection, hospitalization, and severe illness than those that had immunity from the COVID-19 vaccine.  *Id*.  Another report from Israel found a sixfold rate of COVID-19 infection among the vaccinated versus the naturally immune:

> With a total of 835,792 Israelis known to have recovered from the virus, the 72 instances of reinfection amount to 0.0086% of people who were already infected with COVID.  By contrast,

---

[11] Pfizer Recipient Fact Sheet at https://www.fda.gov/media/144414/download ("The COVID-19 Vaccine may not protect everyone."); Moderna Recipient Fact Sheet at https://www.fda.gov/media/144638/download (same); J&J Recipient Fact Sheet at https://www.fda.gov/media/146305/download (same).

[12] https://policy.ucop.edu/doc/5000695/SARS-Cov-2 at FAQ No. 4 which states, "Infectious disease experts anticipate that annual or more frequent boosters will be necessary and receipt of boosters will be required."

[13] *See* https://www.cdc.gov/vaccines/acip/meetings/downloads/slides-2021-06/06-CO VID-Oliver-508.pdf; *see also, e.g.*, https://www.nytimes.com/2021/04/16/world/pfizer-vaccine-booster.html.

---

Israelis who were vaccinated were 6.72 times more likely to get

infected after the shot than after natural infection.

*Id*.   Reflecting this reality, internal official UCI emails reflect that there is a sufficiently alarming number of vaccinated individuals acquiring symptomatic COVID-19 such that it necessitated notice to the entire UCI School of Medicine about this issue, while no such notice has been necessary for naturally immune individuals:

- On July 17, 2021, UCI informed faculty and residents, "[t]here has been a substantial increase in the number of breakthrough infections [*i.e.*, infections in fully vaccinated individuals] among our UCI health care workers, including residents and fellows." A.K. Dec. ¶ 19.

- On July 22, 2021, UCI Health's CEO advised that "[t]he COVID-19 delta variant is now responsible for the majority (75%) of UC cases, including several breakthrough vaccine cases." *Id*.

- On July 27, 2021 UCI explained that "due to continued and increasing concerns about the spread of COVID-19, even among vaccinated individuals, we will not be returning to the classrooms as had been expected for the past several months." *Id*.

In contrast, there has been no such notice of increasing cases among those who have recovered from COVID-19. *Id*.

What is happening at UCI is similarly being seen nationwide as the number of cases of COVID-19 in fully vaccinated individuals is rising precipitously. That number was growing so rapidly and burdening resources to such an extent that the CDC changed its reporting criteria to only report breakthrough cases resulting in hospitalization or death. UC Faculty. Dec. ¶ 9.

But simply taking the FDA and CDC data at face value, the reality is that natural infection provides for greater than 99% protection while vaccine immunity provides for, at best, between 67% and 95% protection.

10

### iii. *COVID-19 Vaccines Do Not Prevent Infection and Transmission*

Natural immunity confers an additional benefit over vaccine immunity. Natural immunity will prevent a virus from being able to replicate and shed in the naturally immune individual. UC Faculty Dec. ¶ 17. In contrast, COVID-19 vaccines appear to reduce symptoms in some but still permit the vaccinees to become infected with and transmit the virus. *Id*.

In animal studies, the COVID-19 vaccine candidates could *not* fully block viral infection and replication in the nose of monkeys upon viral challenge. UC Faculty Dec. ¶ 18. In contrast, natural COVID-19 infection of monkeys completely prevented further re-infection at any site tested—by nasal, throat, and anal swabs. *Id*.

Viral carriage by the vaccinated is reflected in the recent outbreak in Barnstable County, Massachusetts, which has a 69% vaccination coverage rate among its eligible residents. *Id*. ¶ 19. A recent CDC investigation found that 74% of those infected in the outbreak were fully vaccinated for COVID-19 and, even more alarming, the vaccinated had on average more virus in their nose than the unvaccinated that were infected. *Id*. The study reported zero cases of infection among those that previously had COVID-19.

This forced the Director of the CDC, Rochelle Walensky, to admit on CNN that individuals vaccinated for COVID-19, while having less symptoms, can still become infected with and transmit the virus. *Id*. ¶ 20. Dr. Walensky admitted that "**what [the COVID-19 vaccines] can't do anymore is prevent transmission**." After this admission, Dr. Walensky was asked by Wolf Blitzer: "you get covid, you're fully vaccinated, but you are totally asymptomatic, you can still pass on the virus to someone else, is that right?" and Dr. Walensky answers "**that is exactly right**." *Id*.

Defendants will nonetheless only allow individuals that have been vaccinated back on campus, despite the unequivocal data that proves that the COVID-19 vaccines cannot and do not prevent infection and transmission. On the other hand, Defendants will *not* allow back on campus "naturally" immune individuals who, upon reexposure to the virus,

11

have neutralizing immunity, that not only prevents symptoms but also reinfection and transmission.  McCullough Dec. ¶¶ 13-20.  As explained by a professor at Johns Hopkins School of Medicine, the failure to lift restrictions on naturally immune individuals is "one of the biggest failures of our current medical leadership."[14]

## IV.    COVID-19 VACCINES ARE NOT RISK-FREE AND THE RISK IS GREATER FOR THE PREVIOUSLY INFECTED

There are legitimate safety concerns regarding the current COVID-19 vaccines, and heightened concerns when vaccinating naturally immune individuals.

### A. Vaccinating "Naturally" Immune Individuals Presents an Increased Risk

Studies have found that naturally immune individuals have significantly higher rates of adverse reactions after a COVID-19 vaccine.  Raw, *et al.* reported that among 974 individuals vaccinated for COVID-19, the vaccinated COVID-19 recovered patients had higher rates of vaccine reactions.  UC Faculty Dec. ¶ 23.  Mathioudakis, *et al*. found the same result in a study of 2,002 individuals.  *Id.*  Krammer, *et al.* found the same result in a study of 231 individuals, concluding that, "[v]accine recipients with preexisting immunity experience systemic side effects with a significantly higher frequency than antibody naïve vaccines." *Id*.

### B. The COVID-19 Vaccines Present Certain Risks for Everyone

There are also risks to receiving COVID-19 vaccines irrespective of prior infection.  The primary system for tracking adverse vaccine events in the United States is the CDC's Vaccine Adverse Events Reporting System ("**VAERS**").  A.K. Dec. ¶ 22. A three-year federal government funded study by Harvard researchers tracking 715,000 patients found that "fewer than 1% of vaccine adverse events are reported."  *Id*. ¶ 25.

Reports of serious adverse events from COVID-19 vaccines are similarly underreported to VAERS.  *Id*.  For example, according to the CDC, "Anaphylaxis after

---

[14] https://summit.news/2021/05/26/johns-hopkins-prof-half-of-americans-have-natural-immunity-dismissing-it-is-biggest-failure-of-medical-leadership/.

COVID-19 vaccination is **rare** and occurred in approximately **2 to 5 people per million** vaccinated in the United States based on events reported to VAERS." *Id*. This is in stark contrast to a recent study at Mass General Brigham that assessed anaphylaxis in a clinical setting after the administration of COVID-19 vaccines and found "severe reactions consistent with anaphylaxis occurred at a rate of **2.47 per 10,000 vaccinations**." *Id*. This is equivalent to 50 to 120 times more cases than what VAERS and the CDC are reporting. And this is for a serious, potentially life-threatening, adverse event that occurs almost immediately after vaccination and which vaccine providers are repeatedly advised to watch for and report. UC Faculty Dec. ¶ 25.

If anaphylaxis is being underreported, the level of underreporting for serious adverse events that do not occur immediately after vaccination or are not easily identified is likely far greater. For example, on June 23, 2021, the CDC reported the alarming numbers of reported myocarditis and pericarditis cases occurring after COVID-19 vaccination. UC Faculty Dec. ¶ 26. The long-term effects of myocarditis are not fully understood but can be very serious. *Id*. Cases of thrombocytopenia have also occurred after COVID-19 vaccination, as well as serious and sometimes fatal blood clots. *Id*. These and numerous other serious adverse events that are recognized but the true rate of these serious adverse events is most certainly underreported.[15]

Even if the risks from the COVID-19 vaccines are truly small, there is no reason to expose someone to *any* risk when they are already immune. UC Faculty Dec. ¶ 22.

## V. THE MANDATE IMPLEMENTED BY UC

On July 15, 2021, the UC system released its final COVID-19 Vaccination Program Policy.[16] Since that time, it has systemically enforced the policy. The stated

---

[15] The spike protein from COVID-19 vaccines enters the bloodstream and can be found in almost all vital organs. https://tinyurl.com/2zbbnwjp. A viral immunologist stated: "We thought the spike protein was a great target antigen, we never knew the spike protein itself was a toxin… So by vaccinating people we are inadvertently inoculating them with a toxin." https://tinyurl.com/329ybktb.

[16] *See* https://policy.ucop.edu/doc/5000695/SARS-Cov-2.

13

1  purpose of the policy "is to facilitate protection of the health and safety of the University
2  community" by requiring the UC community to "be fully vaccinated against COVID-19
3  before physically accessing the University's Locations and Programs."

4         The Mandate is clear that it is a permanent policy and that "compliance will require
5  repeat vaccinations or boosters on an annual or recurring basis."[17]  The Frequently Asked
6  Questions section of the Mandate specifically addresses "naturally" immune individuals:

> *I was recently diagnosed with COVID-19, and/or I had an*
> *antibody test that shows that I have natural immunity. Does*
> *this support a Medical Exemption?*  You may be eligible for a
> temporary Medical Exemption (and, therefore, a temporary
> Exception), for up to 90 days after your diagnosis and certain
> treatments.    According   to   the   US   Food   and   Drug
> Administration, however, "a positive result from an antibody
> test does not mean you have a specific amount of immunity or
> protection   from   SARS-CoV-2   infection  …   Currently
> authorized SARS-CoV-2 antibody tests are not validated to
> evaluate specific immunity or protection from SARS-CoV-2
> infection." For this reason, individuals who have been
> diagnosed with COVID-19 or had an antibody test are not
> permanently exempt from vaccination.[18]

21  As discussed above, the immunity achieved following natural infection does not expire
22  after 90 days and is, almost certainly, lifelong.  UC has not shared any data to show that
23  immunity on day 89 following diagnosis differs from immunity on day 91 following
24  diagnosis.  Plaintiff recovered from COVID-19 over one year ago and would not be
25  entitled to this temporary naturally immune exemption even though his immunity is

---

[17] *Id.* at pages 4 and 10 of 14.
[18] *Id.* at page 11 of 14, ¶ 9 ("**temporary naturally immune exemption**").

14

superior to an individual who was vaccinated 1 day or 91 days ago.

Plaintiff, and his fellow students and faculty that are "naturally" immune, will suffer great detriment if prevented from returning to campus.  Plaintiff is frustrated and negatively impacted by the prospect of being forced to choose between an invasion of his bodily integrity and his employment at UCI.  A.K. Dec. ¶¶ 4, 39.  Plaintiff merely wants to be treated the same as those deemed immune through vaccination.  Instead, he is being required, under threat of exclusion from UC, to violate his bodily integrity with an injection of a product that presents risks but no benefit to him or others similarly situated.

**ARGUMENT**

It lacks rational basis, let alone a compelling reason, to allow vaccinated individuals to attend or work at UC in person when their immunity is less effective at preventing infection and spread of COVID-19 than those that have had the virus.

The issuance of preliminary injunctive relief rests upon consideration of four factors: [1] the likelihood of the plaintiffs' success on the merits; [2] the threat of irreparable harm to the plaintiffs if the injunction is not imposed; [3] the relative balance of this harm to the plaintiffs and the harm to the defendants if the injunction is imposed; and [4] the public interest. *L.A. Mem'l Coliseum Comm'n v. NFL*, 634 F.2d 1197, 1200-01 (9th Cir. 1980).

**I.  PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS BECAUSE DEFENDANTS' RULE VIOLATE HIS CONSTITUTIONAL RIGHTS**

**A. Plaintiff's Right to Equal Protection of the Laws Has Been Violated**

Plaintiff is immune to SARS-CoV-2.  Therefore, Plaintiff is at least as equally situated as those who are fully vaccinated with a COVID-19 vaccine, yet Defendants deny Plaintiff equal treatment and seek to burden Plaintiff with an unnecessary violation of bodily integrity to which Plaintiff does not consent in order to be allowed to continue to work at UCI.  Defendants' denial of Plaintiff's constitutional rights in this manner

15

1  cannot be justified under a strict scrutiny analysis.

2       When analyzing an equal protection violation, courts apply a two-part analysis.

3  First, they identify the defendants' classification of groups. *See Lazy Y Ranch LTD v.*

4  *Behrens*, 546 F.3d 580, 589 (9th Cir. 2008).  Essentially, the question is whether the

5  policy is applied in a discriminatory manner or imposes different burdens on different

6  groups of people.  Next, the court should identify the level of scrutiny.  *See Golinsky v.*

7  *U.S. Office of Pers. Mgmt.*, 824 F. Supp. 2d (N.D.Cal. Feb. 22, 2012).  If the classification

8  implicates a fundamental right, the court applies a heightened level of scrutiny.  *See*

9  *Sanchez v. City of Fresno*, 914 F. Supp. 2d 1079, 1111 (E.D. Cal. 2012).  Under strict

10  scrutiny, the government must show the highest need for such restrictions combined with

11  the least restrictive methods of achieving that need.  *Id*. at 1108.

12      ***i.***   ***Naturally Immune Individuals are Similarly Situated to Vaccinated Individuals***

13       The Mandate's express purpose is to protect members of the UCI community from

14  COVID-19. A.K. Dec. ¶3.  Defendants seek to achieve this by ensuring that only people

15  who theoretically have immunity to the virus return to campus.  *Id*.  Both individuals with

16  natural immunity, like Plaintiff, and individuals who are vaccinated are alike in that they

17  have immunity to the virus that causes COVID-19.  UC Faculty Dec. ¶¶ 5-16.  Naturally

18  immune individuals have at least as good, and in fact superior, immunity when compared

19  to vaccinated individuals.  *See, e.g.*, McCullough Dec.  ¶¶ 13-20.

20       Nevertheless, the Mandate fails to treat these two groups of immune individuals

21  similarly.  Individuals who have vaccine-created immunity will be permitted to return to

22  campus.[19]  However, with the exception of the temporary naturally immune exception,

23  individuals who have natural immunity will not be allowed to return to campus.[20]

24

25

26

27  [19] *See* https://policy.ucop.edu/doc/5000695/SARS-Cov-2.

28  [20] *Id*. at 11.

ii.     ***The Court Should Apply Strict Scrutiny Because the Mandate Implicates Plaintiff's Fundamental Liberty Interest in Bodily Integrity***

"The Fourteenth Amendment's due process clause 'provides heightened protection against government interference with certain fundamental rights and liberty interests.'" *Sanchez*, 914 F. Supp. 2d at 1100-01 (quoting *Wash. v. Glucksberg*, 521 U.S. 702, 720 (1997)). It is well established that these fundamental liberty interests include the right to bodily integrity. *See Cty. of Santa Cruz v. Ashcroft*, 279 F. Supp. 2d 1192 (N.D. Cal. Aug. 28, 2003) ("The analysis in *Cruzan*, in which the Supreme Court presumed the existence of a constitutionally protected liberty interest in refusing unwanted medical treatment, was based on a long line of earlier cases recognizing such a right. The fundamental right to maintain bodily integrity protects against unjustified invasions of one's body by the state."). "This notion of bodily integrity has been embodied in the requirement that informed consent is generally required for medical treatment." *Cruzan v. Dir., Mo. Dept. of Health*, 497 U.S. 261, 277-78 (1990). This means that the right to bodily integrity includes the concept that a "competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment." *Id.*; *Wash. v. Harper*, 494 U.S. 210 (1990); *see also Galvan v Duffie*, 807 Fed. App'x 696, 697 (9th Cir. 2020) (quoting *Cruzan*).

Here, the Mandate unquestionably impinges this right to refuse unwanted medical treatments. UCI is telling Plaintiff that to return to campus, and thereby be treated equally with other individuals who are immune to COVID-19, he must submit to receive a vaccine, which is a medical treatment he does not want to receive. Because the Mandate impinges a fundamental liberty right by forcing a choice on Plaintiff, it must be analyzed under strict scrutiny. *Sanchez*, 914 F. Supp. 2d at 1108, 1111 (holding that a city's demolition of homeless shelters as temperatures approached freezing could implicate the fundamental right to life/bodily integrity and thus form the basis for strict scrutiny of the equal protection claim); *Saulsberry v. Maricopa Cty.*, 151 F. Supp. 2d 1109, 1118 (D.

17

Ariz. 2001) ("A competent person has a constitutionally protected liberty interest to refuse unwanted medical treatment.").

### iii. The Mandate Cannot Satisfy Strict Scrutiny Because It Does Not Satisfy a Compelling Government Interest As Applied to Naturally Immune Individuals

While Defendants may be able to claim that there is a compelling need to limit transmission of SARS-CoV-2, as applied to Plaintiff, that interest is not in any way furthered by compelling him to be vaccinated.  Plaintiff is already immune to the virus. *See* Section III.a., *supra.*  That immunity is superior to the immunity created by vaccines. *See* Section III.b., *supra.*  Therefore, Plaintiff and other naturally immune individuals are at less risk than the vaccinated of transmitting the virus.  *See* Section III, *surpra*.  Under such circumstances, Defendants' need to prevent transmission cannot trump Plaintiff's fundamental right to bodily integrity and to willingly consent to any medical procedure.

Further, as applied to Plaintiff, the Mandate is arbitrary, oppressive, and irrational. The Mandate it is not just a response to a temporary emergency where deference may be given to the government—it is a permanent policy with no end date. [21]

### iv. The Mandate Cannot Satisfy Strict Scrutiny As It is Not Narrowly Tailored

The Supreme Court explained that any restriction implicating a fundamental right "must be narrowly tailored to promote a compelling Government interest."  *U.S. v. Playboy Entm't Grp.*, 529 U.S. 803, 813 (2000).  "If a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative." *Id.*; *see also Sable Commc'ns of Cal. v. FCC*, 492 U.S. 115, 126 (1989).

Defendants' Mandate is not narrowly tailored because it does not exempt naturally immune individuals whose immunity to SARS-CoV-2 is at least as good as, and in fact better than, the fully vaccinated. There are numerous ways to achieve the asserted interest, including, without limitation, providing the same exemptions for the naturally immune as for the vaccinated.  Defendants cannot prove that naturally immune

---

[21] *See* https://policy.ucop.edu/doc/5000695/SARS-Cov-2 ("This is a permanent policy.")

18

individuals have any higher risk of reinfection and transmission of SARS-CoV-2 when compared to the fully vaccinated and, hence, the Mandate violates Plaintiff's constitutional rights to equal protection and bodily autonomy.  The Mandate is overbroad as to Plaintiff and others that are naturally immune.

> ### v.     The Mandate, Which Conditions Employment on the Invasion of Bodily Integrity, Triggers the Unconstitutional Conditions Doctrine

It is possible that Defendants may raise issues related to rights as employers.  But government cannot condition benefits, or employment, on forgoing fundamental rights, which triggers the unconstitutional conditions doctrine.  *Perry v. Sindermann*, 408 U.S. 593, 597 (1972); *Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 570 U.S. 205 (2013); *Keyishian v. Bd. of Regents*, 385 U.S. 589 (1967).

> ### vi.    The Mandate Does Not Pass Rational Basis

Even if the Court were to assume that the Mandate does not implicate the fundamental right to bodily integrity, which the Mandate does implicate, then it should still be struck down under a rational basis analysis.  "[W]hen a [government] policy distinguishes one group of persons from another," but does not implicate a fundamental interest or a protected class, "that distinction must be rationally related to a legitimate governmental purpose."  *Sanchez*, 914 F. Supp. 2d at 1108.  "However, the rational relation test will not sustain conduct by state officials that is malicious, irrational or plainly arbitrary."  *Lockary v Kayfetz*, 917 F.2d 1150, 1155 (9th Cir. 1990).  In *Lockary*, for example, the plaintiffs were denied water hookups for their new buildings supposedly because of a water shortage and, while a need to control water due to a shortage is a legitimate governmental purpose, the Ninth Circuit found that plaintiffs presented evidence that the water shortage may not have actually existed.  *Id.*  If there was no water shortage then, even under a rational basis evaluation, the city's refusal to provide new hookups "may have been arbitrary or even malicious conduct prohibited by due process

and equal protection." *Id.*

The situation here is similar to that in *Lockary*.  With the Mandate, UCI seeks to ensure that individuals on its campuses will increase public health by having immunity to the virus that causes COVID-19.  However, the need to preclude Plaintiff and other naturally immune individuals from campus is irrational because those individuals are at least as immune to the virus than are people who have been vaccinated.  *See* Section III, *supra*.  Therefore, even on a rational basis evaluation, the distinction made by Defendants between people with natural immunity and vaccine immunity is irrational.

Alternatively, if Defendants are aware of the natural immunity possessed by Plaintiff, but still chose to make the distinction simply because they preferred to favor vaccinated people, that decision too cannot pass a rational basis test.  Defendants' refusal to exempt naturally immune individuals shows that the Mandate is not about wanting an immune student body and faculty, it is only about having a vaccinated student body and faculty.  Similar to the LGBTQ in *Romer v. Evans*,[22] people who are not vaccinated are an unpopular group at the moment, and a desire to harm them is prejudice as purpose and not legitimate.  A purpose to discriminate against the unvaccinated (a politically unpopular group), but who are naturally immune and no more likely to transmit the virus than vaccinated individuals, cannot constitute a legitimate governmental interest.  The Mandate, therefore, cannot satisfy rational basis review and is unconstitutional.

### B. Plaintiff's Fundamental Right to Bodily Integrity Has Been Violated

"The Fourteenth Amendment's due process clause 'provides heightened protection against government interference with certain fundamental rights and liberty interests.'"  *Sanchez*, 914 F. Supp. at 1100-01 (quoting *Glucksberg,* 521 U.S. at 720).

---

[22] *Romer v. Evans*, 517 U.S. 620, 634 (1996) ("If the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that a bare . . . desire to harm a politically unpopular group cannot constitute a *legitimate* governmental interest.").

20

1   As discussed *supra*, Plaintiff's constitutional right to bodily integrity is impinged by the

2   Mandate. *See* Section I.A.ii.

3       It is well established that individuals have a fundamental liberty interest in and

4   right to bodily integrity and informed consent. *See Benson v. Terhune*, 304 F.3d 874, 884

5   (9th Cir. 2002) ("The due process clause of the Fourteenth Amendment substantively

6   protects a person's rights to be free from unjustified intrusions to the body."). "This

7   notion of bodily integrity has been embodied in the requirement that informed consent is

8   generally required for medical treatment." *Cruzan*, 497 U.S. at 277-78. *See also Benson*,

9   304 F.3d at 884 (a person has a right "to refuse unwanted medical treatment and to receive

10  sufficient information to exercise these rights intelligently"). This means that the right

11  to bodily integrity includes the concept that a "competent person has a constitutionally

12  protected liberty interest in refusing unwanted medical treatment." *Galvan*, 807 Fed.

13  App'x at 697 (quoting *Cruzan*, 497 U.S. at 277-78).

14      Defendants lack a compelling interest to impinge on Plaintiff's fundamental rights.

15  The United States Constitution guarantees that state governments shall not "deprive any

16  person of life, liberty, or property without due process of law," U.S. CONST. amend.

17  XIV § 1, and "forbids the government to infringe certain 'fundamental' liberty interests

18  *at all*, no matter what process is provided, unless the infringement is narrowly tailored to

19  serve a compelling state interest." *Reno v. Flores*, 507 U.S. 292, 301-02 (1993).

20      As explained above, Plaintiff has constitutional and fundamental liberty interests

21  in bodily integrity and informed consent, and the substantive due process rights to liberty

22  and to life. Thus, Defendants must prove that the Mandate serves a compelling state

23  interest and is narrowly tailored to that interest.

24      Defendants cannot show that the Mandate serves a compelling state interest. *See*

25  Section I.A.3. While prior court decisions have found that a compelling state interest to

26  control the spread of infection from person-to-person can trump certain constitutional

27  rights in certain situations, *see generally Whitlow v. Cal. Dep't of Educ.*, 203 F. Supp. 3d

28

1079, 1089 (S.D. Cal. 2016), this interest is non-existent with respect to the COVID-19 vaccine since this vaccine does not prevent vaccinated individuals from becoming infected and transmitting COVID-19.  *See supra*, Section I.B.iii.

Professor Sir Andrew Pollard, director of the Oxford Vaccine Group, has explained: "Herd immunity is not a possibility because [the Delta variant] still infects vaccinated individuals."[23]  The vaccinated, when infected, can transmit the virus to others, and are more likely to do so because they have less symptoms and hence are more likely to interact with others not knowing they are contagious.  *See supra*, Section I.B.iii. On the other hand, those who have had the COVID-19 virus and recovered have not been shown to become re-infected and transmit the virus to others.  *See, e.g*, McCullough Dec. ¶¶ 16-17; UC Faculty Dec. ¶¶ 11-18.   Therefore, there is no compelling interest in requiring the COVID-19 vaccine among the naturally immune.

Hence, excluding individuals from the UC locations as a means to compel such individuals to receive an injection of a COVID-19 vaccine does not pass strict scrutiny. There is not even a rational basis to exclude the unvaccinated, recovered individuals from UC since vaccinated individuals are *at least* as likely to spread COVID-19 and, in reality, are more likely.  *See* Section I.A.v.

### C. Plaintiff's Fundamental Right to Informational Privacy Has Been Violated

As a condition of employment, Defendants are compelling the disclosure of sensitive medical information: vaccination status.   The Ninth Circuit has repeatedly acknowledged that the Constitution protects an "individual interest in avoiding disclosure of personal matters." *In re Crawford*, 194 F.3d 954, 958 (9th Cir. 1999). "This interest covers a wide range of personal matters, including ... medical information."  *Nelson v.*

---

[23]  https://twitter.com/Channel4News/status/1425086490002997248.  Professor Pollard also stated that, "And what I suspect the virus will throw up next is a variant which is perhaps even better at transmitting in vaccinated populations.  And so that's even **more of a reason not to be making a vaccine program around herd immunity**…" (emphasis added).

22

*Nat'l Aero. & Space Admin.*, 530 F.3d 865, 877-78 (9th Cir. 2008), *rev'd on other grounds*, 131 S. Ct. 746 (2011). *See also Norman-Bloodsaw v. Lawrence Berkeley Lab.*, 135 F.3d 1260, 1269 (9th Cir. 1998) ("The constitutionally protected privacy interest in avoiding disclosure of personal matters clearly encompasses medical information and its confidentiality."). If the government's actions compel disclosure of private information, it "has the burden of showing that its use of the information would advance a legitimate state interest and that its actions are narrowly tailored to meet the legitimate interest." *Crawford*, 194 F.3d at 959 (internal quotation marks omitted). We must "balance the government's interest in having or using the information against the individual's interest in denying access," weighing, among other things, "the type of [information] requested, ... the potential for harm in any subsequent nonconsensual disclosure, ... the adequacy of safeguards to prevent unauthorized disclosure, the degree of need for access, and whether there is an express statutory mandate, articulated public policy, or other recognizable public interest militating towards access." *Doe v. Att'y Gen.*, 941 F.2d 780, 796-97 (9th Cir. 1991).

There is no narrow tailoring, much less legitimate interest, in applying the disclosure of vaccination status to the naturally immune. And, certainly, the Defendants could meet all of their interests by requiring disclosure of either vaccination status or natural immunity, demonstrating a lack of narrow tailoring.

## II. PLAINTIFF IS SUFFERING AND WILL SUFFER IRREPARABLE HARM, THE BALANCE OF THE EQUITIES TIP IN HIS FAVOR, AND THE PUBLIC INTEREST WEIGHS IN FAVOR OF A PRELIMINARY INJUNCTION

Plaintiff will continue to suffer irreparable harm if the preliminary injunction requested herein is not granted. It has long been established that the loss of constitutional freedoms constitute irreparable harm. *Am. Trucking Ass'ns v. L.A.*, 559 F.3d 1046, 1059 (9th Cir. 2012); *Monterey Mech. Co. v. Wilson*, 125 F.3d 702, 715 (9th Cir. 1997). Moreover, without a preliminary injunction preserving the status quo, Plaintiff will suffer

an impending loss of employment and of his professional reputation.  Indeed, "the loss of one's job does not carry merely monetary consequences; it carries emotional damages and stress, which cannot be compensated by mere back payment of wages." *Nelson*, 530 F.3d at 877-78.

If Plaintiff is not permitted on campus as a result of this mandate, his practice and roles at UC will be drastically and adversely affected, including in the following ways:

      a.  He will not be able to attend in-person meetings with his team or with patients and families in the hospital and so his role as ethics committee chair and director of the ethics consult service will be impacted;

      b.  He will not be able to hold Monday and Tuesday afternoon Resident Clinic;

      c.  He will not be able to see his own patients from his practice as his faculty practice is located at the Department of Psychiatry clinic;

      d.  He will not be able to do his Resident in-person teaching;

      e.  He will not be able to do on-site ethics consultations in the hospital; and

      f.  He will not be able to teach the Ethics and Behavioral Science course for first and second-year medical students.  A.K. Dec. ¶4.

The balance of the equities also tips in Plaintiff's favor.  Among other reasons discussed *supra* at Section III, while the COVID-19 vaccine, depending on brand, at best under the optimal setting of a clinical trial has between 67% and 95% efficacy, and that protection wanes over time, Plaintiff poses virtually no risk to others.

Finally, the public interest always weighs in favor of the vindication of constitutional rights.  *See Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012).  Treating naturally immune individuals differently from the fully vaccinated, when both have immunity, by demanding Plaintiff violate his right bodily integrity presents only a risk of harm and is unconstitutional.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests the court issue a

24

preliminary injunction enjoining and prohibiting Defendants enforcing the Mandate as to naturally immune individuals.

Dated:   August 23, 2021

SIRI & GLIMSTAD LLP

By:   /s/ Caroline Tucker
            Aaron Siri (Pro Hac Vice to be filed)
            Elizabeth Brehm (Pro Hac Vice to be filed)
            Caroline Tucker

CHRIS WIEST ATTORNEY AT LAW, PLLC
            Chris Wiest (Pro Hac Vice to be Filed)

            Attorneys for Plaintiff
            AARON KHERIATY, M.D.

25