SIRI & GLIMSTAD LLP
Aaron Siri (Pro Hac Vice To Be Filed)
Email: aaron@sirillp.com
Elizabeth A. Brehm (Pro Hac Vice To Be Filed)
Email: ebrehm@sirillp.com
200 Park Avenue
Seventeenth Floor
New York, NY 10166
Telephone: 212-532-1091
Facsimile: 646-417-5967

Caroline Tucker (SBN 261377)
Email: ctucker@sirillp.com
700 S. Flower Street, Suite 1000
Los Angeles, CA 90017
Telephone 213-376-3739
Facsimile 646-417-5967

CHRIS WIEST ATTORNEY AT LAW, PLLC
Chris Wiest (Pro Hac Vice To Be Filed)
Email:  chris@cwiestlaw.com
25 Town Center Blvd, STE 104
Crestview Hills, KY 41017
Telephone: 513-257-1895
Facsimile: 859-495-0803

Attorneys for Plaintiff
AARON KHERIATY, M.D.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| AARON KHERIATY, M.D., | Case No.: 8:21-cv-01367 JVS (KESx) |
| Plaintiff, | **DECLARATION OF PLAINTIFF AARON KHERIATY, M.D. IN SUPPORT OF PLAINTIFF'S** |
| v. | |

1

THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, a corporation, et al.,

Defendants.

**MOTION FOR PRELIMINARY INJUNCTION**

Date: September 27, 2021
Time:  1:30 pm
Place: Courtroom 10C
Judge: Hon. James V. Selna

I, Aaron Kheriaty, declare as follows:

1.     I am at least 18 years of age and am competent to testify.  I have personal knowledge of the statements contained in this declaration.

2.     I had SARS-CoV-2 which was confirmed by a PCR test on July 8, 2020.  Attached to this declaration as **Exhibit A** is a true and correct copy of the laboratory confirmation of my SARS-CoV-2 infection.  My symptoms began on July 3, 2020.  I suffered mild to moderate symptoms which included cough, fever, fatigue, myalgia, headache, sore throat, congestion, nausea, and vomiting.  This was followed by loss of my taste and smell for 12 days.  I have since fully recovered.

3.     The University of California ("**UC**") enacted a new policy, finalized on July 15, 2021, to "facilitate the protection of the health and safety of the University community" by ensuring that individuals who return to campus have immunity to the virus that causes COVID-19.   This policy mandates COVID-19 vaccination in order to access UC's locations and programs.  Attached to this declaration as **Exhibit B** is a true and correct copy of the mandate.

4.     If I am not permitted on campus as a result of this mandate, my practice and roles at UC will be drastically and adversely affected, including in the following ways:

　　　　a.  I will not be able to attend in-person meetings with my team or with patients and families in the hospital and so my role as ethics committee chair and director of the ethics consult service will be impacted;

2

      b.  I will not be able to hold my Monday and Tuesday afternoon Resident Clinic;

      c.  I will not be able to see my own patients from my practice as my faculty practice is located at the Department of Psychiatry clinic;

      d.  I will not be able to do my Resident in-person teaching;

      e.  I will not be able to do on-site ethics consultations in the hospital;

      f.  I will not be able to teach the Ethics and Behavioral Science course for first- and second-year medical students.

## BASIS FOR MY OPINIONS

5.     In addition to serving as the plaintiff in this matter, I am offering as an expert witness my professional opinions regarding the University of California's Covid-19 vaccine policy. The opinions I express herein are based upon my medical education, training, research, and over 16 years of clinical experience as a physician and bioethicist, as well as my familiarity with the medical and bioethics literature. These opinions are my own and (obviously) do not represent those of the institutions with which I am affiliated.

## PROFESSIONAL BACKGROUND AND EXPERIENCE

6.     I received my M.D. degree from Georgetown University School of Medicine in 2003. I completed my residency training in psychiatry at the University of California, Irvine ("UCI") in 2007. Since 2009, I have been a board-certified psychiatrist. In 2007, I was hired by UCI as a Health Sciences Assistant Clinical Professor. In, 2013, I was promoted to Health Sciences Associate Clinical Professor and in 2019, I was promoted again to Health Sciences Clinical Professor.

7.     I am currently Health Sciences Clinical Professor of Psychiatry and Human Behavior at University of California Irvine School of Medicine. I have served as

3

chairman of the Medical Ethics Committee and Director of the Ethics Consultation Service at UCI Health since 2008, as well as Director of the Medical Ethics Program at UCI School of Medicine since 2013. I direct the required course in ethics and behavioral science for medical students at UCI. I also serve as chair of the statewide Bioethics Committee at the California Department of State Hospitals. I have also served as Director of Medical Education in the UCI Department of Psychiatry since 2007.

8.      In my capacity as Ethics Committee Chair and director of the Ethics Consult Service at UCI Health, and chair of the statewide Bioethics Committee at the CA Department of State Hospitals, I have conducted thousands of ethics consultations on complex clinical cases. A large proportion of these cases involve ethical and clinical questions related to informed consent and patient decision-making capacity. This experience is relevant to my expertise regarding the professional judgments and opinions provided in this declaration. As a medical ethicist I also rely on knowledge of ethical guidelines, landmark court cases, legal standards for informed consent, and familiarity with the relevant research literature.

9.      I have done extensive work on Covid-19-related public policy since the pandemic began. I am a member of the UC Office of the President (UCOP) Critical Care Bioethics Working Group, which developed several of the University of California's Covid policies, including, (1) Allocation of Scarce Critical Resources under Crisis Standards of Care, which is guidance for all UC Health hospitals in the allocation of ventilators during the Covid-19 pandemic; (2) Allocation Guidelines for Remdesivir if Demand Outstrips Supply, and (3) Covid-19 Vaccine Allocation Institutional Guidelines. Since 2020 I have also served as a consultant to the California Department of Public Health on their allocation of Bamlanivimab during Covid-19 pandemic and on the California SARS-CoV-2 Pandemic Crisis Care Guidelines. I am also a member of the Covid-19 Vaccine Task Force for the County of Orange Healthcare Agency.

10.     For a complete listing of my professional background, experience, research, responsibilities, and publications, please see my Curriculum Vitae, which is attached to this declaration as **Exhibit C**.

## SUMMARY OF OPINIONS

11.     In my professional opinion, the UC vaccine policy violates the principles of medical ethics in unnecessarily mandating vaccination for individuals who have recovered from COVID-19.  Extensive scientific data demonstrates that such individuals have robust immunity as a result of having been exposed to the SARS-CoV-2 virus and may suffer worse adverse effects after vaccination than individuals not previously exposed to the virus.  The evidence shows the infection caused by the SARS-CoV-2 virus in humans produces complete and durable immunity, and natural immunity induced by the virus is comparable to or better than vaccination-induced immunity.  In unnecessarily and unjustifiably mandating vaccination of this population, the policy subjects these individuals to unnecessary risks without commensurate benefit, either to the individuals or the community as a whole.  In its refusal to recognize natural immunity, the UC Vaccine Policy violates the fundamental tenants of medical ethics and lacks a rational basis.

## OPINIONS

12.     The scientific research literature on Covid-19 demonstrates the strength of natural immunity following a SARS-CoV-2 infection, the robust extent of preexisting immunity to the SARS-CoV-2 virus, and the growing number of reported serious harms as a consequence of receiving the Covid-19 vaccine after a SARS-CoV-2 infection.

13.     As explained by Dr. Ryan Cole, a Mayo Clinic-trained pathologist, 'Yes, our antibody levels drop over time, however, scientifically, the memory B cells that make

5

1  antibodies have been proven to be present in our lymph nodes and bone marrow,"[1]  Dr.
2  Cole further explains, "They are primed and ready to produce a broad array of antibodies
3  upon … exposure. It would be physiologically, energetically impossible to maintain high
4  antibody levels to all the pathogens we are constantly exposed to, and we would look like
5  the 'swollen Stay-Puft marshmallow man' of lymph nodes, constantly, if the immune
6  system were required to do that."[2]

7  14.    In my professional opinion, the Complaint is accurate in its summary of the
8  scientific and medical research on these issues.

9              **a.  Mandating Vaccination as a Psychological "Placebo" is Unethical**
10

11  15.    While vaccinating Covid-19-recovered patients might produce an antibody
12  uptick,[3] there is no epidemiological evidence that this improves relevant clinical
13  outcomes like symptomatic reinfection or transmissibility.  Previous infection can easily
14  be verified with the university's own records of testing throughout the past school year,
15  a positive viral test from another provider or an antibody test, which would prove either
16  natural immunity or vaccination.

17  16.    The UC's coercive mandate that Covid-19- recovered individuals receive a Covid-
18  19 vaccine violates basic principles of medical ethics.  Even if the vaccines receive full
19  FDA approval, no sensible understanding of herd immunity can justify forcing
20  vaccinations on those who have already had Covid-19.  There is no evidence that
21  vaccinating Covid-19-recovered individuals benefits others through reduced viral

22
23  ───────────────
24  [1]  https://www.theblaze.com/op-ed/horowitz-israeli-government-data-shows-natural-
     immunity-from-infection-much-stronger-than-vaccine-induced-immunity.
25  [2] *Id*.
26  [3] Wang, Z, et. al, "Vaccination boosts naturally enhanced neutralizing breadth to SARS-
27  CoV-2 one year after infection," preprint available at https://www.biorxiv.
     org/content/10.1101/2021.05.07.443175v1.abstract accessed 16 July 2021.
28                                          6

transmission and, in fact, the evidence is that it does not prevent viral infection and transmission.  But even assuming that it did, that would use the recipients as a means to another end, which is unethical.

17.    Consider the analogy of nontherapeutic research, from which the research subject does not stand to benefit directly.  The central canon of medical ethics in this situation is the free and informed consent of the research subject, as articulated in the Nuremberg Code and the Helsinki Declaration.  Informed consent is likewise required for medical decisions in all adults of sound mind.  This is arguably the most deeply rooted doctrine in contemporary medical ethics. A person may freely choose to accept medical risks for the benefit of others, as when one donates a kidney for transplant.  But there is no moral duty to do so.  This is why we do not harvest organs without consent, even if doing so would save many lives. Those who make such sacrifices for others must truly be volunteers, not conscripts drafted by college administrators.

18.    University leaders might claim that vaccine mandates are necessary to make faculty, staff and students "feel safe" enough to reopen campus.  This reasoning is specious. Requiring the naturally immune to be vaccinated does not make anyone actually safer.  It is wrong to risk harming healthy people so that UC can peddle a psychological placebo to those who have not considered basic scientific facts.

### b. Mandating Vaccination for a Population in which Vaccines Present Risks with No Benefit is Unethical

19.    There is ample scientific evidence that natural immunity of Covid-19-recovered individuals is as good, and very likely superior, to vaccine-mediated immunity.  In an email sent to the UCI School of Medicine on July 17, 2021, the Associate Dean of Graduate Medical Education informed the faculty and residents, "There has been a substantial increase in the number of breakthrough infections among our UCI health care workers, including residents and fellows (fully vaccinated individuals)." A true and

7

correct copy of this July 17, 2021, email is attached hereto and incorporated herein as **Exhibit D**.  In an email sent to Medical Directors at UCI Health on July 22, 2021, CEO Chad T. Lefteris advised, "[t]he COVID-19 delta variant is now responsible for the majority (75%) of OC cases, including <u>several breakthrough vaccine cases</u>."  A true and correct copy of this July 22, 2021, email is attached hereto and incorporated herein as **Exhibit E** (emphasis added).   A July 27, 2021 email sent to course directors at UCI confirmed that "due to continued and increasing concerns about the spread of COVID-19, even among vaccinated individuals, we will not be returning to the classrooms as had been expected for the past several months."  A true and correct copy of this July 27, 2021 email is attached hereto and incorporated herein as **Exhibit F**.  By contrast, but there has been no such notice of increasing cases among those who have recovered from Covid-19.  This indicates that there is a material number of vaccinated individuals that are still acquiring symptomatic Covid-19, such that notice to the entire system about this issue was warranted, while no such notice has been necessary for the naturally immune.

20.     In recent months, new data has raised concerns about the safety profile of the Covid-19 vaccines, with adverse events reported that were not apparent in the smaller clinical trials preceding FDA Emergency Use Authorization of three Covid-19 vaccines. Historically, the full safety profile of medications and vaccines may not but fully apparent until they are widely deployed in large populations.  To mention just two recent examples, rofecoxib (Vioxx) was found to increase the risk of heart attack and stroke, side effects that did not manifest in the smaller clinical trials used for FDA approval.

21.     Likewise, an influenza vaccine used in the 2009 swine flu epidemic, after it was rolled out in several European countries, was found to cause febrile convulsions and narcolepsy in children.[4] This kind of real-world evidence is often necessary, as clinical

---

[4] CDC Fact Sheet, "Narcolepsy Following 2009 Pandemrix Influenza Vaccination in Europe," accessed 16 July 2021 at https://www.cdc.gov/vaccinesafety/concerns/ 8

trials frequently enroll patients who are not fully representative of the general population and deploy smaller numbers of people overall. Relevant to this case, the clinical trials for the Covid vaccines which received Emergency Use Authorization deliberately excluded Covid-recovered patients.  We often gain valuable data about drug safety from real-world evidence, which then leads us to adjust clinical recommendations to balance risk and benefits.

22.    The Vaccine Adverse Event Reporting System ("**VAERS**"), which is administered by the Centers for Disease Control and Prevention ("**CDC**") and the Food and Drug Administration ("**FDA**"), is a database that allows Americans to document adverse events that happen after receiving a vaccine. The FDA and CDC acknowledge that the database is not designed to determine whether the events were caused by a vaccine; however, the data can nonetheless act as an important signal for safety concerns that require additional evaluation.

23.    The VAERS data for Covid-19 vaccines, as well as data from similar European databases for passive monitoring of vaccine safety, demonstrate patterns of significant concern. Several adverse events have been reported at high rates in the days immediately after Covid-19 vaccination, and then fall precipitously afterward.  Granted, these adverse events might have occurred without vaccination, and the database alone cannot determine what would have happened in the absence of vaccination. However, the large clustering of several adverse events immediately after vaccination is concerning, as this pattern typically suggests causal connections.

24.    Several serious adverse events follow this pattern in VAERS, including thrombocytopenia (low platelets) especially among females, noninfectious myocarditis (heart inflammation), especially for males under 30, deep-vein thrombosis (clots), and

history/narcolepsy-flu.html.

9

most concerning, an increased reporting rate of deaths. Population based research has not yet been conducted to determine the actual rates of these and other serious adverse events.

25.     The underreporting to VAERS of anaphylaxis following COVID-19 vaccination is instructive.  A three-year federal government funded study by Harvard Medical School which tracked 715,000 patients at Harvard Pilgrim Health Care found that "fewer than 1% of vaccine adverse events are reported."[5]  So the actual number of adverse events due to the Covid-19 vaccines is most likely considerably higher.  According to the CDC, "Anaphylaxis after COVID-19 vaccination is **rare** and occurred in approximately **2 to 5 people per million** vaccinated in the United States based on events reported to VAERS."[6] This is in stark contrast to a recent study at Mass General Brigham that assessed anaphylaxis in a clinical setting after the administration of COVID-19 vaccines and found "severe reactions consistent with anaphylaxis occurred at a rate of **2.47 per 10,000 vaccinations**."[7]

26.     The implication is that we have reason to believe the risks of a Covid-19 vaccine may outweigh the benefits for certain low-risk populations, including individuals who have recovered from Covid-19 infection. It is entirely reasonable, given these concerns, for a Covid-recovered person to decline vaccination. But this is precisely what the coercive UC vaccine policy does not permit.

---

[5]  https://digital.ahrq.gov/sites/default/files/docs/publication/r18hs017045-lazarus-final-report-2011.pdf.

[6] https://www.cdc.gov/coronavirus/2019-ncov/vaccines/safety/adverse-events.html.

[7] https://jamanetwork.com/journals/jama/fullarticle/2777417.

10

**c. The UC's Purported "Medical Exemption" Is Excessively Narrow and Not Grounded in Sound Medical Criteria, Presenting Unjustifiable Risks**

27.   Defenders of the UC vaccine policy might respond that provision is made for individuals who wish to refuse vaccination by means of the medical exemptions permitted in the vaccine policy.  However, the narrow scope of these medical exemptions is unjust and dangerous: the exemptions are so medically unsound and unduly restrictive that they create a clear and present danger to the health of those subject to these mandates.

28.   The scientific data demonstrates that the natural immunity acquired by previous Covid-19 infection is at least as durable and effective as that provided by the vaccines. The data also shows that those who possess this natural immunity present no greater risk of transmitting the virus to others than those who have been vaccinated.  The UC justifies its mandate by claiming this is the only effective way to maintain a safe campus environment.   But jabbing students who are already immune contributes nothing whatsoever to campus safety.  All that it does, medically speaking, is create danger.

29.   Several published studies suggest, moreover, a significantly increased risk of adverse reactions to the vaccine among those previously infected.[8]  There is no reason to put the thousands of UC faculty, staff, and students who possess natural immunity in such danger.

---

[8]  Cf. for example,  Mathioudakis AG, Ghrew M, Ustianowski A, et al. Self-Reported Real-World Safety and Reactogenicity of COVID-19 Vaccines: A Vaccine Recipient Survey.  Life  (Basel).  2021;11(3):249.  Published  2021  Mar  17. doi:10.3390/life11030249.

Previous COVID-19 infection but not Long-COVID is associated with increased adverse events following BNT162b2/Pfizer vaccination Rachael K. Raw, Clive Kelly, Jon Rees, Caroline Wroe, David R. Chadwick. medRxiv 2021.04.15.21252192; doi: https://doi.org/10.1101/2021.04.15.21252192.

11

30.    The UC vaccine policy relies upon the CDC's guidelines for medical exemptions as if they constitute medical advice applicable in every case.  They do not.  Though this may come as a surprise to many, the CDC is not a medical institution; it is a public health and disease prevention body.  According to the CDC's own mission statement, the agency focuses on "disease prevention and control, environmental health, and health promotion and health education activities." It is not qualified and usually does not purport to offer professional medical opinions applicable to specific patients.  From time to time, the CDC offers findings and recommendations that competent medical practitioners may consider in arriving at a professional medical judgment for a particular patient. In this respect, CDC guidelines are analogous to guidelines from other public health associations or medical societies: they are *guidelines*, not prescriptions.

31.    The UC vaccine policy is unsound not just because it follows various CDC recommendations as if these constitute sound *individualized* medical advice for *every* patient.  It is going all-in on the mistaken conception of the CDC as a super-doctor.  The policy would limit medical exemptions to "contraindications and precautions" recognized by the CDC or the vaccine's manufacturer.  There is no sound medical basis, however, for doing so, especially since (again) the CDC does not practice medicine.  The CDC's list of contraindications was never meant to be comprehensive or exhaustive, but merely representative of the most common situations in which caution is warranted.

32.    For individual patients, physicians have always been granted wide discretionary latitude and appropriate room for clinical judgment, to apply general guidelines and other relevant sources of medical information to the unique needs and circumstances of particular patients.  Any physician could find that there are many additional medically reasonable bases for the current Covid-19 vaccines to be contraindicated in a particular case.

33.    The CDC's contraindications and precautions list essentially comprises a list of anaphylactic allergic reactions or other severe adverse reactions to any Covid-19

12

vaccine—e.g., cardiovascular changes, respiratory distress, or history of treatment with epinephrine or emergency medical attention to control symptoms. At first glance this appears to be an entirely sensible provision, but upon closer examination we see that it presents a risk.  A severe reaction to a first vaccine shot indicates the second shot should be delayed, and possibly declined altogether.  But the danger arises from this criterion when viewed in connection with the unjustifiably narrow limitations on exemptions overall, as described above.  The purpose of any exceptions for a vaccine is to avoid or reduce the risk of allergic or other serious reactions in the first place.  One should not have to actually experience a serious adverse reaction or anaphylaxis prior to being excused from taking the vaccine, if a physician has already determined that one may be at enhanced risks for serious adverse effects based upon an individualized medical evaluation.

34.    Doctors and patients make these determinations routinely by considering the patient's entire medical history, family history, all of the active ingredients in the drug, and then, in light of the doctor's professional judgment, making a decision about the overall benefits and perils of getting vaccinated—or not. As the UC vaccine policy shows, however, all this is deemed irrelevant when it comes to Covid-19 vaccines.  For Covid-19 and this alone, the exceptions in the Policy amounts to a Catch-22: it effectively requires getting an initial dose and having a reaction that could potentially provide the data needed to be exempt from taking the vaccine again.

### d.  The UC's Vaccine Mandate Lacks a Rational Foundation

35.    The notion that some Covid-recovered individuals may harm others by not getting the Covid-19 vaccine is also not grounded in sound ethical reasoning or empirical

13

evidence.  But even if we posit a theoretical benefit in this regard – in the absence of any scientific data to support this – the argument still does not hold up.

36.     The notion that such individuals who refuse the Covid-19 vaccine are harming vulnerable individuals mischaracterizes the situation.  This might be true of something like hand hygiene, for washing my hands does not involve a medical intervention with attendant risks.  All that we know with reasonable certainty with regard to the Covid-19 vaccine is that it provides some protection to the vaccinated person from serious symptoms of Covid-19, at least in the short-term. But the vaccines, according to the CDC, do not prevent infection and viral transmission.

37.     This means that those who judge themselves especially vulnerable to the disease can pursue voluntary vaccination.  Other individuals can also certainly choose to accept medical risks only (or primarily) for the benefit of others, but one is under no *obligation* or duty to do so.  This is why we would never harvest organs from persons without their consent – even if by doing so we could save many lives. Organ donation must be a voluntary act.  It is what ethicists refer to as "supererogatory" – that is, an act that goes above and beyond what is required by duty or justice.

38.     Many seem to have accepted the notion that everyone is required to do everything in our power to reduce the risk of Covid-19 for ourselves and others.  But we take calculated risks all the time and do not adopt this "zero risk" approach in other areas of our lives.  For example, we know with statistical certainty that thousands will die every year in motor vehicle accidents; and we know with statistical certainty that we could save every one of those lives by lowering the speed limit on every road to 15 miles per hour. The fact that we do not do so does not mean we intend the death of all those people, nor that we don't care about them, nor that we are guilty of negligence or manslaughter. Applying this analogy to individual rather than public policy decisions, one could lower the risk of injury or death to fellow citizens on the road by driving a Mini Cooper or a Fiat rather than a Hummer or an Escalade, since a smaller car is statistically less likely to

14

harm others in the event of a collision.  But one is under no moral obligation to drive a smaller car for the sake of this risk reduction to others. To mention one more medical example, in 2020 in the U.S. we had twice as many deaths from cardiovascular disease (691K) as deaths [with] Covid (345K). Coercive public health mandates would save thousands of lives by coercively enforcing a Mediterranean diet and daily exercise to bring down cardiovascular deaths. Of course, such measures in the name of public health would not be justifiable, though they would arguably be less of a bodily intrusion than a mandated vaccine injection.

### e.  Conclusion

39.    I am frustrated and negatively impacted by the prospect of being forced to allow an invasion of the integrity of my body or be banned from continuing my employment at UCI.

40.    In summary, there is no medical or ethical justification for mandating Covid vaccines for Covid-recovered individuals.  We must maintain our integrity under pressure.  It is precisely in dire situations, such as wars or pandemics, that we are most sorely tempted to abandon ethical principles.  Authorities rushing to implement mandatory vaccination protocols are ignoring available scientific data, basic principles of immunology, and elementary ethical norms.  Even if some sincerely think that these regimes are needed to open safely, that belief neither makes it so nor justifies coercive policies that steamroll fundamental liberties.

41.    This UC's vaccine policy, in refusing to recognize the value of natural immunity, unjustly discriminates against Covid-recovered patients, subjecting them to unnecessary risks without commensurate benefits, either to themselves or others.  In doing so, the policy violates basic tenants of medical ethics, defies logical reasoning, and, as I am advised by my lawyers, violates the equal protection of all citizens as guaranteed by the Constitution's 14th Amendment.

15

42.     Since I am also serving as a Plaintiff on this case, I am not being compensated for my work as an expert witness.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct this 13th day of August, 2021, at San Juan Capistrano, California.

Aaron Kheriaty, MD

16

# Exhibit A

Case 8:21-cv-01367-JVS-KES   Document 15-2   Filed 08/23/21   Page 18 of 74   Page ID
#:111
Print This Page or Close This Window
Results Details for CORONAVIRUS DISEASE 2019 (COVID-19) SCOVD, ordered by your PCP, Aaron Kheriaty, MD (PCP).

CORONAVIRUS DISEASE 2019 (COVID-19) SCOVD - Details

## Coronavirus Disease 2019 (COVID-19) SCOVD

Results
**Abnormal**

Status: Final result (Collected: 7/8/2020 10:22 AM)

Specimen Information: Swab

| Component | |
|---|---|
| **COVID-19 Source** | |
| NASOPHARYNX | |
| **COVID-19 Result** ❗ | |
| DETECTED | |
| Comment: | |
| <<ABNORMAL FLAG>> | |
| **COVID-19 Comment** | |
| Reference range: Not Detected | |

Comments:
An interpretation of Not Detected cannot exclude the presence of SARS-CoV-2 RNA
concentrations below detection limits. The DiaSorin Molecular Simplexa COVID-19
Direct is real-time reverse transcription polymerase chain reaction (rRT-PCR)
intended for the qualitative detection of nucleic acid from the SARS-CoV-2.
This test has not been validated for use in asymptomatic individuals. These
specimens may have decreased sensitivity, so caution should be exercised when
interpreting not detected results.
This test has been authorized by the Food and Drug Administration (FDA) under an Emergency Use
Authorization (EUA) for use by laboratories certified to perform moderate and high complexity
testing under the Clinical Laboratory Improvement Amendments
(CLIA).

### Comments from the Doctor's Office

 Here is a copy of your positive test results, as we discussed on the phone. I have sent a copy of home care
instructions via mychart message. I hope you feel better soon. Thank you, Sarah Campbell, FNP-C

Written by Sarah Lynn Campbell on 7/9/2020  7:55 AM PDT
Seen by patient Aaron Kheriaty on 7/23/2021  3:03 PM PDT

# UCI Health

### Keeping Family Safe If You Have or Might Have COVID-19

**Frequently Asked Questions for Patients**

#### If I have COVID-19, can I be at home with my family?
Yes, you can be at home with your family if you are sick with COVID-19, but you will need to follow
strict hygiene and distancing processes to avoid getting others sick (see below). Because some
people may be sick and transfer infection to others in the days before they may know they are sick,
it is possible that your family has already been exposed to the virus by the time you were
diagnosed, but it is still important to follow the recommendations below in case they have not. If
you got the virus from a family member, then anyone in your family that was sick is likely to be
immune and will not get sick again from you.

#### I have COVID-19 symptoms – how can I protect my family and others?
The CDC has many resources to guide you through your illness and we recommend you visit this
website: https://www.cdc.gov/coronavirus/2019-ncov/if-you-are-sick/steps-when-sick.html. The following steps
should be followed by you and your household members to reduce the risk of household members getting
sick.
Remember, COVID-19 is transmitted is in one of two ways:
- Direct droplet spray from a sick person into the eyes, nose, or mouth of another person
- Touching something contaminated with the virus and then eating or touching your eyes, nose, or mouth
  with unclean hands. This happens when the sick person touches something which someone else then
  touches and transfers the virus to their eyes, nose, or mouth because they do not wash their hands.
  Remember that the virus often lives several hours, sometimes 1 or 2 days, on surfaces.

**1. Physically Separate Yourself From Others**
- Stay in a different room from others in your home
- Keep a 6-foot distance from others in the home as much as possible
- Do not hug, kiss, or touch others while you are sick
- If available, use a separate bathroom
- Stay at home except for serious medical care that might require hospitalization.
- Do not leave home to go to work, public areas, shopping, and do not use public transportation or taxis.
- If you need groceries or supplies, ask family, friends, or neighbors bring it to you and leave it outside your
  door.

**2. Follow Strict Hygiene Practices to Minimize Transmission**
- You and all your household members should wash hands frequently. Use soap or use alcohol-based hand
  sanitizer (with 60 to 95% alcohol) often, including before and after touching your face or touching any other
  object someone else may need to touch (e.g. door handle, refrigerator). Be sure to cover all surfaces of
  your hands, including the fingertips.
- If you are sick, everything you touch should be cleaned before someone else touches it. Or, if someone
  else must touch something you touched (e.g. bringing plates out of your room), they need to wash their
  hands after they finish the activity and before they touch their face.
- If you are sick, wear a mask if you are in the same room as others. If you are unable to wear a mask, avoid
  being in the same room with others as much as possible and have your housemates wear a face mask
  when they are around you.
- Everyone should avoid touching eyes, nose, and mouth with unwashed hands.
- Cover your cough and sneeze with a tissue, or sneeze into your sleeve
- Do not share household items (e.g., utensils, drinking glasses, towels, bedding) and either wash right away
  with soap/detergent after you use them, or ensure that after someone does the dishes, they wash their
  hands before touching their face.
- Caregivers can use gloves whenever handling or cleaning soiled items that may contain your secretions or
  body fluids. If gloves are not available, clean hands thoroughly with soap and water after handling any
  contaminated items.

**3. Keep the Environment Clean**
- Household cleaning sprays and wipes can be used to kill COVID-19. Alcohol hand rub (60-95%) will also
  work.
- Use a disinfectant cleaner to clean things that you touch that others may touch
- Examples include: counters, tabletops, doorknobs, bathroom fixtures, toilets, phones, keyboards, tablets,
  and bedside tables that are touched by the person who is sick or someone caring for the sick person who
  touches these objects with unclean hands
- Immediately clean any surfaces that may have oral/nasal secretions, blood, stool, or body fluids on them.
- Wash clothes/linens thoroughly – over-the-counter laundry detergent will kill the virus. Dry thoroughly using
  the temperatures recommended on the linen/clothing label.
- If weather permits, air out rooms when the sick person is not in the room.

#### What if I live with someone who is immunocompromised or elderly?
People who have chronic illnesses, have weakened immune systems, or are >65 years old are at higher risk
for serious complications from COVID-19. In addition to strictly following the above strategies, you can also
consider additional steps to avoid contact with vulnerable household members' environment or touched
objects as much as possible. These high risk individuals can also consider masking while in the home. If they
mask, they should be careful to only touch the mask or their face with after washing their hands with soap or
using alcohol hand rub. Another option is that these high risk persons can temporarily live with someone else
until the person infected with COVID is fully recovered without symptoms for at least 7 days. However, if these
high risk individuals have already been in contact with the ill person at the time they move out, they will need
to be attentive for any symptoms of COVID-19 for the next 14 days.

#### Do I need to move out of the house?
Whether you or others in the home move out of the house is dependent on available opportunities. Ultimately,
this is a personal decision.

#### How long will I be infectious to others?
The length of time someone can be infectious to another person can vary depending on your symptoms and
the status of your immune system. Information on this is not yet fully known. The likelihood of someone getting
sick from you also depends on how vulnerable other household members are – for example if they have a
weak immune system or are elderly. Ask your doctor for advice on when you are no longer infectious to others.
Generally, people are not considered infectious if they have been at least 3 days since the last fever without
using fever-reducing medicines and at least 7 days since the symptoms started.

MyChart® licensed from Epic Systems Corporation © 1999 - 2020

# Exhibit B

**University of California –Policy**



# Policy: SARS-CoV-2 (COVID-19) Vaccination Program

| | |
|---|---|
| **Responsible Officers:** | Provost & Executive Vice President for Academic Affairs (Campuses, ANR, Labs)<br>Executive Vice President – University of California Health (UC Health)<br>Executive Vice President and Chief Operating Officer (Campuses, ANR, Labs) |
| **Responsible Offices:** | Academic Affairs<br>University of California Health (UCH)<br>University of California Operations (UCO) |
| **Issuance Date:** | December 14, 2020<br>Last Updated July 15, 2021 |
| **Effective Date:** | July 15, 2021 |
| **Last Review Date:** | July 15, 2021 |
| **Scope:** | All University of California locations and faculty, academic personnel, staff, trainees, students, and others accessing University facilities and programs. |

| | UC Health | Campuses, ANR, Labs |
|---|---|---|
| **Contact:** | Anne Foster, MD | Amina Assefa |
| **Title:** | Chief Clinical Officer | Director, Emergency Management |
| **Email:** | Anne.Foster@ucop.edu | Amina.Assefa@ucop.edu |
| **Phone:** | (510) 987-0306 | (510) 987-9594 |

## TABLE OF CONTENTS

I.   POLICY SUMMARY ................................................. 2
II.   DEFINITIONS ................................................. 2
III.   POLICY TEXT ................................................. 5
IV.   COMPLIANCE / RESPONSIBILITIES ................................................. 8
V.   PROCEDURES ................................................. 9
VI.   RELATED INFORMATION ................................................. 9
VII.   FREQUENTLY ASKED QUESTIONS ................................................. 10
VIII.   REVISION HISTORY ................................................. 14
IX.   APPENDICES ................................................. 14

**University of California – Policy**
SARS-CoV-2 (COVID-19) Vaccination Program

## I.   POLICY SUMMARY

The purpose of this policy is to facilitate protection of the health and safety of the University community, including its patients as well as its Students, Trainees, Personnel and all others who work, live, and/or learn in any of the University's locations or otherwise participate in person in University Programs.

The University strongly recommends that all members of the University community obtain the COVID-19 vaccine as soon as they are eligible. In addition, this policy provides for a COVID-19 Vaccination Program under which any Covered Individual is required, subject to limited deferrals, exceptions, and associated non-pharmaceutical interventions, to be fully vaccinated against COVID-19 before physically accessing the University's Locations and Programs. This policy further provides that Locations must begin collecting proof of vaccination and processing requests for Exceptions and Deferrals for all Covered Individuals no later than July 15, 2021, to facilitate fall planning efforts.

## II.   DEFINITIONS

**Covered Individuals:** A Covered Individual includes anyone designated as Personnel, Students, or Trainees under this Policy who physically access a University Facility or Program in connection with their employment, appointment, or education/training. A person accessing a Healthcare Location as a patient, or an art, athletics, entertainment, or other publicly accessible venue at a Location as a member of the public, is not a Covered Individual.

**Covered Non-Affiliates:** A Covered Non-Affiliate is a person who accesses a University Facility or Program as a Non-Affiliate (other than as an "official volunteer") under the Regulations Governing Conduct of Non-Affiliates in the Buildings and on the Grounds of the University of California.

**Contraindications and Precautions:** A contraindication or precaution to COVID-19 vaccination recognized by the U.S. Centers for Disease Control and Prevention (CDC), or by the vaccine's manufacturer, as based on a condition in the potential vaccine recipient that may increase the risk for a serious adverse reaction to the vaccine, may cause diagnostic confusion if the vaccine is administered, or may compromise the ability of the vaccine to produce immunity. Contraindications and Precautions are limited and do not include conditions that are unrelated to vaccines or injectable therapies, such as food, pet, venom, or environmental allergies, or allergies to oral medications.

**COVID-19 Vaccination Program or Program:** A set of rules governing Physical Presence at University Locations or in University Programs intended to reduce the incidence of SARS-CoV-2 infection and resultant COVID-19 disease, disability, and death in connection with University Facilities or Programs.

**Deferral:** An approved deferral of vaccination based on pregnancy. Pregnancy Deferral will extend throughout the term of the pregnancy and until the Covered Individual returns to work or instruction, as applicable.

**University of California – Policy**
SARS-CoV-2 (COVID-19) Vaccination Program

**Disability:** A physical or mental disorder or condition that limits a major life activity and any other condition recognized as a disability under applicable law. "Disability" includes pregnancy, childbirth, or a related medical condition where reasonable accommodation is medically advisable.

**Exception:** An approved exception to COVID-19 vaccination based on a Medical Exemption, Disability, or Religious Objection. For purposes of this policy, a person who is pregnant is not eligible on that basis alone for an Exception, but is eligible for a Deferral for the duration of pregnancy.

**Fully Vaccinated:** A person is considered "fully" vaccinated when two weeks have passed since they completed a COVID-19 Vaccine series (for example, 1 dose of the Janssen/J&J vaccine, or 2 doses within no more than 12 weeks of the Moderna or Pfizer vaccine); as well as any boosters consistent with manufacturer instructions and applicable agency approval, authorization, or listing.

**Healthcare Location:** A collection of buildings and Personnel that service an academic health system including hospitals, ambulatory surgery centers, outpatient centers, clinics, or other locations where preventive, diagnostic, therapeutic, or other interventional physical or behavioral healthcare services are provided to UC Health patients, employees, or research participants and any associated educational, research, or administrative facilities and offices. A Healthcare Location refers only to that part of a campus that meets this definition and does not include student health and counseling centers.

**Implementation Date:** The deadline for initial implementation of the Program, which is two (2) weeks before the first day of instruction at any University campus or school for the Fall 2021. For locations that do not operate on an academic calendar (e.g., UCOP, ANR, medical centers, national laboratories), the deadline is September 1, 2021. For new employees whose first date of employment is later, the deadline is 8 weeks after the first date of employment. For students starting or returning to campus after Fall 2021, the deadline is the first date of instruction for the term when they first enroll.

**Location (or Facility):** Any United States campus, medical center, or facility operated by the University in connection with its research, teaching, or public service (including clinical care) missions or programs, including University housing. A Location does not include a property owned by the University but leased to a third party unless (and only to the extent) a University Program occurs at that site.

**Location Vaccine Authority (LVA):** The office or person responsible for implementing the COVID-19 Vaccination Program for a Location, typically the Chief Medical Officer or Occupational Health office at a Medical Center or an Occupational Health or Student Health office at an academic campus. The LVA is a health care provider and its records are considered confidential health records for purposes of the University's privacy policies.

**Medical Exemption:** An excuse from receiving COVID-19 vaccine due to a Medical Contraindication or Precaution.

**University of California – Policy**
SARS-CoV-2 (COVID-19) Vaccination Program

**Non-Pharmaceutical Intervention (NPI):** An action, other than getting vaccinated or taking medicine, that members of the University community can take to help prevent or slow the spread of COVID-19 and other contagious illnesses. NPIs include, for example, staying home, especially when a person is sick or when a member of the person's family or household is sick; quarantining when an unvaccinated person has been exposed to someone else with the illness; avoiding large gatherings; physical/social distancing; wearing personal protective equipment or face coverings; frequent handwashing and cleaning; and asymptomatic (surveillance) and symptomatic testing.

**Participation:** Participation in the COVID-19 Vaccination Program (by providing proof of vaccination or obtaining an approved Exception or Deferral under this policy). Participation is a condition of Physical Presence at any University Location or Program as set forth in this policy. For Covered Individuals who must be vaccinated under this policy, Participation compliance will require repeat vaccinations or boosters on an annual or recurring basis consistent with FDA-approved labeling and CDC recommendations.

**Personnel:** University faculty, other academic appointees, and staff, including but not limited to visiting, volunteer, without salary, and emeritus/a professors, visiting or volunteer academic appointees, contract, recall, and emeritus/a employees. "Personnel" also includes, for purposes of this policy, official volunteers, as defined in the Regulations Governing Conduct of Non-Affiliates in the Buildings and on the Grounds of the University of California.

**Physical Presence:** Physical presence at a University Location or Program for any work, research, or education/training related purpose (as distinguished from accessing a Healthcare Location as a patient, or an art, athletics, entertainment, or other publicly accessible venue at a Location as a member of the public). Physical presence includes living in housing furnished by the University, using University amenities such as entertainment venues, museums, libraries, workout facilities, or dining halls or food courts in one's capacity as Personnel or a Student or Trainee, or participating in person in a University Program even if not occurring at a Location. Access is not defined by reference to any particular frequency (e.g., daily, weekly, monthly, *ad hoc*).

**Reasonable Accommodation:** An adjustment made to the requirements of the COVID-19 Vaccination Program for a Covered Individual who has received an approved Exception or Deferral to allow them to Physically Access a University Location or Program without impairing the health and safety objectives of this policy. Covered Individuals who are granted Exceptions or Deferrals will be required to observe Non-Pharmaceutical Interventions as a condition of Physical Presence.

**Religious Objection:** A Covered Individual's objection to receiving the COVID-19 vaccine based on that person's sincerely held religious belief, practice, or observance.

**Responsible Office:** The office at a Location responsible for processing requests for Exception or Deferral. The list of such offices can be found online at: COVID-19 Vaccination Program: Responsible Offices..

**Students:** The term "Student" has the same meaning as defined in the current version of PACAOS 14.40: an individual for whom the University maintains student records and

Exhibit B

**University of California – Policy**
SARS-CoV-2 (COVID-19) Vaccination Program

who: (i) is enrolled in or registered with an academic program of the University; (ii) has completed the immediately preceding term, is not presently enrolled, and is eligible for reenrollment; or (iii) is on an approved educational leave or other approved leave status, or is on filing-fee status. For purposes of this policy, the term "Student" also includes K-12 students, children enrolled in day care programs, and campers who are eligible for vaccination outside clinical trials; as well as visiting students and extension students.

**Trainees:** Trainees include participants in post-graduate training programs who are neither Students nor Personnel; as well as individuals enrolled in continuing education, lifelong learning, seminars, workshops, and other non degree-granting educational programs.

**University or UC:** The University of California.

**University Program:** A program or activity operated by the University to support the University's teaching or research mission and generally offered exclusively to University Personnel or Students. Examples of covered Programs that may not be conducted at a Location include the UC Education Abroad Program and University-sponsored athletics programs.

**Vaccine:** A COVID-19 Vaccine satisfies the requirements of this policy if: (i) the U.S. Food and Drug Administration (FDA) has issued a License or an Emergency Use Authorization (EUA) for the vaccine or; (ii) the World Health Organization has approved Emergency Use Listing (EUL).

**Vaccine Information Statement ("VIS"):** An information sheet produced by or including information derived from the Centers for Disease Control and Prevention, the California Department of Public Health, or UC Health or any of its components, explaining in plain language the benefits and risks of a COVId-19 vaccine to vaccine recipients. A VIS generally must be provided to an individual being vaccinated prior to each dose of the vaccine, in a language they understand. For purposes of this policy, a VIS may also include FDA fact sheets for vaccine recipients and caregivers.

## III.  POLICY TEXT

This policy supplements, and does not replace, policies or guidelines requiring University Personnel, Trainees, Students, patients, and visitors to observe Non-Pharmaceutical Interventions, as further described in Appendix A: COVID-19 Prevention Strategies.

    **A.  COVID-19 Vaccination Program.** As a condition of Physical Presence at a Location or in a University Program, all Covered Individuals must Participate in the COVID-19 Vaccination Program by providing proof of Full Vaccination or submitting a request for Exception or Deferral no later than the Implementation Date. This requirement will be subject to implementation guidelines and any local procedures for enforcement. Alternative remote instructional programming is not expected to be available in most cases and the availability of alternative remote work arrangements will depend on systemwide guidance and any local policies or procedures, as well as the nature of the work to be performed.

University of California – Policy
SARS-CoV-2 (COVID-19) Vaccination Program

1. **Access to Vaccination.** All Locations that are campuses and medical centers must offer COVID-19 vaccination on-site or maintain a list of nearby and accessible off-site locations offering vaccination to Covered Individuals during working and non-working hours. This provision is not intended to restrict a Covered Individual's choice of provider, but to maximize their access to the Vaccine.

2. **Proof of Vaccination.** Covered Individuals must submit proof of their vaccination or of a University-approved Exception or Deferral to their Location Vaccine Authority, by providing: (i) in the case of one who has been Fully Vaccinated, a copy of their CDC vaccination card (or foreign equivalent in the case of Covered Individuals who received their vaccinations abroad); official documentation issued by a State vaccine registry; or an official medical record; or (ii) in the case of one who has received an Exception or Deferral, documentation that the Exception or Deferral has been granted. Proof of vaccination may be subject to audit.

   **Request for Exception/Deferral**. A Covered Individual seeking an Exception or Deferral must, no later than the Implementation Date, submit their request to the appropriate Responsible Office. While a request is pending, the Covered Individual must, as a condition of Physical Presence, observe Non-Pharmaceutical Interventions defined by the LVA consistent with applicable public health directives and the guidelines in Appendix A: COVID-19 Prevention Strategies. If an Exception or Deferral is granted, the issuing office must notify the Covered Individual and the LVA of the approval and the associated expiration date, if any. If a request for Exception or Deferral is denied, the Covered Individual will be notified and, thereafter, will be expected to promptly become Fully Vaccinated or denied Physical Presence at the relevant University Location(s) or Program(s).

3. **Education.** Any Covered Individual who has not provided proof of Full Vaccination by the Implementation Date will receive from the Location Vaccine Authority or designee information concerning:

   a. The potential health consequences of COVID-19 illness for themselves, family members and other contacts, coworkers, patients, and the community;

   b. Occupational exposure to SARS-CoV-2;

   c. The epidemiology and modes of transmission, diagnosis, and non-vaccine infection control strategies (such as the use of appropriate precautions, personal protective equipment or face coverings, and respiratory hygiene/cough etiquette), in accordance with their level of responsibility in preventing COVID-19 infections;

   d. The potential benefits of COVID-19 vaccination; and

   e. The safety profile and risks of any COVID-19 vaccine.

University of California – Policy
SARS-CoV-2 (COVID-19) Vaccination Program

The information may be conveyed through any combination of written information statements, verbal communications, or online or in-person training programs, as required by the Location Vaccine Authority.

This educational requirement is not an alternative to required Participation in the COVID-19 Vaccination Program as a condition of Physical Presence at a University Location or Program as set forth above.

4. **Registration Holds.** Program implementation and enforcement with respect to Students will be handled consistent with the procedural provisions of the Student Immunization Policy. Students who fail to provide proof of vaccination or apply for an Exception or Deferral by the Implementation Date may, therefore, be subject to a registration hold.

5. **Non-Pharmaceutical Interventions.** All Covered Individuals must participate in Non-Pharmaceutical Interventions described in Appendix A: COVID-19 Prevention Strategies, as implemented by the relevant University Location or Program. In the event of a COVID-19 outbreak, Covered Individuals and Covered Non-Affiliates who are not Fully Vaccinated may be excluded from the Location or site of the outbreak.

6. **Optional Additional Measures.** Covered Individuals may wear masks or face coverings even if they are Fully Vaccinated.

B. **Covered Non-Affiliates.** Each University Location and Program will define any requirements for public or other Covered Non-Affiliate Physical Presence (for example, at health facilities, entertainment venues, museums, libraries, workout facilities, or dining halls or food courts), consistent with applicable public health guidance.

C. **Superseding Public Health Directives.** A federal, state, or local public health agency with jurisdiction may impose a COVID-19 vaccination requirement that lawfully supersedes this policy. In the event of a perceived conflict between public health requirements and this Policy, UC Legal should be consulted.

D. **Tracking and Reporting**

1. **Vaccination Data.** The following information must be recorded and tracked by the Location Vaccine Authority or designee in the Covered Individual's confidential health record, consistent with University privacy and security policies including BFB-IS-3 (Electronic Information Security Policy):
   (i) date(s) of administration and vaccine type and manufacturer; and
   (ii) documentation of a University-approved Exception or Deferral.

2. **Vaccines Administered by the University**

   a. *Registries.* For all vaccinations administered by the University in its capacity as healthcare provider, appropriate information will be submitted to the California Immunization Registry (CAIR) or such other registries as may be required by applicable public health agencies or University policy. While vaccine recipients ordinarily are permitted to opt out from registry reporting in California, the California Department of Public Health has mandated that all

**University of California – Policy**
SARS-CoV-2 (COVID-19) Vaccination Program

participating vaccinators report each dose of COVID-19 vaccine administered. Accordingly, the typical opt-out option does not apply.

    b. *Adverse Events.* Any adverse events associated with COVID-19 vaccine administered at a Location and reported to the University must be tracked and logged by the LVA or designee and reported to federal and state public health officials using the [Vaccine Adverse Event Reporting System (VAERS)](#).

**E. Program Evaluation.** Unless UCOP requires more regular reporting, Individual Healthcare Locations must, and other Locations may, evaluate Program Participation on an annual and ongoing basis, including evaluation of equity in Program implementation; as well as reasons identified for non-Participation or untimely Participation and the number and population-level characteristics of Covered Individuals who are not vaccinated.

## IV.  COMPLIANCE / RESPONSIBILITIES

A. CDC and FDA generally translate VIS into many languages commonly spoken in California and elsewhere in the United States and post these online. Whenever the University is administering a vaccine in its capacity as healthcare provider, the relevant VIS should be provided to a person receiving vaccine in a language that they understand. In the unlikely event relevant VIS translations are unavailable, they should be accompanied when distributed with a document with [taglines such as those approved by the U.S. Department of Health & Human Services to facilitate language access by all affected Personnel, Trainees, and Students](#). Interpreters should also be made available in person, by video, or by phone during vaccine clinics.

B. Each campus is responsible for: (i) assuring any necessary updates are made to its local Infectious Diseases/Infection Prevention and Control Programs; (ii) establishing deadlines for COVID-19 Vaccination Program Participation on an annual or ongoing basis, in consultation with epidemiology and infection prevention experts and occupational health representatives as applicable and consistent with any supply limitations; and (iii) assuring implementation of the COVID-19 Vaccination Program at all sites.

    1. Implementation includes informing Personnel, Trainees, and Students of the requirement and deadline for Program Participation, dates and Locations for on-site administration, and that vaccines will be provided at no cost to them if they wish to receive the vaccine from the University.

    2. Each campus should implement strategies for vaccine access, including efforts to ensure vaccination availability during all work shifts and to address vaccine hesitancy, particularly among groups at most significant risk for contracting COVID-19 and suffering severe illness.

C. Chancellors, Laboratory Directors, and the Vice President ANR are responsible for implementing this policy. Deans, Department Chairs, unit heads, managers, supervisors, student affairs leaders, and others with responsibility for personnel

University of California – Policy
SARS-CoV-2 (COVID-19) Vaccination Program

management will support Program implementation and enforcement. Consultation with Academic Senate leaders, especially on the campus, is encouraged with respect to implementation procedures for academic appointees.

## V.   PROCEDURES

A systemwide implementation working group will develop implementation guidelines for this policy, which will subsequently be attached to the policy. Each Location may establish local procedures consistent with those guidelines to facilitate implementation of the policy.

## VI.   RELATED INFORMATION

- Advisory Committee on Immunization Practices – *Ethical Principles for Allocating Initial Supplies of COVID-19 Vaccine – United States, 2020 (MMWR Nov. 23, 2020)* and *Meeting Information* (November 23 and December 1, 2020)

- American College Health Association Recommends COVID-19 Vaccination Requirements for All On-Campus College Students in Fall 2021

- American College of Obstetricians and Gynecologists, COVID-19 Vaccination Recommendations for Obstetric-Gynecologic Care (December 2020)

- UC Health Coordinating Committee – Bioethics Working Group Vaccine Allocation Recommendations

- Cal. Health & Safety Code Division 2, Chapter 2, Article 3.5

- California Department of Public Health, Licensees Authorized to Administer Vaccine in California

- Centers for Disease Control and Prevention, COVID-19 Contraindications and Precautions

- Centers for Disease Control and Prevention, COVID-19 Vaccine Training: General Overview of Immunization Best Practices for Healthcare Providers

- FDA COVID-19 Vaccine Information

- FDA AstraZeneca COVID-19 Vaccine (includes fact sheet and translations) [COMING SOON]

- FDA Janssen COVID-19 Vaccine (includes fact sheet and translations)

- FDA Pfizer-BioNTech COVID-19 Vaccine (includes fact sheet and translations)

- FDA Moderna COVID-19 Vaccine (includes fact sheet and translations)

- CDC COVID-19 Vaccination

- CDC COVID Vaccination Program Planning Guidance

- CDC Vaccine Recommendation Process

Exhibit B

**University of California – Policy**
SARS-CoV-2 (COVID-19) Vaccination Program

- [American Medical Association, Opinion 8.7, Routine Universal Immunization of Physicians](#) and KB O'Reilly, *Are Physicians Obligated to Get Vaccinated Against COVID-19?* (November 16, 2020)

- [Infectious Disease Society of America – COVID-19 Vaccine Information](#)

- [Congregation for the Doctrine of the Faith, Note on the Morality of Using Some Anti-COVID-19 Vaccines](#) (December 21, 2020)

- [UC Responsible Offices](#)

## VII. FREQUENTLY ASKED QUESTIONS

1. *What is the relationship between this policy and the previously posted interim policy?* This policy replaces the previously posted interim policy in its entirety.

2. *The policy both encourages and requires members of the University Community to be vaccinated. Which is it?* The policy strongly *encourages* all members of the University Community to be vaccinated. Only Covered Individuals are *required* to Participate in the Program by becoming Fully Vaccinated or receiving a University-approved Exception or Deferral.

3. *Why is UC allowing exceptions for reasons other than medical exemption? If California can eliminate personal belief and religious exceptions for K-12 students, why can't UC do the same?* The University is required by law to offer reasonable accommodations to individuals who qualify for an Exception to the vaccination requirement based on their disability, as well as to employees who object to vaccination based on their sincerely-held religious belief, practice, or observance. A decision was made to apply the COVID-19 vaccine mandate consistently across all groups of individuals covered by this policy. Vaccination against the virus that causes COVID-19 is a critical step for protecting the health and safety of our communities and ending the pandemic.

4. *Is this a one-time mandate or will I be required to get boosters or annual shots?* This is a permanent policy. Infectious disease experts anticipate that annual or more frequent boosters will be necessary and receipt of boosters will be required, consistent with product labeling, in the same way that the initial vaccination is required by this policy and subject to the same Exceptions and Deferrals.

5. *Am I required to be vaccinated to attend school?* Covered Individuals must receive the COVID-19 vaccine as a condition to Physical Presence at Locations and in University Programs, unless they have been granted an Exception or Deferral.

6. *Will this requirement apply to union-represented employees?* Yes, in accordance with any applicable collective bargaining requirements.

7. *How do I apply for an Exception or Deferral?* Individuals covered by this policy who seek an exception (on medical, disability, or religious grounds) or deferral (during pregnancy) must complete the request form and submit it to their location's Responsible Office. Model forms have been published with this final policy for adaptation or as-is use by each location. Employees should use the forms adopted

Exhibit B

University of California – Policy
SARS-CoV-2 (COVID-19) Vaccination Program

by their location. Details will be communicated by each UC Location to Covered
Individuals.

8. *I am pregnant. Will I be eligible for a medical exemption?* No, but you are eligible
for a Deferral throughout your pregnancy or (if later) when you return to work or
instruction, as applicable. You may also be eligible for a disability accommodation.
According to the Centers for Disease Control and Prevention (CDC), pregnant
people and recently pregnant people are at increased risk for severe illness from
COVID-19 when compared with non-pregnant people. Severe illness includes
illness that requires hospitalization, intensive care, or a ventilator or special
equipment to breathe, or illness that results in death. Additionally, pregnant people
with COVID-19 are at increased risk of preterm birth and might be at increased risk
of other adverse pregnancy outcomes compared with pregnant people without
COVID-19. There is currently *no evidence* that any vaccines, including COVID-19
vaccines, cause female or male fertility problems. Accordingly, the University
strongly recommends that all Students, Trainees, and Personnel be vaccinated
unless they have Contraindications or Precautions. However if you are pregnant,
you will be eligible for Deferral through the end of the pregnancy or (if later) when
you return to work or instruction, as applicable.

9. *I was recently diagnosed with COVID-19, and/or I had an antibody test that shows
that I have natural immunity. Does this support a Medical Exemption?* You may be
eligible for a temporary Medical Exemption (and, therefore, a temporary
Exception), for up to 90 days after your diagnosis and certain treatments.
[According to the US Food and Drug Administration](), however, "a positive result
from an antibody test does not mean you have a specific amount of immunity or
protection from SARS-CoV-2 infection … Currently authorized SARS-CoV-2
antibody tests are not validated to evaluate specific immunity or protection from
SARS-CoV-2 infection." For this reason, individuals who have been diagnosed with
COVID-19 or had an antibody test are not permanently exempt from vaccination.

10. *I am participating or have participated in a vaccine clinical trial for a vaccine that
has not been approved, and so I have not received a CDC card. Am I considered
to be in compliance with the policy?* The University will accept any FDA- or WHO-
authorized vaccine as fulfilling the mandate. If you participated in a trial of a
vaccine that has received authorization from *either* body, and you can show that
you did not receive the placebo (that is, your record has been "unblinded"), then
you will be considered in compliance with the policy. Boosters may later be
required as explained above.

11. *How will I know if my co-workers or fellow Students are going unvaccinated?* You
probably won't know. Because vaccination-related information is private and
confidential, the University will not disclose vaccine status of Covered Individuals
except on a need-to-know basis; however third parties and some Locations may
distribute badge attachments, stickers, pins, or other indicators that vaccinated
individuals may use to show that they have received the vaccine.

12. *I teach both seminar and lecture classes, and as a result am typically exposed to
many students. Will I be informed if someone in my class is not vaccinated? If not,*

University of California – Policy
SARS-CoV-2 (COVID-19) Vaccination Program

*will all students be required to wear masks?* As will be the case in any public setting, you will not be informed of the vaccination status of individual students and should expect that some may not be vaccinated due to pending or granted Exceptions or Deferrals. Guidance on face coverings for individuals who have and have not been Fully Vaccinated is provided in Appendix A: COVID-19 Prevention Strategies.

13. *Will University of California Health specify which authorized or licensed vaccine is preferred?* No. Any COVID-19 vaccine authorized or approved by the U.S. Food and Drug Administration or by the World Health Organization will be accepted to satisfy the vaccination requirement.

14. *Will Locations provide paid time off for non-exempt employees for the time needed to get vaccinated?* Yes. Non-exempt employees and hourly academic appointees may take up to four hours of paid time to obtain each dose of the SARS-CoV-2 (COVID-19) vaccine. These employees and academic appointees must provide advance notice to their supervisor. If an employee or academic appointee needs more time for this purpose before September 30, 2021, the employee or academic appointee may request 2021 Emergency Paid Sick Leave (EPSL) (Reason 3(d)) for the additional time.

15. *What if I experience flu-like symptoms as a result of the vaccine that mean I cannot work as scheduled, or attend classes?* Employees should contact their supervisors or local human resources offices for instruction but as a general matter, accrued sick leave, vacation, and/or PTO may be used to take time off as needed to recover. Before September 30, 2021, employees may also request EPSL (Reason 3(e)) for that purpose. Students should contact their faculty/instructors regarding minor illnesses or disability services to address any significant issues.

16. *If I have applied for or been granted an Exception or Deferral, what Non-Pharmaceutical Interventions (NPIs) will I be required to observe?* See Appendix A: COVID-19 Prevention Strategies, which describes required NPIs. Additional safety measures may be deemed necessary, depending on the circumstances, by local public health, environmental health and safety, occupational health, or infection prevention authorities, including the Location Vaccine Authority. In that case, a person who has received an approved Exception or Deferral (or whose request is pending) will be informed of any additional requirements.

17. *Who will pay for the vaccine?* Initial supplies have been paid for by the federal government. Vaccines administered by the University to consenting Covered Individuals as part of the COVID-19 Vaccination Program (e.g., during vaccine clinics or at employee health or occupational health offices) are administered free of charge. In addition, all of the University's health plans cover CDC-recommended vaccines administered by an employee's primary care physician or at a local pharmacy.

18. *How will enforcement work for failure to participate in the program?* Efforts will be made to encourage Participation in the COVID-19 Vaccination Program prior to the Implementation Date. Those Covered Individuals who fail to Participate by being Vaccinated or requesting an Exception or Deferral on or before the Implementation

University of California – Policy
SARS-CoV-2 (COVID-19) Vaccination Program

Date will be barred from Physical Presence at University Facilities and Programs, and may experience consequences as a result of non-Participation, up to and including dismissal from educational programs or employment.

19. *I am at high risk for severe illness if I contract COVID-19 (e.g., immunocompromised) and even though I have been vaccinated, I know that no vaccine is 100% effective. Do I have to come to work if my co-workers or Students are not all vaccinated? What accommodations will be made for me?* Please contact your local disability services office to discuss your situation and possible accommodations.

20. *Will the University accept internationally approved vaccines even if not authorized or approved in the United States* Yes, if the vaccine is authorized by the World Health Organization (WHO). The WHO has developed a process for assessing and listing unlicensed vaccines, therapeutics, and diagnostics during public health emergencies. Through that process, a number of vaccines not available in the United States have received Emergency Use Listing (EUL). A document summarizing the status of a wide range of international vaccines can be found online on the WHO's website (click on link to status of COVID-19 vaccines in the EUL/PQ evaluation). The University will, consistent with CDC and CDPH guidance, accept proof of Full Vaccination with any international vaccine that has been authorized for emergency use by WHO through the EUL process. People who have completed a COVID-19 vaccination series with one of these vaccines *do not need* additional doses with an FDA-licensed or -authorized COVID-19 vaccine, at least initially (but may be subject to subsequent booster requirements). Those who are not Fully Vaccinated generally will be required to receive an FDA-licensed or -authorized Vaccine no less than 28 days after their last international vaccination (but may consult with the LVA or designee to discuss eligibility for a temporary Medical Exemption). In the interim, they will be treated as if they are not Fully Vaccinated.

21. *I was vaccinated in another country, where the government increased the time between first and second vaccines to longer than the CDC and FDA advise. Do I have to be revaccinated?* No. If you have proof of completing a series of any FDA-licensed or FDA- or WHO-authorized vaccine consistent with your country's implementation, you will be considered to have been Fully Vaccinated.

22. *I cannot come back to campus 3-4 weeks before school starts, and I can't access any vaccine in my country. Will I be allowed on campus?* Yes. You will be allowed on campus but will be referred to a vaccine site to get vaccinated immediately, unless you qualify for a University-approved Exception or Deferral. Until you are Fully Vaccinated, you will be subject to the NPIs described in Appendix A: COVID-19 Prevention Strategies for unvaccinated individuals. Additional safety measures may be deemed necessary, depending on the circumstances, by local public health, environmental health and safety, occupational health, or infection prevention authorities, including the Location Vaccine Authority.

## VIII. REVISION HISTORY

First Effective Date: December 14, 2020

Amended: January 15, 2021 (extended from UC Health to all University locations)

Amended: July 15, 2021 (extended to Students, effective Fall 2021; and vaccine mandated at that time for all groups subject only to limited Exceptions and Deferrals)

This Policy is formatted to meet Web Content Accessibility Guidelines (WCAG) 2.0.

## IX. APPENDICES

A. COVID-19 Prevention Strategies
B. Vaccine Information Statements [COMING SOON]
    a. FDA EUA Fact Sheet for Recipients and Caregivers (AstraZeneca) [COMING SOON]
    b. FDA EUA Fact Sheet for Recipients and Caregivers (Janssen)
    c. FDA EUA Fact Sheet for Recipients and Caregivers (Pfizer-BioNTech)
    d. FDA EUA Fact Sheet for Recipients and Caregivers (Moderna)
C. COVID-19 Vaccination Program: Responsible Offices.
D. Exceptions and Deferrals
    a. Medical Exemption and/or Disability Exception Request Form
    b. Religious Exception Request Form
    c. Deferral Request Form
    d. Approval of Request for Exception or Deferral Form
    e. Denial of Request for Exception or Deferral Form

Note: The model forms are provided for convenience only and may be adapted by locations consistent with applicable policies and practices.

E. Implementation Guidelines: Exceptions and Deferrals
F. Implementation Guidelines: Employee Compliance

   Compliance Flowchart

**UNIVERSITY OF CALIFORNIA**
**MEDICAL EXEMPTION AND/OR DISABILITY EXCEPTION REQUEST FORM**
Exception to SARS-CoV-2 (COVID-19) Vaccination Requirement

| EMPLOYEE OR STUDENT NAME | EMPLOYEE OR STUDENT ID |
|---|---|
| JOB TITLE (IF APPLICABLE) | LOCATION |
| DEPARTMENT | SUPERVISOR (IF APPLICABLE) |
| PHONE NUMBER | EMAIL |

*This form should be used by University employees and students to request an Exception to the COVID-19 vaccination requirement in the University's SARS-CoV Vaccination Program Policy based on (a) Medical Exemption due to a Contraindication or Precaution to COVID-19 vaccination recognized by the U.S. Centers for Disease Control and Prevention (CDC) or by the vaccines' manufacturers; (b) Medical Exemption due to COVID-19 diagnosis or treatment within the last 90 days; or (c) Disability.*

*Fill out Part A to request a Medical Exemption due to Contraindication or Precaution. Fill out Part B to request a Medical Exemption due to COVID-19 diagnosis or treatment within the last 90 days.  Fill out Part C to request an Exception based on Disability. More than one section may be completed if applicable. Important: Do not identify any diagnosis, disability, or other medical information (other than COVID-19 diagnosis in Part B). That information is not required to process your request.*

**Part A: Request for Medical Exemption Due to Contraindication or Precaution**

☐      The Contraindications or Precautions to COVID-19 vaccination recognized by the CDC or by the vaccines' manufacturers apply to me with respect to all available COVID-19 vaccines. For that reason, I am requesting an Exception to the COVID-19 vaccination requirement based on Medical Exemption. My request is supported by the attached certification from my health care provider. *I understand that some local (city/county) public health departments have issued orders specifying that the certification must be signed by a physician, nurse practitioner, or other licensed medical professional practicing under the license of a physician.*

**Part B: Request for Medical Exemption Due to COVID-19 Diagnosis or Treatment**

☐      I have been diagnosed with or treated for COVID-19 within the last 90 days. For that reason, I am requesting an Exception to the COVID-19 vaccination requirement based on Medical Exemption. My request is supported by the attached certification from my health care provider. *I understand that some local (city/county) public health departments have issued orders specifying that the certification must be signed by a physician, nurse practitioner, or other licensed medical professional practicing under the license of a physician.*

Exhibit B

**UNIVERSITY OF CALIFORNIA**
**MEDICAL EXEMPTION AND/OR DISABILITY EXCEPTION REQUEST FORM**
Exception to SARS-CoV-2 (COVID-19) Vaccination Requirement

**Part C: Request for Exception Based on Disability**

☐ I have a Disability and am requesting an Exception to the COVID-19 vaccination requirement as a Disability accommodation. My request is supported by the attached certification from my health care provider. *I understand that some local (city/county) public health departments have issued orders specifying that the certification must be signed by a physician, nurse practitioner, or other licensed medical professional practicing under the license of a physician.*

Please provide any additional information that you think may be helpful in processing your request. *Again, do <u>not</u> identify your diagnosis, disability, or other medical information.*

_____

**While my request is pending, I understand that I must comply with the Non-Pharmaceutical Interventions (e.g., face coverings, regular asymptomatic testing) for unvaccinated or not fully vaccinated individuals as a condition of my Physical Presence at any University Location/Facility or Program. These required Non-Pharmaceutical Interventions are defined by my Location's public health, environmental health and safety, occupational health, or infection prevention authorities, including the Location Vaccine Authority. I also understand that I must comply with any additional Non-Pharmaceutical Interventions applicable to my circumstances or position, as required by my Location. If my request is granted, I understand that I will be required to comply with Non-Pharmaceutical Interventions specified by my Location as a condition of my Physical Presence at any University Location/Facility or Program.**

**I verify the truth and accuracy of the statements in this request form.**

Employee/Student Signature: _____ Date: _____

Date Received by University: _____ By: _____

35
Exhibit B

**UNIVERSITY OF CALIFORNIA**
**MEDICAL EXEMPTION AND/OR DISABILITY EXCEPTION REQUEST FORM**
Exception to SARS-CoV-2 (COVID-19) Vaccination Requirement

## CERTIFICATION FROM HEALTH CARE PROVIDER

The University of California requires that its employees and students be vaccinated against COVID-19 infection as a condition of accessing any University location, facility, or program in person. The University may grant Exceptions to this requirement based on (a) Medical Exemption due to a Contraindication or Precaution to COVID-19 vaccination recognized by the U.S. Centers for Disease Control and Prevention (CDC) or by the vaccines' manufacturers; (b) Medical Exemption due to COVID-19 diagnosis or treatment within the last 90 days; or (c) Disability, provided that the individual's request for such an Exception is supported by a certification from their qualified licensed health care provider.

| HEALTH CARE PROVIDER NAME | LICENSE TYPE, # AND ISSUING STATE |
|---|---|
| FULL NAME OF PATIENT | DATE OF BIRTH OF PATIENT |
| PATIENT'S EMPLOYEE/STUDENT/TRAINEE ID NUMBER | HEALTH CARE PROVIDER PHONE/EMAIL |
| PHYSICIAN SUPERVISOR AND LICENSE # (FOR A PHYSICIAN ASSISTANT WORKING UNDER A PHYSICIAN'S LICENSE) | |

Please note the following from the Genetic Information Nondiscrimination Act of 2008 (GINA), which applies to all University employees:

*The Genetic Information Nondiscrimination Act of 2008 (GINA) prohibits employers and other entities covered by GINA Title II from requesting or requiring genetic information of an individual or family member of the individual, except as specifically allowed by this law. To comply with this law, we are asking that you not provide any genetic information when responding to this request for medical information. "Genetic information," as defined by GINA, includes an individual's family medical history, the results of an individual's or family member's genetic tests, the fact that an individual or an individual's family member sought or received genetic services, and genetic information of a fetus carried by an individual or an individual's family member or an embryo lawfully held by an individual or family member receiving assistive reproductive services.*

**Please complete Part A of this form if one or more of the Contraindications or Precautions to COVID-19 vaccination recognized by the CDC or the vaccines' manufacturers apply to this patient. Please complete Part B if this patient has been diagnosed with or treated for COVID-19 within the last 90 days. Please complete Part C if this patient has a Disability, as defined below, that makes COVID-19 vaccination inadvisable in your professional opinion. More than one section may be completed if applicable to this patient. <u>Important</u>: Do not identify the patient's diagnosis, disability, or other medical information (other than COVID-19 diagnosis in Part B) as this document will be returned to the University.**

**UNIVERSITY OF CALIFORNIA**
**MEDICAL EXEMPTION AND/OR DISABILITY EXCEPTION REQUEST FORM**
Exception to SARS-CoV-2 (COVID-19) Vaccination Requirement

## Part A: Contraindication or Precaution to COVID-19 Vaccination

☐ I certify that one or more of the Contraindications or Precautions recognized by the CDC or by the vaccines' manufacturers for each of the currently available COVID-19 vaccines applies to the patient listed above. For that reason, COVID-19 vaccination using *any* of the currently available COVID-19 vaccines is inadvisable for this patient in my professional opinion. The Contraindication(s) and/or Precaution(s) is/are:
☐ Permanent ☐ Temporary.

If temporary, the expected end date is:          .

## Part B: COVID-19 Diagnosis or Treatment Within Last 90 Days

☐ I certify that my patient has been diagnosed with or treated for COVID-19 within the last 90 days.

☐ My patient's COVID-19 diagnosis or last day of treatment (whichever is later) was on          .

☐ My patient is being actively treated for COVID-19.  The expected end date of treatment is:          .

## Part C: Disability That Makes COVID-19 Vaccination Inadvisable

*"Disability" is defined as a physical or mental disorder or condition that limits a major life activity and any other condition recognized as a disability under applicable law. "Disability" includes pregnancy, childbirth, or a related medical condition where reasonable accommodation is medically advisable.*

☐ I certify that the patient listed above has a Disability, as defined above, that makes COVID-19 vaccination inadvisable in my professional opinion. The patient's disability is: ☐ Permanent ☐ Temporary.

If temporary, the expected end date is:          .

_____          _____
Signature of Health Care Provider                          Date

37
Exhibit B

## UNIVERSITY OF CALIFORNIA
## RELIGIOUS EXCEPTION REQUEST FORM
### Accommodation to SARS-CoV-2 (COVID-19) Vaccination Requirement

| | |
|---|---|
| EMPLOYEE OR STUDENT NAME | EMPLOYEE OR STUDENT ID |
| JOB TITLE (IF APPLICABLE) | LOCATION |
| DEPARTMENT (IF APPLICABLE) | SUPERVISOR (IF APPLICABLE) |
| PHONE NUMBER | EMAIL |

**Based on my sincerely held religious belief, practice, or observance, I am requesting an Exception to the COVID-19 vaccination requirement in the University's SARS-CoV-2 Vaccination Program Policy as a religious accommodation.**

Please identify your sincerely held religious belief, practice, or observance that is the basis for your request for an Exception as a religious accommodation.

Please briefly explain how your sincerely held religious belief, practice, or observance conflicts with the University's COVID-19 vaccination requirement.

Please provide any additional information that you think may be helpful in processing your religious accommodation request.

**While my request is pending, I understand that I must comply with the Non-Pharmaceutical Interventions (e.g., face coverings, regular asymptomatic testing) for unvaccinated or not fully vaccinated individuals as a condition of my Physical Presence at any University Location/Facility or Program. These required Non-Pharmaceutical Interventions are defined by my Location's public health, environmental health and safety, occupational health, or infection prevention authorities, including the Location Vaccine Authority.  I also understand that I must comply with any additional Non-Pharmaceutical Interventions applicable to my circumstances or position, as required by my Location. If my request is granted, I understand that I will be required to comply with Non-Pharmaceutical Interventions specified by my Location as a condition of my Physical Presence at any University Location/Facility or Program.**

**I verify the truth and accuracy of the statements in this request form.**

Employee/Student Signature: _____ Date: _____

Date Received by University: _____ By: _____

Exhibit B

**UNIVERSITY OF CALIFORNIA**
**DEFERRAL REQUEST FORM**
Deferral of SARS-CoV-2 (COVID-19) Vaccination Requirement

| EMPLOYEE/STUDENT NAME | EMPLOYEE/STUDENT ID |
|---|---|
| JOB TITLE (IF APPLICABLE) | LOCATION |
| DEPARTMENT (IF APPLICABLE) | SUPERVISOR (IF APPLICABLE) |
| PHONE NUMBER | EMAIL |

*This form should be used by University employees and students to request a Deferral of the COVID-19 vaccination requirement in the University's* SARS-CoV-2 Vaccination Program Policy *during pregnancy.*

☐      I am currently pregnant and am requesting a Deferral of the COVID-19 vaccination requirement during my pregnancy. My anticipated due date is: _____.

**While my request is pending, I understand that I must comply with the Non-Pharmaceutical Interventions (e.g., face coverings, regular asymptomatic testing) for unvaccinated or not fully vaccinated individuals as a condition of my Physical Presence at any University Location/Facility or Program. These required Non-Pharmaceutical Interventions are defined by my Location's public health, environmental health and safety, occupational health, or infection prevention authorities, including the Location Vaccine Authority.  I also understand that I must comply with any additional Non-Pharmaceutical Interventions applicable to my circumstances or position, as required by my Location. If my request is granted, I understand that I will be required to comply with Non-Pharmaceutical Interventions specified by my Location as a condition of my Physical Presence at any University Location/Facility or Program.**

**I verify the truth and accuracy of the statements in this request form.**

Employee/Student Signature: _____ Date: _____

Date Received by University: _____ By: _____

39
Exhibit B

## UNIVERSITY OF CALIFORNIA
## APPROVAL OF REQUEST FOR EXCEPTION OR DEFERRAL
### SARS-CoV-2 (COVID-19) Vaccination Requirement

| TO: | EMPLOYEE/STUDENT NAME | | EMPLOYEE/STUDENT ID |
|---|---|---|---|
| FROM: | ISSUING OFFICE | | ISSUING OFFICE PHONE/EMAIL |
| | ISSUING AUTHORITY NAME | | ISSUING AUTHORITY TITLE |
| CC: | LOCATION VACCINE AUTHORITY NAME/EMAIL | | |

On _____, we received your request for the following in connection with the COVID-19 vaccination requirement in the University's SARS-CoV-2 Vaccination Program Policy:

☐ Exception based on Medical Exemption
☐ Exception based on Disability
☐ Exception based on Religious Objection
☐ Deferral based on pregnancy

For Exceptions: Based on the information you have provided, your request for Exception has been **APPROVED** subject to the requirement that you comply with the Non-Pharmaceutical Interventions specified below. This approval is valid ☐ until _____ ☐ indefinitely. If your approval has an end date and you no longer need an Exception or Deferral at that time, you will have until _____ (eight [8] weeks after the end date) to become Fully Vaccinated and submit proof of vaccination.

For Deferrals: Based on the information you have provided, your request for Deferral has been **APPROVED** subject to the requirement that you comply with the Non-Pharmaceutical Interventions specified below. This approval is valid until you return to work or instruction, as applicable. If you no longer need an Exception or Deferral at that time, you must become Fully Vaccinated and submit proof of vaccination within eight (8) weeks of your return.

**You must comply with the Non-Pharmaceutical Interventions (e.g., face coverings, regular asymptomatic testing) for unvaccinated or not fully vaccinated individuals as a condition of your Physical Presence at any University Location/Facility or Program. These required Non-Pharmaceutical Interventions are defined by your Location's public health, environmental health and safety, occupational health, or infection prevention authorities, including the Location Vaccine Authority. You must also comply with the following Non-Pharmaceutical Interventions applicable to your position (if any):**

If you have any questions or concerns regarding the above, please contact: _____ .

**BY SIGNING BELOW, YOU CERTIFY THAT YOU HAVE BEEN INFORMED OF THE RISKS OF COVID-19 INFECTION, INCLUDING LONG-TERM DISABILITY AND DEATH, BOTH FOR YOU AND FOR OTHERS WHO YOU MAY EXPOSE TO THE DISEASE.**

Approved by: _____     Date: _____
              (Signature of Issuer)

Accepted: _____     Date: _____
           (Signature of Employee/Student)

Exhibit B

## UNIVERSITY OF CALIFORNIA
## DENIAL OF REQUEST FOR EXCEPTION OR DEFERRAL
### SARS-CoV-2 (COVID-19) Vaccination Requirement

| TO: | EMPLOYEE/STUDENT NAME/EMAIL | EMPLOYEE/STUDENT ID |
|---|---|---|
| FROM: | ISSUING OFFICE | ISSUING OFFICE PHONE/EMAIL |
| | ISSUING AUTHORITY NAME | ISSUING AUTHORITY TITLE |
| CC: | LOCATION VACCINE AUTHORITY NAME/EMAIL | |

On _____, we received your request for the following in connection with the COVID-19 vaccination requirement in the University's SARS-CoV-2 Vaccination Program Policy:

☐ Exception based on Medical Exemption
☐ Exception based on Disability
☐ Exception based on Religious Objection
☐ Deferral based on pregnancy

Your request has been **DENIED** based on the information we have received to date.

The reason for the denial is the following:

☐ You do not qualify for the Exception/Deferral that you requested.

☐ Your request is incomplete. We have requested the following additional information from you but have not received it.


☐ You are not a Covered Individual as defined by the SARS-CoV-2 Vaccination Program Policy. This means that you are not required to be vaccinated against COVID-19 at this time, so you do not need an Exception or Deferral to the University's COVID-19 vaccination requirement. If you later become a Covered Individual and wish to request an Exception or Deferral at that time, you will need to submit a new request.  (Note:  The deadlines referenced below do not apply to you.)

Because your request for an Exception/Deferral has been denied, **you have until _____ (14 calendar days from the denial date below) to submit proof that you have received your first dose of a COVID-19 vaccine. That proof must include the date that you received it.  You then have until _____ (eight [8] weeks from the denial date below) to submit proof that you are Fully Vaccinated**. If either of the dates above falls on a weekend or University holiday, the deadline for providing the required proof is the next business day that is not a University holiday.

**Until you are Fully Vaccinated, you must comply with the Non-Pharmaceutical Interventions (e.g., face coverings, regular asymptomatic testing) for unvaccinated or not fully vaccinated individuals as a condition of your Physical Presence at any University Location/Facility or Program. These required Non-Pharmaceutical Interventions are defined by your Location's public health, environmental health and safety, occupational health, or infection prevention authorities, including the Location Vaccine Authority. You must also comply with the following Non-Pharmaceutical Interventions applicable to your position (if any):**


If you have any questions regarding the above, please contact:


Denied by: _____   Date: _____
             (Signature of Issuer)

41

Exhibit B

**University of California – Policy**
SARS-CoV-2 (COVID-19) Vaccination Program

## Appendices E, F: Implementation Guidelines

These Guidelines are provided to aid those charged with evaluating, processing, and resolving Personnel requests for Exception and/or Deferral to the University of California Policy: SARS-CoV-2 (COVID-19) Vaccination Program ("Program") and also provide information regarding compliance with the Program.

### APPENDIX E: EXCEPTIONS AND DEFERRALS

These Guidelines apply to Covered Individuals who physically access a University Location/Facility or University Program in connection with their employment or appointment and who have requested an Exception to the COVID-19 vaccination requirement based on Medical Exemption, Disability, and/or Religious Objection or who have requested a Deferral of that requirement based on pregnancy.

### I.   DEFINITIONS

All terms in the "Definitions" section the Program apply to these Guidelines.

*Additional Term:*

**Decision**: The determination of the approval or denial of an Exception or Deferral request.

### II.   ADMINISTRATION OF REQUESTS

#### A.  Establishment of a Responsible Office

1.  Locations should designate a particular office(s) and/or individual(s) to field Exception or Deferral requests and make this Responsible Office known to Personnel.

2.  This Office might be different for each type of Exception or Deferral allowed under the Program – e.g. Medical Exemption or Disability Exception requests may be processed by a different Office from the Religious Objection Exception requests.

3.  Locations can opt to utilize Third Party Administrator (TPA) Sedgwick to support the administration and review of Medical Exemptions, Disability Exceptions, Religious Objection Exceptions, and/or Deferrals due to pregnancy. If utilizing this option, the Location must still designate a Responsible Office to manage the coordination with Sedgwick.

#### B.  Documentation of the Request

1.  The Responsible Office is responsible for reporting all Exception and Deferral requests, approvals, and denials to the Local Vaccine Authority (LVA) at the Location.

2.  The Responsible Office should make Exception and Deferral Request Forms

**University of California – Policy**
SARS-CoV-2 (COVID-19) Vaccination Program

(see Program, Appendix D) publicly available to Personnel and available upon request.  Locations utilizing the TPA should provide full name and email address (individually or in a flat list format such as an Excel table) to the TPA; Sedgwick will then reply with the applicable Exception or Deferral Request Form.

3. Either the Responsible Office or TPA should evaluate the Exception or Deferral request using the standardized criteria.

4. The Responsible Office should use the Approval or Denial Form to record the Decision.

5. The Responsible Office will exercise best practice information security procedures and comply with BFB-IS-3 (Electronic Information Security Policy) as well as BFB-RMP-1 (the University Records Management Program) when storing Program records (e.g., Exception and Deferral request forms, approval forms, denial forms, related communications) and when notifying the LVA regarding pending requests for Exceptions/Deferrals and Exception/Deferral Decisions. Program records should be kept confidential and only accessed for Program-related purposes. Program records should not be stored in an employee's personnel file.

**C. Standardized Communications and Process**

1. All forms and notifications should follow standard templates. Location-specific forms may include consistently communicated modifications such as campus-specific non-pharmaceutical intervention (NPI) requirements, Responsible Office contact information, etc.

2. Communications and forms regarding Exceptions and Deferrals (including request forms, notifications such as a notice of pending request, notice of approval, and notice of denial) should be standardized as much as possible regardless of medium (e.g., digital/e-mail vs. hard-copy) or the office sending the communication (e.g., local Responsible Office or Sedgwick).

3. Communications should be made in a timely fashion, both acknowledging receipt of the request and communicating the subsequent Decision.

**D. Pending and Granted Exceptions and Deferrals Require Employee Use of NPI**

All forms and references to Exception and Deferral requests should clearly state that, as a condition of Physical Presence, employees are required to comply with the Location's NPI requirements (e.g., face coverings, regular asymptomatic testing) while an Exception or Deferral request is pending or after such requests have been approved.   NPI requirements may be amended and communicated to employees subsequently, such as if public health conditions prompt revisions to NPI requirements. See Appendix D of the Program for recommended model form language.

**University of California – Policy**
SARS-CoV-2 (COVID-19) Vaccination Program

### III.  DECISION PROCESS

A.  The Responsible Office will evaluate all Exception and Deferral requests consistently in both the application of the Guidelines and treatment of similarly situated Personnel throughout the University.

B.  The Responsible Office will utilize system-wide training for individuals charged with evaluating Exception or Deferral requests. The Responsible Office will stay up to date on training, which may be amended as new information or changes to conditions (i.e., Public Health) may require.

C.  The Responsible Office will contact Personnel in a timely fashion in the event that an incomplete form is submitted or more information is needed in order to evaluate the request.

### IV.  APPENDIX E REVISION HISTORY

**First Effective Date**: July 20, 2021

**Amended Effective Date**: August 11, 2021

## APPENDIX F: EMPLOYEE COMPLIANCE

### I.   SUMMARY

The purpose of the Program is to facilitate the protection of the health and safety of the University community. The Program requires employees to be Fully Vaccinated against COVID-19 before physically accessing the University's Locations/Facilities or University Programs, subject to specified Exceptions and Deferrals.

These Guidelines provide information regarding compliance with the Program by University of California policy-covered staff and Academic Personnel Manual (APM)-covered academic appointees. The University desires a consistent approach for all employee populations, including represented employees, subject to its collective bargaining obligations and applicable collective bargaining agreements.

### II.   EMPLOYEE REQUIREMENTS BY IMPLEMENTATION DATE

The COVID-19 vaccination requirement applies to UC employees who physically access the University's Locations/Facilities or University Programs in connection with their employment or appointment. As a condition of Physical Presence at a University Location/Facility or in a University Program, all of these UC employees must provide proof of Full Vaccination or submit a request for an Exception or Deferral no later than the applicable implementation date.

### III.   TIMELINE

The path to full compliance for each employee, including the notices provided, may differ depending upon the date that the employee complies with each compliance step or submits a Request for Exception/Deferral.

### IV.   REQUEST FOR EXCEPTION/DEFERRAL

An employee seeking an Exception or Deferral must, no later than the applicable implementation date, submit their request to the Responsible Office described in Section II.A of Appendix E. While a request is pending, the employee must, as a condition of Physical Presence, comply with non-pharmaceutical interventions (NPIs) defined by the Location.

####   A.   Request Approved

If an Exception or Deferral is granted, the issuing office must notify the employee and the Location Vaccine Authority of the approval and the associated expiration date, if any. The employee must, as a condition of Physical Presence, comply with NPIs defined by the Location.

####   B.   Request Denied

If an employee has submitted a single request for an Exception or Deferral that has been denied, or requests on more than one ground that have all been fully

45
Exhibit B

**University of California – Policy**
SARS-CoV-2 (COVID-19) Vaccination Program

considered and denied, the employee ("Non-Excepted Employee" hereafter) will receive a Denial of Request for Exception or Deferral.

### 1.  Employee Chooses to Become Fully Vaccinated

If the Non-Excepted Employee chooses to become Fully Vaccinated, they must provide proof that they have received their first shot within 14 calendar days of the date of denial. This proof must include the date of the first shot.

Until the Non-Excepted Employee is Fully Vaccinated, they must, as a condition of Physical Presence, comply with NPIs defined by the Location.

If the Non-Excepted Employee receives the Johnson & Johnson vaccine, they will be considered Fully Vaccinated two weeks after the date of the first shot. If they receive the Moderna or Pfizer vaccine, they will be considered Fully Vaccinated two weeks after the date of the second shot. Proof of Full Vaccination must be provided no later than eight weeks from the date of the denial.

### 2.  Employee Chooses Not to Start the Vaccination Process

If the Non-Excepted Employee chooses not to receive their first shot within 14 calendar days of the date of denial, the applicable process begins at Section V.A.

## V.  EMPLOYEE NON-COMPLIANCE

### A.  First Notice of Non-Compliance (All Employees)

UC employees subject to the COVID-19 vaccination requirement who fail to provide proof of Full Vaccination and who have not requested an Exception or Deferral by the applicable implementation date (or Non-Excepted Employees, who fail to provide proof that they have received their first shot within the 14 calendar days as described in Section IV.B.2) will receive a First Notice of Non-Compliance.

### B.  Three-Day Period Following First Notice of Non-Compliance (All Employees)

Once an employee has received a First Notice of Non-Compliance, they will have three business days to provide proof of Full Vaccination or to make a request for an Exception or Deferral (or, in the case of a Non-Excepted Employee, to provide proof that they have received their first shot or, if applicable, to make a new request). During these three business days, the employee must, as a condition of Physical Presence, comply with NPIs defined by the Location.

If an employee has not responded within three business days and is a non-Excepted Employee, the applicable process continues below at Section V.D; for other employees, the applicable process continues below at Section V.C.

University of California – Policy
SARS-CoV-2 (COVID-19) Vaccination Program

### C. Second Notice of Non-Compliance (Employees Other Than Non-Excepted Employees)

If, after receipt of the First Notice of Non-Compliance, the employee does not submit proof of Full Vaccination or make a request for an Exception or Deferral within three business days, they will receive a Second Notice of Non-Compliance that requires them to submit proof that they have received their first shot within 14 calendar days of the date of the Second Notice of Non-Compliance. This proof must include the date of the first shot.

As described in Section V.B, until the employee is Fully Vaccinated, the employee must, as a condition of Physical Presence, comply with NPIs defined by the Location.

If the employee receives the Johnson & Johnson vaccine, the employee will be considered Fully Vaccinated two weeks after the date of the first shot. If the employee receives the Moderna or Pfizer vaccine, the employee will be considered Fully Vaccinated two weeks after the date of the second shot.

Proof of Full Vaccination must be provided no later than eight weeks from the date of the Second Notice of Non-Compliance.

### D. Notice of Continued Non-Compliance

If an employee fails to submit proof of Full Vaccination or make a request for an Exception or Deferral within the period prescribed in the Second Notice (or the First Notice, if a Non-Excepted Employee), the employee will receive a Notice of Continued Non-Compliance stating that the Department will commence a period of progressive corrective action/discipline against the employee.

During the corrective action/discipline period, the employee will be permitted Physical Presence for up to six weeks (at the Location's discretion) and must, as a condition of Physical Presence, comply with NPIs defined by the Location.

The Chancellor or designee may choose to briefly extend the six-week period of Physical Presence for exceptional circumstances, including but not limited to:

- Providing for a non-compliant instructor to continue teaching or mentorship in the best interest of student learning;

- Providing for a non-compliant employee to continue work in order to avoid potential negative impacts on critical University operations due to unanticipated business requirements; or

- For other urgent requirements.

Any corrective action/discipline taken as a result of employee non-compliance will be consistent with the policies or collective bargaining provisions applicable to the specific employee population.

University of California – Policy
SARS-CoV-2 (COVID-19) Vaccination Program

### E. Corrective Action/Discipline

#### 1. Policy-Covered Staff

For regular status employees in the Professional & Support Staff (PSS) personnel group, corrective action/discipline is taken in accordance with PPSM 62 (Corrective Action).

For career employees in the Managers & Senior Professionals (MSP) personnel group refer to PPSM 64 (Termination and Job Abandonment). For Senior Management Group (SMG) employees refer to PPSM II-64 (Termination of Appointment).

For employees in the PSS or MSP personnel groups who are not regular status or career, refer to the specific appointment type in PPSM 3 (Types of Appointment).

#### 2. Policy-Covered Academic Appointees

For all faculty, the University policy on faculty conduct is set forth in APM – 015 (The Faculty Code of Conduct). For Senate Faculty, the administration of discipline is set forth in APM – 016 (University Policy on Faculty Conduct and the Administration of Discipline). In cases of disciplinary action commenced by the administration against a member of the Academic Senate, or against other faculty members in cases where the right to a hearing before a Senate committee is given by Section 103.9 or 103.10 of the Standing Orders of The Regents, proceedings shall be conducted before a Divisional Committee on Privilege and Tenure according to Senate Bylaw 336 Privilege and Tenure: Divisional Committees -- Disciplinary Cases.

For all other academic appointees, corrective action is taken in accordance with APM – 150 Corrective Action and Dismissal.

#### 3. Represented Employees

Corrective action/discipline for represented employees is described in the employee's applicable collective bargaining agreement.

## VI. APPENDIX F REVISION HISTORY

**First Effective Date**: July 20, 2021

**Amended Effective Date:** August 11, 2021 (added timeline; updated language in sections IV.B, V.A and V.B for clarity; added two additional examples in section V.D; and clarified corrective action/discipline for policy-covered staff)



Exhibit B

49

Exhibit C

# Aaron Kheriaty, MD

**Professor of Psychiatry, UCI School of Medicine**
**Director, Medical Ethics Program, UCI Health**
UCI Department of Psychiatry, Bld 56, Rm 401
101 The City Drive, Orange, CA 92868
mobile: 949-874-4009 | office: 714-456-8774 | Email: akheriat@hs.uci.edu

**Licensure**

-Medical Board of California: Physician's and Surgeon's License (A89144)
-DEA number BK9083433
-Diplomate, American Board of Psychiatry and Neurology (Board Certified), Jan 2009, renewed Dec 2019, certificate number 59280.

**Residency Training**

General Psychiatry, University of California Irvine, 6/2003 – 6/2007

**Graduate Education**

MD, Georgetown University School of Medicine, Washington, DC
8/1999 - 5/2003
Center for Clinical Bioethics, Georgetown
Bioethics research at Center completed under direction of Prof. Edmund Pellegrino, former Chairman of the U.S. President's Council on Bioethics

**Undergraduate Education**

University of Notre Dame, 8/1995 - 5/1999, Bachelor of Arts
Honors Philosophy and Pre-Medical Sciences, *Magna Cum Laude*

**Employment**

8/2007 – Present, University of California Irvine, Department of Psychiatry
***Health Sciences Clinical Professor**, 2019 – present*
*Health Sciences Associate Clinical Professor, 2013 – 2019*
*Health Sciences Assistant Clinical Professor, 2007 – 2013*

**Professional Positions**

**Director, Medical Ethics Program**, UCI Health, 2013 - Present

Exhibit C

1

**Director, Medical Education**, UCI Department of Psychiatry, 2007 – Present
Duties include directing required six-week clerkship in psychiatry for third-year medical students, and all electives in psychiatry for fourth-year medical students

**Director, Ethics and Behavioral Science Courses**, MS1 & MS2, 2012 – Present
Required courses for all first- and second-year students in the School of Medicine

**Director of Residency Training**, UCI Department of Psychiatry, 2009 –2013

Associate Dir. of Residency Training, UCI Department of Psychiatry, 2008 –2009

Founding Director, UCI Psychiatry and Spirituality Forum, 2006 – 2011
Sponsored grants from Metanexus Institute, the George Washington Institute for Spirituality and Health, the Templeton Foundation, the Reynold's Foundation, and private benefactors.

**Professional Committees & Consulting**

**Member, UC Office of the President (UCOP) Critical Care Bioethics Working Group**, 2020 – Present
- Published, *Allocation of Scarce Critical Resources under Crisis Standards of Care*: guidance for all UC Health hospitals in the allocation of ventilators during the COVID-19 pandemic.
- Published, *Allocation Guidelines for Remdesivir if Demand Outstrips Supply*
- COVID Vaccine Allocation Institutional Guidelines

**Consultant, State of California—Health and Human Services Agency, California Department of Public Health,** 2020 – Present
- Allocation of Bamlanivimab during COVID pandemic
- California SARS-CoV-2 Pandemic Crisis Care Guidelines

**Member, COVID-19 Vaccine Task Force, County of Orange Healthcare Agency,** 2020 – Present
- COVID Vaccine Allocation Policy

Medical Ethics Committee, UCI Health
**Committee Chair**, 2008 – Present
Committee Member, 2007 – Present

Medical Ethics Committee, CA Department of State Hospitals
**Committee Chair**, 2017 – Present

Advisory Committee, UCI Center for Medical Humanities, 2018 – Present

<u>**Co-Director, Executive Committee,** UCI Center for Medical Humanities</u>, 2014 – 2018
Collaborative Program with School of Medicine, School of Humanities, and School of the Arts. Supported by UCI Provost's Interschool Excellence Grant

<u>Mentoring Junior Faculty Committee, UCI Dept of Psychiatry</u>, 2020 – Present

<u>Academy for Innovation in Medical Education</u>, UCI School of Medicine, 2014 – Present

<u>Clinical Competence Committee, Psychiatry Residency Training Program</u>, 2012 – Present

<u>UCI School of Medicine Admissions Committee</u>, 2007

<u>UCI Department of Psychiatry Applicant Ranking Committee</u>, 2004 – 2013

<u>UCI Dalai Lama Scholarship Award Selection Committee</u>, 2007 – 2008
Worked with Vice-Chancellor for Student Affairs to select the undergraduate who receives this annual scholarship.

Journal peer-reviewer, *Medical Education*, 2014 – present.

Journal peer-reviewer, *Linacre Quarterly*, 2012 – present.

Journal peer-reviewer, *Philosophy, Ethics, and Humanities in Medicine*, 2017 – present.

**Grants**

*UCI Provost's Interschool Excellence Initiative Grant,* 2013 – 2016.
Three-year, $150,000 per year ($450,000 total)
Medical Humanities Program, Co-Director (with Prof. Shapiro and Prof. Haynes)

*Fieldstead and Company*, 2011 – Present.
Bioethics Program, UCI School of Medicine
$25,000 – $60,000 per year.

*Metanexus Institute*, 2006 – 2009
<u>Local Societies Initiative Grant</u> (Primary Investigator)
Three-year, $30,000 grant to support scholarly, educational, and community outreach initiatives of the UCI Psychiatry and Spirituality Forum

*George Washington Institute for Spirituality and Health,* 2006 – 2009
<u>Spirituality and Medicine Award for Curriculum Development for Psychiatry Residency Training Programs</u> (Primary Investigator)
Three-year, $30,000 grant to support curriculum development, research.

*The Center for Theology and the Natural Sciences, Templeton Foundation*, 2007
<u>Science and Transcendence Advanced Research Series (STARS) Program</u>
$20,000 planning grant.  "Brain Connectivity and Contemplative Experiences": Structural brain MRI study of long-term effects of contemplation and meditation.

*The Donald W. Reynolds Foundation*, 2008 – 2011
<u>Comprehensive Programs to Strengthen Physicians Training in Geriatrics</u>
Co-investigator (10% time).  Curriculum development for improving training in geriatric psychiatry for third-year medical students and psychiatric residents.

*Fetzer Institute: Inter-Generational Mentoring Community: Fostering an Emergence and Transfer of Leadership in Higher Education*, 2009 – 2013
Co-investigator: Three-year project on team of six educators/administrators: Formation Mentoring Community project development.

**Professional Awards**

*County of Los Angeles Board of Supervisors: Commendation.*
For contributions made in the work of integrating spirituality and mental health for the benefit of citizens of Los Angeles, 5 June 2009.

*Excellence in Teaching Award*
Given by the Office of Medical Education, selected by UCI School of Medicine Students.
1. 2011 – 2012 Academic Year, Excellence in Clinical Sciences
2. 2012 – 2013 Academic Year, Excellence in Pre-Clinical Sciences
3. 2013 – 2014 Academic Year, Excellence in Pre-Clinical Sciences
4. 2018 – 2019 Academic Year, Excellence in Pre-Clinical Sciences

**Other Appointments and Affiliations**

Scholar, <u>Paul Ramsey Institute</u>, Center for Bioethics and Culture
San Francisco, CA. 2016 – Present

Senior Fellow; Director, Program in Health & Human Flourishing, <u>Zephyr Institute</u>
Palo Alto, CA. 2016 – Present

**Books**

1. **Kheriaty A**, Bauman D, Taylor E, Felton P, *Transformative Conversations: A Guide to Mentoring Communities Among Colleagues in Higher Education*, Jossey-Bass (2013).
2. **Kheriaty A**, with Cihak J, *The Catholic Guide to Depression*, Sophia Institute Press (2012).

**Book Chapters**

1. **Kheriaty A**. "Capacity and Informed Consent in the Writings of Edmund Pellegrino," in *Edmund Pellegrino's Philosophy of Medicine*, Georgetown University Press (in Press).
2. Rodríguez CG, **Kheriaty A** (2021). "Suicidio Asistido, Autodeterminación e Influencia Social: una Aproximación Empírica desde la Salud Mental y las Ciencias Sociales" [Assisted Suicide, Self-determination and Social Influence. An Empirical Approach from Mental Health and Social Sciences]. In: Carreño, J. E. (Ed.) *La Eutanasia y el Suicidio Asistido. Una Mirada Multidisciplinaria* (pp. 95 – 116). Ediciones Universidad de Navarra.
3. **Kheriaty A**. "From Beneficence to Love: Adequate care for the mentally incapacitated," in *Incapacity and Care: Controversies in Healthcare and Research*, Ed. Helen Watt.  The Linacre Center, Oxford: 2009, 24-36.

**Publications – Peer Reviewed**

1. **Kheriaty A**, Rajczi A, Daar J, "Creating Triage Procedures Using Public Values," *Hastings Center Report* (in press).
2. Shapiro J, **Kheriaty A**, Pham T, Chen Y, Clayman R. (2019). The Human Kindness Curriculum: An Innovative Preclinical Initiative to Highlight Kindness and Empathy in Medicine. *Education for Health*, 32(2), 53-61.
3. Chan S, Liao S, Randall LM, **Kheriaty A**, Dayal R, Kuo JV, Nguyen J, Vega C, Bota R, Barrios C, et al. Implementation of a multidisciplinary palliative and supportive care education lecture series. *Journal of Clinical Oncology.* American Society of Clinical Oncology (ASCO). November 01, 2017. 35: 144-144.  DOI: 10.1200/JCO.2017.35.31
4. Aggarwal S. **Kheriaty A**. "Same behavior, different provider: American medical students' attitudes towards reporting risky behaviors committed by doctors, nurses, and classmates," *AJOB Empirical Bioethics*, 8 Sep 2017.
5. **Kheriaty A**. Social Contagion Effects of Physician-Assisted Suicide: Commentary on ''How Does Legalization of Physician-Assisted Suicide Affect Rates of Suicide?'' *Southern Medical Journal* 2015; 108:10, 605-606.  PMID: 26437189.
6. Bota RG, Novac A, **Kheriaty A**. Longitudinal reflections of the recent political shifts in the prescription of opiates.  *Mental Illness*, 2015; 7:6066, 28-29.
7. **Kheriaty A**. Dementia and its Challenges - A Problem-Based Learning Case. *POGOe - Portal of Geriatric Online Education*; 2012 Available from: http://www.pogoe.org/productid/20770.

Exhibit C

8. **Kheriaty A**. "Philosophical Anthropology and the Psychological Sciences: A Response to E. Christian Brugger", *Edification*, Vol 3, Issue 1, 2009, 23 – 25.
9. **Kheriaty A**. "From Beneficence to Love: Adequate Care for the Mentally Incapacitated," *CMQ*, May 2008, Vol. LVIII No.
10. **Kheriaty A**. "The Return of the Unconscious," *Psychiatric Annals*, Vol. 7, Number 4, April 2007, 285-287.
11. **Kheriaty A.**, editor and contributing author: "Psychiatry Board Review Study Guide, Part 1, Part 2, Part 3," *Resident & Staff Physician*, March, April, May 2007.
12. **Kheriaty A**. editor, Unit 4: "Mental Health", *Georgetown University Interacting with the Medical Humanities Curriculum* (MedEd Portal).
13. **Kheriaty A**. "Sterilizing the Erotic", peer reviewed essay, *Georgetown University Interacting with the Medical Humanities Curriculum* (MedEd Portal).
14. **Kheriaty A**. "The Death of Matthew Allen", nonfiction narrative, *Georgetown University Interacting with the Medical Humanities Curriculum* (peer reviewed MedEd Portal).
15. Wise TN, **Kheriaty A**, Sheridan M, "Attribution of Cause by Patients with Depression, Anxiety, and Alexithymia", *Psychological Reports*, 2004; 94 (1), pp. 259-263.

**Publications – Opinion, Essays, Book Reviews**

1. Kheriaty A, et. al, "How College COVID Vaccine Mandates Put Students In Danger," *The Federalist*, 5 July 2021.
2. Kheriaty A, Bradley G, "University Vaccine Mandates Violate Medical Ethics," *Wall Street Journal*, 14 June 2021.
3. Kheriaty, A, "The Other Pandemic: The Lockdown Mental Health Crisis," *Public Discourse*, 4 October 2020.
4. Kheriaty, A, "The Latent Fascism of Today's Anti-Fascists," Part III of The Crisis of Our Times, *Arc Digital*, 12 July 2020. Republished in *Foundations*, 14 February 2021.
5. Kheriaty, A, "Revolutions vs. The Total Revolution," Part II of The Crisis of Our Times, *Arc Digital*, 26 June 2020.
6. Kheriaty A, "Police Brutality and the Suicide of Revolutionary Violence," Part I of The Crisis of Our Times, *Arc Digital*, 4 June 2020.
7. Kheriaty A, et. al., Moral Guidance on Prioritizing Care During a Pandemic, *Public Discourse*, 5 April 2020.
8. Kheriaty A, "The Impossible Ethics of Pandemic Triage," TheNewAtlantis.com, April 3, 2020.
9. Kheriaty A. "Battlefield Promotions," TheNewAtlantis.com, March 18, 2020.
10. Kheriaty A. "First, Take No Stand," *The New Atlantis*, Number 59, Summer 2019, pp. 22-35.
11. Kheriaty A. "The Physician's Vocation," *MercatorNet*, 14 September 2018. Reprinted in *Bioethics Outlook* (forthcoming).

12. Kheriaty A. "Card-Carrying Precadavers," *First Things*, Number 284, June/July 2018.
13. Kheriaty A. "Cyber Self-Harm," *First Things* web exclusives, 29 January 2018.
14. Kheriaty A. "Dying of Despair," *First Things*, Number 275, August/September 2017.
15. Kheriaty A.  "Killer Show," *First Things* web exclusives, 8 May 2017.
16. Kheriaty A.  "Why are doctors afraid of the word 'death'?" *Washington Post*, 26 October 2015.
17. Kheriaty A. "The dangerously contagious effect of assisted-suicide laws," *Washington Post*, 20 November 2015.
18. Kheriaty A. "Oregon assisted suicide law no model for California," *San Jose Mercury News*, 3 September 2015.
19. Kheriaty A. "The Assisted-Suicide Movement Goes on Life Support," *Wall Street Journal*, 22 May 2015.
20. Kheriaty A. "Apostolate of Death," *First Things*, April 2015.
21. Kheriaty A. "Hooked Up and Tied Down: The Neurological Consequences of Sadomasochism," *The Public Discourse*, 17 February 2015.  Reprinted in *MercatorNet*, 25 February 2015.
22. Kheriaty A, McHugh P.  "Assisted suicide places most vulnerable at risk," *Orange County Register*, 13 February 2015.
23. Kheriaty A. "Sterilizing the Erotic," *Plexus: UC Irvine School of Medicine Journal of Arts and Humanities*, 2014.
24. Kheriaty A. "The Era of the Narcissist," *First Things* web exclusives, 16 Feb 2010 (review of, *The Narcissism Epidemic*, by J Twenge and K Campbell).
25. Kheriaty A. "Who Can Heal a Guilty Conscience," *Mercatornet*, 25 March 2010.
26. Kheriaty A. "God and the Unconscious," *The Global Spiral*, also published in Conference Proceedings for "Subject, Self, and Soul: Transdisciplinary Approaches to Personhood", July 13-17, 2008, Metanexus Institute Conference, Madrid, Spain.
27. Kheriaty A. "Cosmetic Drugs for Mental Makeovers: Antidepressants and Our Discontents," *The Digest*, Volume 6, Issue 6, April 2006.

**Print Interviews, Media Citations, Reviews of My Work**

1. "A Scary Plan to Revise the Definition of Death," by Ramesh Ponnuru, *Bloomberg*, 14 June 2021.
2. "California's secret weapon in COVID-19 success: We are not skeptical about the vaccine," by Luke Money, Matt Stiles, Colleen Shalby, *Los Angeles Times*, 1 May 2021.
3. "California's huge COVID-19 vaccine expansion relies on trust. Will cheaters stay away?" by Colleen Shalby & Haley Smith, *Los Angeles Times*, 16 March 2021.
4. "Catholic Church's direction on Johnson & Johnson COVID-19 vaccine raises questions," by Deepa Bharath, *Orange County Register*, 12 March 2021.

5. "Ethical land mines, 'Sophie's Choice' moments as California decides who gets COVID-19 vaccine next," by Colleen Shalby, Luke Money, Rong-gong Lin II, *Los Angeles Times*, 5 February 2021.

6. "Could California's psych hospitals be ordered to admit inmates with COVID?" By Lee Romney, *Cal Matters*, 18 November 2020.

7. "Doctors want to end life support for fatally ill baby; his parents want to try experimental therapy," by Alexandra Zavis and Christina Boyle, *Los Angeles Times*, 4 July 2017.

8. "Euthanasia: Quebec, Dutch, Belgian and Oregon laws a 'mess'," by Debra Vermeer, *News Weekly*, 11 February 2017

9. "California Aid-In-Dying Law Concerns Some Latinos, Blacks," by Julie Watson, *Associated Press*, 8 June 2016.  Also ran in *ABC News*, *Fox News, The New York Times, Orange County Register.*

10. "As California's End of Life act goes into effect, some doctors question where to draw the line," by Soumya Karlamangla, *Los Angeles Times*, 6 June 2016.

11. "Suicides Are up — What to Do About It," by John Burger, *Aleteia*, 9 May 2016.

12. "Will California's end-of-life law push lethal drugs over costlier care?" by Soumya Karlamangla, *Los Angeles Times*, 18 October 2015.

13. "California Governor Signs Assisted Suicide Bill Into Law," by Ian Lovett and Richard Perez-Pena, *The New York Times*, 5 October 2015.

14. "Joy, concern over passage of California's right-to-die law," by Deepa Bharath, *The Orange County Register*, 5 October 2015.

15. "California Legislature Approves Assisted Suicide," by Ian Lovett, *The New York Times*, 11 September 2015.

16. "Laws allowing assisted suicide can have far-reaching impact," *The Oklahoman*, by The Oklahoman Editorial Board, 20 July 2015.

17. "Aid in dying' causes a Democratic split: Divisive bill pits Latino Democrats v. wealthy coastal legislators," by Steven Greenhut, *San Diego Union-Tribune*, 6 July 2015.

18. "CMA's Change of Stance on Assisted Suicide Bill Sets Off Wave of Controversy," *Physicians News Network*, 25 May 2015.

19. "Assisted-suicide debate focuses attention on palliative, hospice care," by Lisa Schencker, *Modern Healthcare*, 16 May 2015.

20. "Physician-assisted suicide supporters try courts to win legalization," by Lisa Schencker, *Modern Healthcare*, 16 May 2015.

21. "In end-of-life debate on Sen. Bill Monning's bill, words matter," by Jason Hoppin, *Santa Cruz Sentinel*, 6 April 2015.

22. "Is there a time to end life," by Deepa Bharath, *Orange County Register*, 1 March 2015.

23. "Woman suing California for her right to die at home," by Stephanie Gallman, *CNN*, 13 February 2015.

24. "Beyond the Misconceptions about Depression," interview with Kathleen Naab, *Zenit*, 9 September 2014.

25. "Getting Free: Combatting Depression Today," interview with Kathryn Jean Lopez, *National Review Online*, 27 February 2014.
26. "A public death," (interview on the topic of suicide prevention), by Courtney Perkes, *Orange County Register*, 23 April 2008.
27. "Mind and Soul: A unique forum on psychiatry and spirituality at the University of California, Irvine," an interview with Carolyn Monahan, *Mercatornet*, 29 November 2007.

**Invited Lectures (selected)**

1. Johns Hopkins University Nanjing Center, Simone Weil Center for Political Philosophy, "Utopia and Dystopia in the Post-Covid World," 20 February 2021. Panel discussion with Adrian Pabst (U. of Kent), Adam Webb (Johns Hopkins), D.C. Schindler (Catholic U), moderated by Paul Grenier and Susannah Black (Simone Weil Center).
2. New York Encounter 2021, *"Why on Earth?"* A discussion on the epidemic of suicide and mental health issues in the time of Covid, with Jeremy McLellan (comedian), Mary Townsend (St. John's University), moderated by Margarita Mooney (Princeton).
3. *Visit the Sick: What We Owe in Health Care*, panel discussion on medicine and public health with Kristin Collier (U. Michigan), Lauris Kaldjian (U. Iowa), moderated by William Hurlbut (Stanford), University of Notre Dame DeNicola Center for Ethics and Culture Winter Conference, Jan 2021.
4. *Rioters and Revolutionaries: On the Origins of Our Crisis*. Napa Institute Conference, August 2020.
5. *Maintaining Our Mental Health During the COVID Pandemic*. Napa Institute Conference, August 2020.
6. *Bioethics and the Human Future*. Invited seminar for UC Office of the President Legal, UCOP Legal Summer Research Fellows, 23 June 2020.
7. *The Physician's Vocation*. Keynote address, White Coat Ceremony, UCI School of Medicine, 3 August 2018.
8. *The Moral Foundations of Medicine*. Stanford University School of Medicine, sponsored by Zephyr Institute, Palo Alto, CA, 19 January 2018.
9. *Dying of Despair: Healing the Depressed, the Lonely, and the Vulnerable*. Napa Institute Conference, Napa CA, 27 July 2017.
10. *Positive Psychology: The Science of Happiness and the Virtues*. Napa Institute Conference, Napa CA, 29 July 2017.
11. *Capacity and Informed Consent in Pellegrino's Philosophy of Medicine*, Georgetown University Pellegrino Center for Clinical Bioethics, 4th Annual Pellegrino Seminar, 24 March 2017.
12. *Germline Gene Editing: Perspectives from Science, Ethics, and Law*, ABOG Foundation/Kenneth J. Ryan Ethics Symposium, American Society for Reproductive Medicine Annual Conference, Salt Lake City, UT, 17 October 2016.

13. *Biotechnology and the Human Future: Human-Animal Hybrids, Three Parent Embryos, and the New Genetic Engineering,* Napa Institute Conference, Napa CA, 7 July 2016.

14. *Transhumanism and the Human Future: A Panel Discussion*, Stanford University, sponsored by the Zephyr Institute, Palo Alto, CA, 8 January 2016.

15. *Depression: An Integrated Approach*, Gathering on Mental Health and the Church, Saddleback Church, Lake Forest CA, 9 October 2015.

16. *The Art of Dying*.  TEDx UC Irvine, 3 October 2015.

17. *Problems with Physician Assisted Suicide*, University Synagogue, Irvine CA, 23 September 2015.

18. *Public Debate on Doctor Assisted Suicide with Erwin Chemerinsky*, UC Irvine, 3 September 2015.  Sponsored by UCI Medical Ethics Program, Medical Humanities Initiative, Department of Psychiatry, and School of Law.

19. *Senate Bill 128 Debates: Problems with Legalizing Physician Assisted Suicide*, UC Center, Sacramento CA, 4 August 2015.

20. *Discussion with Medical Ethicists on Aid in Dying*, Sacramento Press Club, 30 June 2015.

21. *Testimony in opposition to Senate Bill 128,* California Senate Health Committee Hearings, 25 March 2015.

22. *Problems with Senate Bill 128*, California Medical Association Council on Legislative Affairs, Sacramento, 20 March 2015.

23. *Spirituality and Mental Health* (plenary lecture), and *Depression: An Integrated Approach* (workshop), Gathering on Mental Health and the Church, Lake Forest, CA (28 March 2014).

24. *Depression and Spiritual Health* (plenary lecture and workshop), and panel discussion, MindYourHeart Conference, Biola University (1 February 2014).

25. *Is Hope Healthy for Body and Soul?*  Institute for Psychological Sciences, Cardinal Newman Distinguished Lecture Series, Washington DC (14 November 2013).

26. *Ethical Decisions at the End of Life*: Ethics and Spiritual Care at the End of Life CME Symposium, UC Irvine (18 May 2011)

27. *Compassion in Medicine: The Doctor – Patient Relationship.* Compassion in Medicine Course, UC Irvine Department of Biology (5 April 2011)

28. *Conscience from a Psychiatric Perspective.*  Integritas Institute, University of Illinois, Chicago: Healthcare Ethics Symposium on Conscience (20 Nov 2009)

29. *Spiritually Oriented Psychotherapy: An Introduction.*  Keynote address, Southern California Mental Health and Spirituality Conference, sponsored by the Los Angeles Department of Mental Health and the California Institute of Mental Health, Los Angeles (5 June 2009)

30. *Cosmetic Drugs for Mental Makeovers: Antidepressants and Our Discontents*. Georgetown University Center for Clinical Bioethics (2003), Grand Rounds, U.C. Irvine Department of Psychiatry (2004). Metanexus Institute International Conference: "Continuity and Change: Perspectives on Science and Religion," Philadelphia, PA (June 2006)

31. *Psychopharmacology and Human Enhancement.* "California Health Systems Pharmacists Annual Conference," Disneyland Hotel, Anaheim, CA (2005)

32. *Ethics at the End of Life: The Death of Terry Schiavo.* Grand Rounds, U.C. Irvine Department of Psychiatry (2005). Continuing Medical Education Conference, "End of Life: Medical, Religious, Philosophical, and Spiritual Perspectives," U.C. Irvine Medical Center, Irvine, CA (2006)

33. *Metabolic Consequences of Psychotropic Therapy.* 8th Annual American Foundation for Suicide Prevention, Greater Los Angeles Division's Conference, UCLA, Los Angeles, CA (18 November 2006)

34. *Model Psychiatry Residency Programs on Religion and Spirituality.* "American Psychiatric Association: 160th Annual Conference," San Diego, CA (24 May 2007)

35. *Ethical Care for the Mentally Incompetent.* Linacre Center for Healthcare Ethics, International Conference, "Incapacity and Care: Moral Problems in Healthcare and Research", St. Mary's University College, London, England (5 July 2007)

36. *Developing Personal Integrity.* UCI 2007 Summer Multicultural Leadership Institute: Lecture at workshop for incoming undergraduate freshman (10 August 2007).

37. *Spirituality and Suicide Prevention.* UCI Psychiatry and Spirituality Forum (6 November 2007).

38. *Ethical Care at the End of Life.* Grand Rounds Lecture, Los Alamitos Hospital, CA (10 December 2007). Grand Rounds Lecture, Lakewood Regional Medical Center, CA (15 February 2008). Grand Rounds Lecture, Orange Coast Medical Center, CA (29 April 2008)

39. *Stress Management and Substance Abuse Prevention.* MCLE Conference for Lawyers, Thomas More Society of Orange County (26 January 2008)

40. *Spirituality and Mental Health: A Panel Discussion.* Moderator and Panelist, sponsored by Psychiatry and Spirituality Forum. (10 April 2008)

41. *God and the Unconscious.* "Subject, Self, and Soul: Transdisciplinary Approaches to Personhood", July 13-17, 2008, Metanexus Institute Conference, Madrid, Spain.

**Radio Interviews (selected)**

1. KNX 1070 News Radio, "[KNX In Depth: Johnson & Johnson vaccine gets major boost from the FDA; California prepares to stop vaccine cheaters](#)," 24 February 2021.

2. KCBS Radio, "[Ask an Expert: How do you decide who gets vaccinated first](#)?" 24 February 2021.

3. CBS Los Angeles News Radio (KNX 1070): "Ethical Problems with Covid "Vaccine Tourism," 17 February 2021.

4. NPR Los Angeles (Southern California Public Radio, KPCC 89.3), Air Talk with Larry Mantle: "[As Coronavirus Vaccine Rollout Continues, What Are Some of the Ethical Questions We (and the Public Health Experts) Will be Considering?](#)" 4 January 2021.

Exhibit C

5. NPR Los Angeles (Southern California Public Radio, KPCC 89.3), Air Talk with Larry Mantle: "As COVID-19 Vaccine Doses Make Their Way Across The Country, A Look At Plans For Distribution in Southern California" 15 December 2020.

6. NPR Los Angeles (Southern California Public Radio, KPCC 89.3), Air Talk with Larry Mantle: "What Are The Ethical Considerations When Deciding Who Gets The Coronavirus Vaccine First?" 6 August 2020.

7. NPR Los Angeles (Southern California Public Radio, KPCC 89.3), Air Talk with Larry Mantle: "COVID-19: Difficult Ethical Considerations For Care And Treatment," 27 March 2020.

8. NPR Los Angeles (Southern California Public Radio, KPCC 89.3), Air Talk with Larry Mantle: "A Look At The Legal And Personal Ramifications Of Sperm Donation. What's Your Story?" 22 August 2019.

9. NPR Los Angeles (Southern California Public Radio, KPCC 89.3), Air Talk with Larry Mantle: "Embryo Mix Up at SoCal Fertility Center Sheds Lights On Lack Of Regulations For Clinics Nationwide," 11 July 2019.

10. NPR Los Angeles (Southern California Public Radio, KPCC 89.3), Air Talk with Larry Mantle: "The impending ubiquity of DNA-sequencing for infants – and the bioethical challenges," 23 April 2018.

11. Relevant Radio Network, weekly series on mental health and bioethics (episodes available here), A Closer Look with Sheila Liaugminas, 2017 - Present.

12. NPR Los Angeles (Southern California Public Radio, KPCC 89.3), One year of legal doctor-assisted suicide in California, with Michelle Faust, 9 June 2017.

13. KQED Public Radio (NPR/PBS) San Francisco, Forum with Michael Krasney, "California Readies for Aid-in-Dying Law to Take Effect," 9 June 2016.

14. NPR Los Angeles (Southern California Public Radio, KPCC 89.3), Air Talk with Larry Mantle: "Ethical, legal questions surrounding Pentagon initiative to freeze eggs, sperm," 5 February 2015.

15. NPR Los Angeles (Southern California Public Radio, KPCC 89.3), Air Talk with Larry Mantle: Oregon family's decision to let 4-year-old daughter choose death sparks ethical debate, 28 October 2015.

16. KABC Los Angeles 790, The Peter Tilden Show: The End of Life Option Act, 20 October 2015.

17. NPR Los Angeles (Southern California Public Radio, KPCC 89.3), Air Talk with Larry Mantle: What's next now that CA becomes 5th state in nation to allow assisted suicide for the terminally ill?, 6 October 2015.

18. Capital Public Radio (NPR Sacramento), California Governor Signs Hard-Fought End-Of-Life Legislation, News with Ben Adler, 5 October 2015.

19. NPR Los Angeles (Southern California Public Radio, KPCC 89.3), Air Talk with Larry Mantle: Health committee ends consideration of 'End of Life Option Act,' 7 July 2015.

20. CBS Los Angeles News Radio (KNX 1070): SB 128 Passes CA Senate, interview with Mike Landa, 4 June 2015.

21. NPR Los Angeles (Southern California Public Radio, KPCC 89.3): 'Assisted suicide' or 'aid in dying?' The semantic battle over SB 128, 4 June 2015.

Exhibit C

22. NPR Los Angeles (Southern California Public Radio, KPCC 89.3): [Doctors debate the ethics of assisted suicide](#), 18 May 2015.
23. CBS Los Angeles News Radio (KNX 1070): The End of Life Option Act, interview with Margaret Carrero, 7 April 2015.
24. Capitol Public Radio (NPR Sacramento): Insight With Beth Ruyak, "['Right-To-Die' Legislation In California](#)," 25 March 2015.
25. Regular guest 2012 – present: The Drew Mariani Show, *Relevant Radio Network*.
26. Regular guest 2015 – present: A Closer Look with Sheila Liaugminas, *Relevant Radio Network*.

**Television Interviews**

1. Fox News, "[College COVID mandates represent form of 'medical authoritarianism'](#)," 16 June 2021.
2. Fox News, Happening Now, "[Scientists hope human organs grown in animals can save lives](#)," 13 January 2016.
3. CBS News Los Angeles, "[Brown Signs Hard-Won Right-To-Die Legislation](#)," 5 October 2015.
4. Fox News, "[Should you have the right to die: California bill would allow assisted suicide](#)," 9 July 2015.
5. CBS News Los Angeles, "[California's end of life legislation](#)," 7 July 2015.
6. America Tonight on Al Jazeera, "[Debates over CA Senate Bill 128](#)," 24 June 2015.
7. CBS News Los Angeles, "[Medical Association No Longer Opposes 'End-Of-Life Option' Act As Bill Goes Through Legislature](#)," 20 May 2015.
8. America with Jorge Ramos, Fusion network, "[Discussion: Brittany Maynard's end of life option](#)," a debate with Dan Diaz (husband of Brittany Maynard), 19 May 2015.
9. NBC Los Angeles, NewsConference with Conan Nolan, "Problems with End-of-Life Legislation," 29 March 2015.  Links to 2 segments [here](#) and [here](#).
10. "Understanding and Overcoming Depression."  Five-part interview with Johnnette Benkovic, EWTN, 27 Sept 2013.
11. "Depression: An Integrated Approach."  Interview with Scott Hahn and Regis Martin, EWTN, June 2014.

**Podcast Interviews**

1. "[*Hope for Mental Health Community with Aaron Kheriaty*](#)," Interview with Kay Warren, 28 February 2021.
2. "[Dr. Aaron Kheriaty on America's pandemic response and the frontline realities confronting our physicians and medical personnel](#)," Life, Liberty, and Law, 20 April 2020.
3. "[Hospital Ethics in the Face of COVID-19](#)," The Accad & Koka Report, 1 April 2020
4. "[Simple Ways to Cope with Stress During Challenging Times](#)," Good Things Radio with Brooke Taylor, 8 April 2020.

5. "[Is Physician Assisted Suicide Good Policy? A discussion with Dr. Aaron Kheriaty](#)," The Paradocs, 20 December 2019.

**Expert Witness Testimony**

1. Expert witness for the defense (CA Department of State Hospitals), declaration dated 2 December 2020, *Coleman v. Newsom*, Case No. No. 90-CV-520.
2. Expert witness for the defense, *Becerra v. Duffy*, Case No. 900-2017-000223, 2020.
3. Expert witness for the defense (Attorney General, State of AZ), declaration dated 11/16/20 in *PPAZ v. Brnovich*.
4. Expert witness for the defense (Attorney General, State of MS), declaration dated 4/24/20 and deposition in *Jackson v. Dobbs*, Case No. 3:18-CV-171–CWR-FKB.
5. Expert witness for the defense (Kaiser Permanente), *Battaglia v. Golden*, 2019-2020.
6. Expert witness for the defense (LA County), *Haftevani v. LA County*, 2019-2020.
7. Expert witness for the defense (Attorney General, State of IN), declaration dated 8/26/19; deposition 10/16/19; trial testimony 3/18/21, in *Whole Women's Health Alliance v. Hill*, Case No.:  1:18-cv-01904-SEB-MJD.
8. Expert witness for the defense (Attorney General, State of IN), declaration dated 10/4/16 in *PPINK v. Commissioner, Indiana State Department of Health*, Case No. 1:16-cv-01807-TWP-DML
9. Declaration for the plaintiffs dated 6/7/16 in *Ahn v. Hestrin*, Case No. RIC 1607135.
10. Testimony in mental health LPS Conservatorship writ hearings, Riese petition hearings, and 5250 writ hearings.

**Community Service**

1. Board of Directors, *J Serra High School*, San Juan Capistrano, CA, 2012 – 2013.
2. Board of Directors, *Center for Bioethics and Culture*, Pleasant Hill, CA, 2015 – 2019.
3. Board of Directors, *Seymour Institute for Black Church and Policy Studies*, Boston, MA, 2016 – Present.
4. Advisory Board, *Simone Weil Center for Political Philosophy*, 2021 – present.

# Exhibit D

From: **Wiechmann, Warren** wiechmaw@hs.uci.edu 📎
Subject: Fwd: COVID Breakthrough Infections, Occupational Health Guidance
Date: July 17, 2021 at 11:58 AM
To: EDUAFF-Clinical Course coordinators ClinicalCoursecoordinators@hs.uci.edu, EDUAFF-ClinicalCD ClinicalCD@hs.uci.edu,
EDUAFF-4th Year Elective Directors EDUAFF-4thYearElectiveDirectors@hs.uci.edu, EDUAFF-4th Year Elective Coordinators
EDUAFF-4thYearElectiveCoordinators@hs.uci.edu
Cc: Wiechmann, Warren wiechmaw@hs.uci.edu, Terri Dean tdean@uci.edu

Dear clerkship and elective faculty and coordinators,

Please see the message below that was sent to our students.  In short, we're starting to see a rise of COVID breakthrough infections
amongst our UCI Health population.

Just like during the peak of the pandemic, we are again asking you to be flexible with students who are required to be away from
direct patient care due to Occupational Health guidance for breakthrough infections.  We still have access to "Zot Bots" to allow
students to join rounds remotely (feel free to reach out to Cameron Harding from IM for more information).  On shorter, 2-4 week
electives or clerkships, being pulled from clinical duties may require that the student make up the experience at a later time.  The
MedEd team will work with you and the student in these situations.

There may be changes to masking policy specifically in non-patient care areas which may affect your educational sessions.  We will
send more information once we receive that guidance.

Thank you in advance for your attention!


-ww


Warren Wiechmann, MD, MBA
Associate Dean of Clinical Science Education and Educational Technology
Associate Professor of Clinical Emergency Medicine
UC Irvine Health School of Medicine
: : wiechmaw@uci.edu
: : @warrenwiechman
: : 949-824-3837
: : Pronouns: he/him/his

Begin forwarded message:

**From:** "Wiechmann, Warren" <wiechmaw@hs.uci.edu>
**Date:** July 17, 2021 at 11:52:25 AM PDT
**To:** Health Affairs - Med Students 3rd yr <mdstu3rd@health.uci.edu>, Health Affairs - Med Students 4th yr
<mdstu4th@health.uci.edu>, Health Affairs - Med Students 2nd yr <mdstu2nd@health.uci.edu>
**Cc:** "Osborn, Megan" <mbo@hs.uci.edu>, "Wiechmann, Warren" <wiechmaw@hs.uci.edu>, Terri Dean <tdean@uci.edu>
**Subject: COVID Breakthrough Infections, Occupational Health Guidance**

Hi everyone,

I will continue to keep forwarding COVID-related updates as we receive them.

For this update, please pay close attention to the section on "Breakthrough Infections" at UCIMC — these are COVID+ results for
fully vaccinated individuals and unfortunately, these numbers are increasing.

The second section on the UC Mandate is slightly different for us — medical students must be vaccinated by July 21st (earlier for
incoming students).  There will be more specific messaging coming out for the School of Medicine shortly, but here is the
information from the UC:
https://uci.edu/coronavirus/messages/210716-uc-covid19-vaccine-policy.php?
utm_source=digest&utm_medium=email&utm_campaign=7-16-21

Finally, please take a look at the final section "UCI Occupational Policy for COVID Symptoms and Testing" that summarizes what
happens if you are symptomatic or COVID+.  Similar to before, at least 10 days will need to transpire before returning to work if you
are positive, though these breakthrough patients have been taking longer despite milder disease.  Again, our clerkship and elective
leadership will work closely on you with any necessary leaves for recovering.

It also looks like "In early August, UCI will roll out more easily accessible daily testing on site with longer hours of operation and
faster turnaround times."  Of note, there may be changes to the masking policy coming soon for non-patient care areas, so we will
keep you posted.

Thanks for your attention and stay vigilant and safe out there!

Exhibit D

-ww

Warren Wiechmann, MD, MBA
Associate Dean of Clinical Science Education and Educational Technology
Associate Professor of Clinical Emergency Medicine
UC Irvine Health School of Medicine
: :  wiechmaw@uci.edu
: :  @warrenwiechmann
: :  949-824-3837
: :  Pronouns: he/him/his

Begin forwarded message:

**From:** "McRae, Deena" <mcraed@hs.uci.edu>
**Date:** July 17, 2021 at 11:33:53 AM PDT
**Subject: UCI GME Update - July 17, 2021**

*Dear colleagues,*

*I am asking you all for help in ensuring that:*

1. *The residents and fellows increase safety measures and vigilance regarding COVID symptoms, regardless of vaccination status.*
2. *There is 100% compliance with vaccination mandate by September 1 (2nd shot must be obtained by Aug 18 so fully vaccinated by Sept 1).*

*Please read this email in its entirety and check out the helpful links. Please let me know if you have questions.*
*Thank you very much for your help!*

**<u>Breakthrough Infections at UCIMC</u>**
There has been a substantial increase in the number of breakthrough infections among our UCI health care workers, including residents and fellows (fully vaccinated individuals). UCI Occupational Health stated that COVID+ UCI employees, on average, have been on medical leave for longer with this strain, up to 15-20 days. However, on the flip side, some UCI HCWs have had extremely mild symptoms and were surprised when they got the test result. In early August, UCI will roll out more easily accessible daily testing on site with longer hours of operation and faster turnaround times. Stay tuned.
- Please prepare yourselves for the possibility of a change in masking policies (state, county, institutional) due to the high transmissibility of the delta variant.
- Please strongly encourage your trainees to wear their masks in non-patient care areas and to be vigilant about monitoring for symptoms.
- Please reassure your trainees that you support them remaining home if they have symptoms. We cannot risk having team members and patients exposed.

**<u>UC mandate: Faculty, trainees and staff must be fully vaccinated by September 1 to access UC sites (2 weeks from last shot)</u>**
- 2nd shot must be given by August 18 to report in person at any UC-operated site on September 1. Affiliates are still sorting out their policies (I will update you as I hear them).
- There are provisions for rare exceptions based on a medical exemption, disability

Exhibit D

- There are provisions for rare exceptions based on a medical exemption, disability, or religious objection. Those who are pregnant are eligible for a deferral for the duration of the pregnancy. Trying to get pregnant is not considered by UC to be a reason for exception.
- The Pfizer vaccine requires 3 weeks between the 1st and 2nd dose, while the Moderna vaccine requires 4 weeks between doses. To be considered fully vaccinated, you must be 2 weeks past your second dose of Pfizer or Moderna (or 2 weeks past the single J&J dose).
- Vaccinations for UCI HCWs are available in the UCI Health Occupational Health office (Pavilion 3, 8 a.m. – 12 p.m., Monday-Friday).
- If vaccinations were completed at a non-UCI facility, faculty and housestaff must immediately upload proof of vaccination at the **Occupational Health upload portal**.
- Through the UCI Occupational Health portal, program coordinators can check resident/fellow compliance and CAOs can check faculty compliance.
    - UCIHS intranet home page -> QuickLink in menu bar on right side (UCI Occupational Health Portal)
    - Red box for "Department Reports" -> Health Compliance Reports -> Dept Health Compliance
- We are waiting for final University of California Office of the President guidance on procedure if employees and trainees are not fully vaccinated by September 1. Our office will notify you as soon as there is confirmation of process.

**More Information about the Vaccination Policy**
- UC Vaccination Policy: https://provost.uci.edu/2021/07/16/ucop-vaccine-policy/
- UC Vaccination Policy FAQs: https://ucnet.universityofcalifornia.edu/coronavirus/employee-covid-vaccine-policy-faqs.pdf

**UCI Occupational Policy for COVID Symptoms and Testing**
If you tested **negative**, you will need to meet the following criteria to return to work on the premises
• At least 1 day (24 hours) has passed since recovery, defined as resolution of fever without the use of fever-reducing medications
• Improvement of symptoms (e.g., cough, shortness of breath); secretions can be properly maintained and you feel capable of returning to work as per Working Well Policy.
• Obtain a formal clearance from Occupational Health.
***If you feel you meet the above criteria for return, please send in a screen capture of your negative COVID result and email your symptom log to Dr.Chang for clearance: wwchang@hs.uci.edu

If you tested **positive**, the UCOP-mandated COVID19 symptom-based strategy will be followed in order to return you to work:
You will need to check in regularly with UCI Occupational Health for the duration of your illness so they can monitor your temperature/symptom log (page 3 of attachment)
Exclude from work until:
• At least 1 day (24 hours) has passed since recovery defined as resolution of fever without the use of fever-reducing medications and resolution of symptoms (e.g., cough, shortness of breath); and,

• At least 10 days have passed since symptoms first appeared.

***If you tested positive, please send in a screen capture of your positive COVID result and email your symptom log to Dr.Chang for quarantine instructions: **wwchang@hs.uci.edu**

You will need a formal written clearance from quarantine by Occupational Health prior to returning to regular work for a COVID19 issue.

## UCI Occupational Health Phone: 714.456.8300

## DEENA SHIN MCRAE, MD

Associate Dean for Graduate Medical Education
Designated Institutional Official
Associate Clinical Professor, Dept of Psychiatry
UC Irvine School of Medicine

Office of Graduate Medical Education
333 City Boulevard West, Suite 870
Orange, California 92868
www.meded.uci.edu/gme/





MB UCI Health
COVID...1].docx

69

Exhibit D

# Exhibit E



From: **Lefteris, Chad** chad.lefteris@hs.uci.edu
Subject: COVID-19 Delta Variant Update
Date: July 22, 2021 at 9:48 AM
To: Amin, Alpesh anamin@hs.uci.edu, Arroyo, Jeffrey jarroyo@hs.uci.edu, Bhatia, Nitin bhatian@hs.uci.edu, Chang, Kenneth kchang@hs.uci.edu, Chang, Wayne wwchang@hs.uci.edu, Chow, Emilie elchow@hs.uci.edu, Cobham-Brown, Melitza mjcobham@hs.uci.edu, Evans, Gregory gevans@hs.uci.edu, Garg, Sumit gargs@hs.uci.edu, Gibbs, Lisa lgibbs@hs.uci.edu, Hsu, Frank P. fphsu@hs.uci.edu, Joe, Victor vcjoe@hs.uci.edu, Karnes, William E. karnesw@hs.uci.edu, Kim, Cy cyk@hs.uci.edu, Kim, Jin K. jkim13@hs.uci.edu, Leveroni Calvi, Matteo mleveron@hs.uci.edu, Mandel, Dan dmandel@hs.uci.edu, Nelson, Edward enelson@hs.uci.edu, Nelson, John jsnelson@uci.edu, Parajuli, Ritesh rparajul@hs.uci.edu, Patel, Pranav pranavp@hs.uci.edu, Reikes, Andrew arreikes@hs.uci.edu, Salamat Saberi, Naghmeh nsalamat@hs.uci.edu, Safani, David dsafani@hs.uci.edu, Schubl, Sebastian D. sschubl@hs.uci.edu, Seard, Melvin L. mseard@hs.uci.edu, Shah, Shalini ssshah1@hs.uci.edu, Tarver, Leslie Bishop lbtarver@hs.uci.edu, Thai, Gaby gtthai@hs.uci.edu, Verma, Sunil verma@hs.uci.edu, Yang, Qin qiny3@hs.uci.edu, Abbona, Pablo pabbona@hs.uci.edu, Anavim, Arash aanavim@hs.uci.edu, Bittencourt, Cassiana bittencc@hs.uci.edu, Chan, Jefferson jchan@uci.edu, Chandwani, Carrie E chandwa@hs.uci.edu, Helmy, Mohammad mhelmy@hs.uci.edu, Houshyar, Roozbeh rhoushya@hs.uci.edu, Joshi, Paramjit paramjij@hs.uci.edu, Kain, Tatiana tkain@hs.uci.edu, Katrivesis, James jkatrive@hs.uci.edu, Kheriaty, Aaron akheriat@hs.uci.edu, Lu, Di lud5@hs.uci.edu, Monuki, Edwin emonuki@hs.uci.edu, Perez-Rosendahl, Mari mperezro@hs.uci.edu, Rawles, Jody jrawles@hs.uci.edu, Rezk, Sherif srezk@hs.uci.edu, Roh, Jennifer S. jsroh@hs.uci.edu, Soun, Jennifer Elaine jesoun@hs.uci.edu, Tran, Minh-Ha minhhat1@hs.uci.edu, Wang, Beverly bevwang@hs.uci.edu, Woo, Jennifer woojs@hs.uci.edu, Zhao, Xiaohui zhaox@hs.uci.edu, Barseghian, Ailin barsegha@hs.uci.edu, Bhatia, Nitin bhatian@hs.uci.edu, Brueseke, Taylor tbruesek@hs.uci.edu, Carmichael, Joseph jcarmich@hs.uci.edu, Dafoe, Donald Cameron cdafoe@hs.uci.edu, Daly, Shaun shaund@hs.uci.edu, Dastur, Cyrus cdastur@hs.uci.edu, De Alba, Israel idealba@hs.uci.edu, Engwall, Scott sengwall@hs.uci.edu, Ferrey, Antoney J. ferreya@hs.uci.edu, Ghashghaei, Roxana rghashgh@hs.uci.edu, Gohil, Shruti skgohil@hs.uci.edu, Goldenberg, Emily ebgolden@hs.uci.edu, Hameed, Afshan ahameed@hs.uci.edu, Han, Jay jayjhan@hs.uci.edu, Hecht, Kim khecht@hs.uci.edu, Hsieh, Lanny llhsieh@hs.uci.edu, Huang, Susan sshuang@hs.uci.edu, Imagawa, David dkimagaw@hs.uci.edu, Iyer, Sonali iyers@hs.uci.edu, Jeyakumar, Deepa djeyakum@hs.uci.edu, Joe, Victor vcjoe@hs.uci.edu, Kabutey, Nii-Kabu nkabutey@hs.uci.edu, Kalantar, Kam (Kalantar-Zadeh, Kamyar) kkz@hs.uci.edu, Landman, Jaime landmanj@hs.uci.edu, Lee, Richard A richaral@hs.uci.edu, Lekawa, Michael melekawa@hs.uci.edu, Lombardo, Dawn lombardo@hs.uci.edu, Nahmias, Jeffry jnahmias@hs.uci.edu, Park, Steven stevenp@hs.uci.edu, Patel, Roshan M. roshanmp@hs.uci.edu, Qazi, Alliya qazia@hs.uci.edu, Raymundo, Virgil vsraymun@hs.uci.edu, Reddy, Uttam ureddy@hs.uci.edu, Scott, Shruti shrutis@hs.uci.edu, Shah, Shalini ssshah1@hs.uci.edu, Suzuki, Shuichi shuichis@hs.uci.edu, Tantisattamo, Ekamol etantisa@hs.uci.edu, Uy, Cherry ccuy@hs.uci.edu, Vakharia, Shermeen svakhari@hs.uci.edu, Yafi, Faysal fyafi@hs.uci.edu, Yu, Wengui wyu@hs.uci.edu
Cc: Lefteris, Chad chad.lefteris@hs.uci.edu, Burton, Michelle mrovella@hs.uci.edu, Stamos, Michael mstamos@hs.uci.edu

Dear Medical Directors,

The COVID-19 delta variant is now responsible for the majority (75%) of OC cases, including several breakthrough vaccine cases. Thus far, cases have been tied to unmasked social activities external to UCI, but several HCP have worked while ill. We ask your help in reinforcing the following UCI Health policies in your areas:

- Speak up about any COVID symptoms. Stay home and be tested promptly, regardless of vaccination status. Testing for HCP is available 7 days a week by calling Occupational Health.
- If a co-worker is ill, please encourage and ensure prompt testing and reporting.
- Please ensure all inpatients are told to mask when a HCP enters the room, regardless of the vaccination status of the patient or provider. This is for your protection and theirs.

Additional messaging will be shared in the upcoming days to weeks as we remain nimble in ensuring staff and patient safety.


Sincerely,


Chad T. Lefteris, FACHE
Chief Executive Officer



Exhibit E

# Exhibit F



**From:** "Suchard, Jeffrey" <jsuchard@hs.uci.edu>
**Subject: Hybrid Teaching in academic year 2021-22 - Get ready for a lot of Zoom lectures
again**
**Date:** July 27, 2021 at 1:28:07 PM PDT
**To:** "Wikenheiser, Jamie" <jwikenhe@uci.edu>, "Xu, Xiangmin" <xiangmix@hs.uci.edu>,
"Singh, Harinder (Campus)" <harinder.singh@uci.edu>, "Wray, Alisa" <awray@hs.uci.edu>,
"Lyon, David" <dclyon@uci.edu>, "Stern-Nezer, Sara Rebecca Jessica"
<ssternne@hs.uci.edu>, "Kheriaty, Aaron" <akheriat@hs.uci.edu>, "Steele, Robert"
<resteele@uci.edu>, "Zaragoza, Michael" <mzaragoz@hs.uci.edu>, "Sasson, Bobby"
<bsasson@hs.uci.edu>, "Edwards, Robert" <redwards@hs.uci.edu>, "McClelland, Michael"
<mmcclell@uci.edu>
**Cc:** "Greenberg, Milton" <greenbem@hs.uci.edu>, "Dean, Terri" <tdean@hs.uci.edu>,
"Paliescheskey, Mary" <mpaliesc@hs.uci.edu>, "Meza, Angel" <ameza7@hs.uci.edu>,
"Baumann, Travis" <tbaumann@hs.uci.edu>

MS1 and MS2 Course Directors,

At yesterday's MedEd Deans Cabinet meeting, it was verbally confirmed that due to continued and
increasing concerns about the spread of COVID-19, even among vaccinated individuals, we will not be
returning to the classrooms as had been expected for the past several months.  This directive is coming
from the Dean's Office, and is being applied across our enterprise with respect to educational settings,
both clinical and non-clinical.  It is possible that these restrictions may be lifted in the near-future, but
until then our didactic teaching will be mostly via Zoom meetings.

This is a return to virtually the same teaching conditions we had last academic year.  As occurred last
year, in-person teaching will be allowed, although only under some conditions, namely all of the
following:
- Students need to be vaccinated, or provide proof of medical exemption
  - This is already a condition of their matriculation
- Masking will be required
  - And must be maintained; i.e. no unmasking to eat while near others
- Teaching should be in small groups, ideally 10 or fewer
- The teaching session <u>must be essential for educating future physicians</u> and which <u>requires a
  hands-on / tactile component</u> that can not be achieved through distance-learning
  - Thus, as examples, most clinical skills sessions in the CF courses and dissections in
    Anatomy may occur in-person.
  - Other in-person instructional sessions might be possible, but would need to be
    reviewed/approved by me well beforehand to confirm they meet the above criteria.

Personally, I am hoping that these restrictions will be lifted before the return from Winter Break in
January 2022, and perhaps even before the Winter Break starts, but there is no indication yet when this
may occur.

- Jeff

Jeffrey Suchard, MD FACEP FACMT
Professor of Clinical Emergency Medicine and Pharmacology
Associate Dean for Basic Science Education
University of California, Irvine School of Medicine
Email: jsuchard@hs.uci.edu
Cell (714) 329-1697
Pager 506-2440
http://www.meded.uci.edu

If this communication involves discussion of patient care issues in the performance improvement process, it is protected from discovery by California Evidence Code 1157 as a confidential medical staff communication.

2
Exhibit F