1   EMILY T. KUWAHARA (SBN 252411)
      ekuwahara@crowell.com
2   URI NIV (SBN 307487)
      univ@crowell.com
3   CROWELL & MORING LLP
    515 South Flower Street, 40th Floor
4   Los Angeles, CA  90071
    Telephone: 213.622.4750
5   Facsimile: 213.622.2690

6   KRISTIN J. MADIGAN (SBN 233436)
      kmadigan@crowell.com
7   SUZANNE E. RODE (SBN 253830)
      srode@crowell.com
8   CROWELL & MORING LLP
    3 Embarcadero Center, 26th Floor
9   San Francisco, CA  94111
    Telephone: 415.986.2800
10  Facsimile: 415.986.2827

11  [Additional Counsel Listed on Next Page]

12  Attorneys for Defendants
    THE REGENTS OF THE UNIVERSITY OF
13  CALIFORNIA and MICHAEL V. DRAKE

14

15                    UNITED STATES DISTRICT COURT

16                   CENTRAL DISTRICT OF CALIFORNIA

17                         SOUTHERN DIVISION

18   AARON KHERIATY, M.D.,              Case No. 8:21-cv-01367-JVS-KES

19                Plaintiff,            **DEFENDANTS' OPPOSITION TO
                                        PLAINTIFF'S MOTION FOR
20         v.                           PRELIMINARY INJUNCTION**

21   THE REGENTS OF THE                 Date:   September 27, 2021
     UNIVERSITY OF CALIFORNIA, a        Time:   1:30 p.m.
22   corporation, and MICHAEL V.        Place:  Courtroom 10 C
     DRAKE, in his official capacity as Judge:  Hon. James V. Selna
23   President of the UNIVERSITY OF
     CALIFORNIA,
24
                 Defendants.
25

26

27

28

CROWELL
& MORING LLP
ATTORNEYS AT LAW

1   CHARLES F. ROBINSON (SBN 113197)
        charles.robinson@ucop.edu
2   NORMAN J. HAMILL (SBN 154272)
        norman.hamill@ucop.edu
3   KATHARINE ESSICK (SBN 219426)
        katharine.essick@ucop.edu
4   UNIVERSITY OF CALIFORNIA
    Office of General Counsel
5   1111 Franklin Street, 8th Floor
    Oakland, CA  94607
6   Telephone: 510.987.9800
    Facsimile: 510.987.9757
7
    Attorneys for Defendants
8   THE REGENTS OF THE UNIVERSITY OF
    CALIFORNIA AND MICHAEL V. DRAKE
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION ....................................................................................... 1

II.   FACTUAL BACKGROUND ...................................................................... 3

      A.    COVID-19 Has Caused Death and Infirmities. .................................. 3

      B.    The Delta Variant Has Created a New Urgency. ................................. 4

      C.    The COVID-19 Vaccines Are Safe and Effective and Provide a
            More Robust Immune Response for Those Who Have Had
            COVID-19 Before. ............................................................................... 4

      D.    In Contrast to the Safety and Efficacy of Vaccines, Much
            Remains to Be Understood About Infection-Induced Immunity .......... 6

      E.    University of California Issued the Vaccine Policy to Maintain
            the Health and Well-being of the Campus Community and That
            of the General Public ........................................................................... 7

      F.    Dr. Kheriaty Is a Psychiatrist and Professor at UCI Medical
            School Who Alleges He Is Naturally Immune to Future
            Infection and Disease Because He Had COVID-19 Over a Year
            Ago. ...................................................................................................... 9

III.  ARGUMENT .............................................................................................. 9

      A.    Legal Standard ...................................................................................... 9

      B.    Dr. Kheriaty Lacks Article III Standing Because He Does Not
            Have a Redressable Injury. ................................................................ 10

      C.    Dr. Kheriaty Cannot Show Likelihood of Success on the Merits. ..... 11

            1.    The Policy is subject to rational basis scrutiny. ...................... 11

                  a.    Under *Jacobson v. Massachusetts*, the Policy is
                        subject to rational basis review. ..................................... 11

                  b.    Dr. Kheriaty's asserted rights of bodily integrity
                        and privacy are not fundamental rights that are
                        impinged. ......................................................................... 12

            2.    The Policy easily survives rational basis review. ................... 14

            3.    The Policy also satisfies strict scrutiny. ................................ 19

      D.    The Balance of Equities Tips Heavily in Favor of the Public
            Interest and Continuing to Require Vaccination ................................ 20

            1.    UC and the public's interest in maintaining the health and
                  well-being of the campus community and that of the
                  general public cannot be overstated ......................................... 20

            2.    Concerns about safety are heightened because Dr.
                  Kheriaty is a psychiatrist, serving patients at UC Irvine
                  Health. ..................................................................................... 21

            3.    Dr. Kheriaty has not demonstrated irreparable harm if he
                  refuses to get vaccinated. ........................................................ 23

**TABLE OF CONTENTS**
(continued)

Page

E.     The Scope of the Injunction Sought by Plaintiff Is
       Inappropriately Broad and Not Narrowly Tailored to the Alleged
       Harm.............................................................................................. 25

IV.    CONCLUSION ........................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Associated Gen. Contractors of Cal., Inc. v. Coal. for Econ. Equity*,
  950 F.2d 1401 (9th Cir. 1991).................................................................................23

*Bridges v. Houston Methodist Hosp.*,
  No. CV H-21-1774, 2021 WL 2399994 (S.D. Tex. June 12, 2021) ...................21, 24

*Cruzan v. Director, Missouri Department of Health*,
  497 U.S. 261 (1990)......................................................................................................12

*Doe v. The Regents of the Univ. of California*,
  891 F.3d 1147 (9th Cir. 2018)........................................................................................9

*Edge v. City of Everett*,
  929 F.3d 657 (9th Cir. 2019)........................................................................................10

*Endy v. Cty. of Los Angeles*,
  975 F.3d 757 (9th Cir. 2020).................................................................................13, 14

*Erotic Serv. Provider Legal Educ. & Rsch. Project v. Gascon*,
  880 F.3d 450 (9th Cir. 2018)........................................................................................14

*Friends of Gualala River v. Gualala Redwood Timber, LLC*,
  No. 20-CV-06453-JD, 2021 WL 3373618 (N.D. Cal. Aug. 3, 2021)......................10

*Frontline Doctors v. Wilcox*,
  No. 5:21-cv-01243 (C.D. Cal. July 30, 2021)...................................................13, 21

*Gamble v. City of Escondido*,
  104 F.3d 300 (9th Cir. 1997)........................................................................................11

*Graphic Commc'ns Conference-Int'l Bhd of Teamsters Local 404M v. Bakersfield Californian*,
  541 F. Supp. 2d 1117 (E.D. Cal. 2008).....................................................................24

*Harris v. Univ. of Mass.*,
  No. 21-cv-11244-DJC, 2021 WL 3848012 (D. Mass. Aug. 27, 2021)...................21

*Jacobson v. Commonwealth of Massachusetts*,
  197 U.S. 11 (1905).............................................................................................*passim*

*Klassen v. Trustees of Ind. Univ.*, ___ F. Supp. 3d. ___,No. 1:21-CV-238, 2021
  WL 3073926 (N.D. Ind. July 18, 2021).......................................................... *passim*

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Lockary v. Kayfetz*,
    917 F.2d 1150 (9th Cir. 1990)..........................................................................16, 17

*Munaf v. Geren*,
    553 U.S. 674 (2008) ...............................................................................................9

*Overton v. Uber Techs., Inc.*,
    No. 18-CV-02166-EMC, 2018 WL 1900157 (N.D. Cal. Apr. 20, 2018). ...............10

*Phillips v. City of New York*,
    775 F.3d 538 (2d Cir. 2016).............................................................................11, 17

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
    592 U.S. __, 141 S. Ct. 63 (2020) .......................................................................15

*S. Bay United Pentecostal Church v. Newsom*,
    140 S. Ct. 1613 (2020) ...................................................................................17, 20

*S. Bay United Pentecostal Church v. Newsom*,
    985 F.3d 1128 (9th Cir. 2021)..............................................................................19

*San Francisco Apartment Ass'n v. City & Cty. of San Francisco*,
    881 F.3d 1169 (9th Cir. 2018)..............................................................................14

*Sanchez v. City of Fresno*,
    914 F. Supp. 2d 1079 (E.D. Cal. 2012)..........................................................12, 13

*Stormans, Inc. v. Selecky*,
    586 F.3d 1109 (9th Cir. 2009)..............................................................................25

*Titaness Light Shop, LLC v. Sunlight Supply, Inc.*,
    585 F. App'x 390 (9th Cir. 2014) .........................................................................24

*Vegan Outreach, Inc. v. Chapa*,
    454 F. App'x 598 (9th Cir. 2011) .........................................................................10

*Whitlow v. California*,
    203 F. Supp. 3d 1079 (S.D. Cal. 2016)................................................................19

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)................................................................................................10

1

**TABLE OF AUTHORITIES**
(continued)

2

**Page(s)**

3

**Other Authorities**

4

California Department of Public Health, State Public Health Officer Order of
        August 5, 2021
        https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/COVID-19/Order-of-
        the-State-Public-Health-Officer-Health-Care-Worker-Vaccine-
        Requirement.aspx....................................................................................................................2

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## I.     INTRODUCTION

This fall, the University of California ("UC") has welcomed back over 500,000 students, faculty, and staff to campus, against the backdrop of rising cases of COVID-19 caused by the Delta variant of the SARS-CoV-2 virus. Even before the rise of the Delta variant, vaccines became available to combat this unprecedented and deadly pandemic, so that on July 15, 2021, UC issued its final COVID-19 vaccination policy ("Policy"). Under its Policy, UC requires that, with limited exceptions, students and employees must provide proof that they have been vaccinated against SARS-CoV-2 as a condition of their physical presence at campus facilities. Now, more than ever, UC's COVID-19 vaccination requirement is a necessary tool in the effort to keep its communities and the public safe.

Plaintiff Aaron Kheriaty, M.D., challenges this Policy on the basis of an unproven hypothesis that a prior bout of COVID-19 will definitively provide the same or better protection against re-infection than a COVID-19 vaccine. Based on that uncertain premise, Dr. Kheriaty requests an injunction against the Policy as applied against those individuals who have recovered from COVID-19. But the scientific evidence and consensus about the strength, duration, and durability of infection-induced immunity[1] is still developing and not nearly as clear as Dr. Kheriaty asserts.

Based on the currently available scientific data—namely that the vaccines are safe and effective, including for those who have already had COVID-19—UC adopted its systemwide Policy in response to a definitive and immediate need to protect the health and safety of both the campus community and that of the general public. Vaccination remains the safest and most effective way for UC to protect its community. In Dr. Kheriaty's case, his immediate community includes other doctors, residents, staff, faculty, psychiatric patients, students, and the larger

---

[1] Plaintiff refers to infection-induced immunity as "natural immunity." "Natural immunity" as used in this case refers to the immunity resulting from having had COVID-19 and not to the more generalized concept of a body's immune defenses.

community served by University of California Irvine ("UCI") Medical Center.

Here, UC, rather than the Court, must be permitted to draw the lines around who is covered under this Policy, especially where UC must actively shape its response to the ongoing and changing pandemic. The Policy is evidence-based and rational. If the requested injunction is granted, the court would usurp UC's role as policy maker in creating a judicial exemption to the Policy.

Dr. Kheriaty's motion for a preliminary injunction should be denied:

*First*, Dr. Kheriaty lacks Article III standing to bring this suit because, as a healthcare worker, he still must get vaccinated under California Department of Public Health, State Public Health Officer Order of August 5, 2021 ("CDPH Order").[2] Thus, even if this Policy were enjoined as to him, he would still not obtain the relief he seeks. He therefore does not have a redressable injury.

*Second*, Dr. Kheriaty is not likely to prevail on his Fourteenth Amendment claims because the Policy is rationally related to UC's legitimate and compelling interest in protecting the health and safety of its community. Under *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11, 25-26 (1905), rational basis review applies. The Policy is directly aimed at UC's legitimate and compelling interest in the health and well-being of the community. The evidence is overwhelming that the COVID-19 vaccines are safe and effective, and confer potent hybrid immunity, for those who have previously had COVID-19.

*Third*, the balance of equities tips heavily in favor of the public interest in the community's health and safety in continuing to require vaccinations. UC and the public's interest in maintaining the health and well-being of the campus community cannot be overstated. If Dr. Kheriaty's theory that infection-induced immunity is robust and provides lifelong stable protection for every person who has recovered from COVID-19 is incorrect—it could put thousands of students, faculty and staff,

---

[2] https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/COVID-19/Order-of-the-State-Public-Health-Officer-Health-Care-Worker-Vaccine-Requirement.aspx, attached as Kuwahara Decl., Ex. 1.

not to mention vulnerable patients seeking treatment in UC medical centers, at higher risk of COVID-19 infection. On the other hand, Dr. Kheriaty is not being deprived of a constitutional right, as UC is not forcing him to be vaccinated against his will; rather, vaccination is a condition of physical presence at UC. Moreover, where Dr. Kheriaty's claim of harm is his inability to see patients and teach residents at the hospital, the patients and community must come first. In addition, Dr. Kheriaty is subject to the CDPH Order, which requires vaccination of health-care workers such as him. On balance, the public health interest greatly outweighs any harm to Dr. Kheriaty.

*Finally*, the requested injunctive relief reaches far beyond what is necessary to address any alleged harm or concerns of the Plaintiff, and is inappropriately broad. Any preliminary relief (which Defendants do not concede is appropriate), should be strictly limited to addressing Dr. Kheriaty's concerns and should not apply to all unvaccinated individuals who have already had COVID-19.

Accordingly, Defendants respectfully request that this motion for preliminary injunction be denied in its entirety.

## II.   FACTUAL BACKGROUND

### A.   COVID-19 Has Caused Death and Infirmities.

COVID-19 is a deadly communicable disease caused by the novel coronavirus, SARS-CoV-2, that has killed over 637,000 Americans and infected nearly 39 million more. Declaration of Arthur L. Reingold, M.D. ("Reingold Decl.") ¶ 13. While the mortality is extraordinary, the burden inflicted by the COVID-19 disease is much greater than mortality alone. Declaration of Shane Crotty, Ph.D. ("Crotty Decl.") ¶ 8. Over 2 million people have been hospitalized with COVID-19 in the United States. *Id*. ¶ 8. Half of those hospitalizations have been among people under the age of 65, and half of those have been in people under the age of 50. *Id*. ¶ 8. Over 117,000 Americans ages 18-29 years old have been hospitalized with COVID-19 in the past 12 months. *Id.*

COVID-19 can also cause severe and long-term illness in individuals of all ages, including previously healthy individuals. Reingold Decl. ¶ 12. Among children and adolescents, a severe illness called Multisystem Inflammatory Syndrome in Children can result, as can a similar illness in adults, Multisystem Inflammatory Syndrome in Adults. *Id.* In addition, many individuals with COVID-19, including those with mild cases, go on to have persistent sequelae, so-called "Long COVID," the frequency, duration and severity of which remain to be characterized. *Id*.

The transmission of SARS-CoV-2 in communities has significantly impacted the U.S. healthcare system, and surges can threaten the level of care provided at healthcare facilities, such as at UC Irvine Medical Center. Declaration of Annabelle de St. Maurice, M.D., M.P.H. ("de St. Maurice Decl.") ¶ 7.

### B.     The Delta Variant Has Created a New Urgency.

Vaccination efforts, along with mask mandates and other restrictions, slowed the spread of COVID-19. But there is a new urgency: the Delta variant has recently emerged as a significantly more infectious form of SARS-CoV-2, and was dominant in the United States by July 2021. Declaration of Carrie L. Byington, M.D., ("Byington Decl.") ¶ 6. The data support that vaccination remains an effective —perhaps the single most effective—strategy for preventing severe disease, hospitalization, and death from COVID-19. Reingold Decl. ¶ 25.

### C.     The COVID-19 Vaccines Are Safe and Effective and Provide a More Robust Immune Response for Those Who Have Had COVID-19 Before.

"COVID-19 vaccines are safe and effective" and "serious side effects that could cause long-term health problem [sic] are extremely unlikely." CDC, Safety of COVID-19 Vaccines, attached as Kuwahara Decl., Ex. 2 at 13. As of August 23, 2021, over 363 million doses of the COVID-19 vaccine have been given in the United States, and "no long-term side effects have been detected." *Id*. at 14.

The three COVID-19 vaccines, two of which are authorized for emergency

use by the U.S. Food and Drug Administration ("FDA"), and one of which is now fully approved, have impressive safety records. Crotty Decl. ¶¶ 9-15. While there is a possibility of rare adverse events associated with each of these vaccines, the risks of these events are very small and the benefits of the vaccine outweigh them. Reingold Decl. ¶¶ 18-19.

The safety data for COVID-19 vaccines establish that they are also safe for individuals previously infected with COVID-19. Crotty Decl. ¶¶ 16-19. Clinical trials for the vaccines included participants who were previously infected, and studies show that vaccine safety for them was equal to participants who never had COVID. *Id*. ¶ 40. As such, the CDC affirmatively recommends that individuals with a history of COVID-19 infection be vaccinated. CDC, FAQ about COVID-19 Vaccination, attached as Kuwahara Decl., Ex. 3 at 17-18. The Vaccine Adverse Events Reporting System ("VAERS") cited by Dr. Kheriaty is not a reliable source of information regarding vaccine-related adverse events, as it compiles self-reported data and was never designed to establish causation. Crotty Decl. ¶¶ 33-36; Reingold Decl. ¶ 17.

And the vaccines are working. Protection against the Delta variant for symptomatic COVID-19 and hospitalizations remain high. Crotty Decl. ¶ 22. The current data support that vaccines are preventing the transmission of the SARS-CoV-2 virus, even against Delta. Crotty Decl. ¶ 45. Earlier in the pandemic, vaccines were able to prevent almost all transmission against the Alpha variant, so the current increase of transmission of the Delta variant among those who are vaccinated has created some confusion. *See id.* In fact, the data continue to support a decrease in transmissions for vaccinated individuals as compared to an unvaccinated person, with a likely 93% reduction in transmissions based on 7 times fewer infections and a 50% shorter window of time for transmission. Crotty Decl. ¶ 46.

Indeed, when individuals who have had COVID-19 are vaccinated, the

1   resulting hybrid immunity from both the natural immune response and the vaccine

2   provides far more potent immune response than a person who has only been

3   vaccinated or previously infected. Crotty Decl. ¶¶ 25-26. Notably, the hybrid

4   immunity recognizes variants far better than infection-induced immunity. Crotty

5   Decl. ¶ 26.

6           **D.     In Contrast to the Safety and Efficacy of Vaccines, Much Remains
7                    to Be Understood About Infection-Induced Immunity.**

8           Real-world data regarding the strength and duration of infection-induced

9   immunity against infection from SARS-CoV-2 and its variants remain subject to

10  further study. While the data emerging in real-time support the theory that

11  previously infected individuals have some level of immunity to reinfection or

12  severe disease, the central premise of Dr. Kheriaty's argument—that infection-

13  induced immunity is known to be <u>definitively</u> superior to the immunity of those

14  who are vaccinated under any circumstance and for all time—is not proven, and

15  scientific consensus regarding infection-induced immunity is still developing. Since

16  the filing of Dr. Kheriaty's motion, a pre-print (not yet peer-reviewed) publication

17  has come out claiming that infection-induced immunity is superior to the Pfizer

18  vaccine against the Delta variant. But, other studies conclude otherwise. *See* Crotty

19  Decl. ¶ 49. Thus, this is not an area with a final scientific answer and clear

20  scientific consensus. *Id.* In addition, Dr. Kheriaty's supposition, that those who

21  have had COVID-19 before have a near zero risk of becoming reinfected and

22  transmitting SARS-CoV-2, is unproven. *See* Crotty Decl. ¶ 48. Reinfection is

23  plausible, and due to the scientific uncertainty on this topic, the conservative

24  scientific position is that reinfections do result in a meaningful number of

25  transmissions. *Id.*

26          As of today, neither the completeness nor durability of protection from

27  infection-induced immunity against a second case of COVID-19 has been

28  established. Reingold Decl. ¶ 21. The extent to which infection-induced immunity

provides protection against new variants is also unknown. *Id.* While hybrid immunity is quite broad against variants, infection-induced immunity can be narrow against variants and of uncertain protective capacity. Crotty Decl. ¶ 27. For example, in a study from Brazil, many individuals previously infected with SARS-CoV-2 were subsequently infected with the Gamma variant, showing a substantial loss of infection-induced immunity against reinfection with Gamma. *Id.*

Furthermore, although antibody tests exist, none is currently considered to provide a reliable indication of a person's level of immunity to or protection from COVID-19 in the future. Reingold Decl. ¶ 22. Thus, the FDA and CDC do not recommend serologic screening intended to identify prior infection to guide decisions about the administration of COVID-19 vaccines. *Id.* Indeed, FDA explicitly warns "that a positive result from an antibody test does not mean you have a specific amount of immunity or protection from SARS-CoV-2 infection." FDA Safety Communication, Antibody Testing Is Not Currently Recommended to Assess Immunity After COVID-19, attached as Kuwahara Decl., Ex. 4 at 23.

In light of the known protective effect and safety of vaccination, including for people who have previously had COVID-19, CDC continues to recommend vaccinations for individuals who have already had the disease. CDC, FAQ about COVID-19 Vaccination, attached as Kuwahara Decl., Ex. 3 at 17-18.

**E.** **University of California Issued the Vaccine Policy to Maintain the Health and Well-being of the Campus Community and That of the General Public.**

This fall, the University of California system is welcoming back more than 280,000 students and more than 227,000 faculty and staff to campuses and other locations. Declaration of Bernadette M. Boden-Albala, M.P.H. ("Boden-Albala Decl.") ¶ 8. UC communities are heavily interdependent, with frequent contact between faculty, students, and staff. *Id.* ¶ 7. Most of the activities in this university setting are performed indoors, where multiple individuals are in reasonably close proximity, especially where communication and collaboration are involved, and

which pose a higher risk for the spread of the novel coronavirus. *Id.* ¶ 9.

On or about July 15, 2021, UC issued its final Policy requiring vaccination of employees and students as a condition of their access to UC locations, "[t]o maintain the health and well-being of the campus community and that of the general public." Declaration of President Michael Drake ("Drake Decl.") ¶ 13, Ex. A at 6 (President's Cover Letter). The Policy is the "product of consultation with UC infectious disease and public health experts and ongoing review of the evidence from medical studies concerning the dangerousness of COVID-19 and emerging variants of concern, as well as the safety and effectiveness of the vaccines for preventing infection, hospitalizations, and deaths from COVID-19, and for reducing the spread of this deadly disease." *Id.* ¶ 11, Ex. A at 6. In arriving at this Policy, UC reviewed "the safety and efficacy of the three vaccines approved by the Food and Drug Administration (FDA) for emergency use, and considered the severe risks presented by a virus that has killed more than 600,000 people in the United States alone, as well as the rise of more transmissible and more virulent variants." *Id.* The Policy provides a limited set of exceptions on the basis of medical exemption, disability, and religious objection only. *Id.* at 10 (Policy, defining "Exception").

The Policy's Frequently Asked Questions ("FAQ") directly address the particular circumstance in which someone has been either "recently diagnosed with COVID-19 and/or [] had an antibody test that shows that [they] have natural immunity." Drake Decl., Ex. A at 18 (FAQ 9). The FAQ clarifies that such individuals may apply for a temporary medical exemption of up to 90 days after diagnosis and certain treatment. Individuals do not, however, qualify for permanent medical exemptions under the Policy. As explained in the FAQ: "According to the US Food and Drug Administration,[3] . . . 'a positive result from an antibody test

---

[3] The Policy links to FDA Safety Communication, Antibody Testing Is Not Currently Recommended to Assess Immunity After COVID_19 Vaccination: FDA (May 19, 2021), https://www.fda.gov/medical-devices/safety-communications/antibody-testing-not-currently-recommended-assess-immunity-after-covid-19-vaccination-fda-safety, also attached as Kuwahara Decl., Ex. 4.

CROWELL
& MORING LLP
ATTORNEYS AT LAW

does not mean you have a specific amount of immunity or protection from SARS-CoV-2 infection. . . . Currently authorized SARS-CoV-2 antibody tests are not validated to evaluate specific immunity or protection from SARS-CoV-2 infection.' For this reason, individuals who have been diagnosed with COVID-19 or had an antibody test are not permanently exempt from vaccination." *Id.*

**F.   Dr. Kheriaty Is a Psychiatrist and Professor at UCI Medical School Who Alleges He Is Naturally Immune to Future Infection and Disease Because He Had COVID-19 Over a Year Ago.**

Plaintiff Dr. Kheriaty is a Professor of Psychiatry and Human Behavior at the University of California Irvine School of Medicine. Compl. ¶ 5. He avers that he had COVID-19 in July 2020, and that his natural immunity is superior to that of a vaccinated person. Compl. ¶¶ 6, 23. As a practicing physician seeing patients at a health facility (*see* Compl. ¶ 60), Dr. Kheriaty is also subject to the CDPH Order. *See* CDPH Order, attached as Kuwahara Decl., Ex. 1.

Dr. Kheriaty has brought suit against The Regents[4] and President of the University of California, Michael Drake, M.D., in his official capacity, alleging Fourteenth Amendment violations brought on the grounds of equal protection and substantive due process. Dr. Kheriaty seeks a preliminary injunction of the Policy on behalf of those who have recovered from COVID-19.

## III.   ARGUMENT

### A.   Legal Standard

"A preliminary injunction is an extraordinary and drastic remedy; it is never awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (citations omitted). To prevail, plaintiff must establish that he is "likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the

---

[4] All claims against "The Regents of the University of California" are foreclosed by the Eleventh Amendment and should be dismissed. *Doe v. The Regents of the Univ. of California*, 891 F.3d 1147, 1153 (9th Cir. 2018).

public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

Of these four *Winter* factors, the most important is whether the Plaintiff is likely to succeed on the merits. *Edge v. City of Everett*, 929 F.3d 657, 663 (9th Cir. 2019); *Friends of Gualala River v. Gualala Redwood Timber, LLC*, No. 20-CV-06453-JD, 2021 WL 3373618, at *5 (N.D. Cal. Aug. 3, 2021) ("demonstrating a likelihood of success on the merits, or at least a serious question, remains the *sine qua non* of injunctive relief"). Where "a movant fails to meet this threshold inquiry" the Court "need not consider the other factors." *Edge*, 929 F.3d at 663 (quoting *California v. Azar*, 911 F.3d 558, 575 (9th Cir. 2018)).

**B.    Dr. Kheriaty Lacks Article III Standing Because He Does Not Have a Redressable Injury.**

A fundamental issue with Dr. Kheriaty's request for injunctive relief is that even if the Court grants relief, Dr. Kheriaty remains obligated to get vaccinated under the CDPH Order. To have standing, Dr. Kheriaty must show that "it is likely, although not certain, that his injury can be redressed by a favorable decision." *Vegan Outreach, Inc. v. Chapa*, 454 F. App'x 598, 600 (9th Cir. 2011) (holding plaintiff lacked standing because injunction would not have redressed injuries) (quotations omitted); *Overton v. Uber Techs., Inc.*, No. 18-CV-02166-EMC, 2018 WL 1900157, at *2 (N.D. Cal. Apr. 20, 2018) (identifying a "fatal problem" when "granting preliminary relief would not redress the harm"). Under the CDPH Order, hospitals are identified as "particularly high-risk settings where COVID-19 outbreaks can have severe consequences for vulnerable populations including hospitalization, severe illness, and death" with "frequent exposure to staff and highly vulnerable patients."  CDPH Order, Kuwahara Decl., Ex. 1 at 7. All workers who "provide services or work in facilities" such as hospitals, clinics and doctor's offices, including for behavioral health, must be vaccinated by September 30, 2021. Dr. Kheriaty actively sees patients and their families at the hospital, Resident Clinic, and at the Department of Psychiatry Clinic. Compl. ¶¶ 11, 61. Dr. Kheriaty

does not challenge the CDPH Order. Accordingly, even if the Court grants relief, Dr. Kheriaty's alleged harm will not be redressed, and he lacks standing.

### C.   Dr. Kheriaty Cannot Show Likelihood of Success on the Merits.

Dr. Kheriaty brings two challenges under the Fourteenth Amendment on the grounds of equal protection and substantive due process. The rubric for evaluating due process and equal protection claims under the rational basis test is the same. *Gamble v. City of Escondido*, 104 F.3d 300, 307 (9th Cir. 1997).

#### 1.   The Policy is subject to rational basis scrutiny.

##### a.   Under *Jacobson v. Massachusetts*, the Policy is subject to rational basis review.

Dr. Kheriaty's Fourteenth Amendment claims must be analyzed under rational basis scrutiny. No fundamental right is at issue. The Policy does not implicate the free exercise of religion. The Policy does not target a suspect class. The conclusion that rational basis applies here is consistent with a well-settled precedent of the Supreme Court in its 1905 decision *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11, 25-26 (1905). The Supreme Court in *Jacobson* held that "a community has the right to protect itself against an epidemic of disease which threatens the safety of its members." *Jacobson*, 197 U.S. at 27. Though *Jacobson* was decided before the Supreme Court developed the three tiers of review (rational basis, intermediate, strict scrutiny), the Court "effectively endorsed—as a considered precursor—rational basis review of a government's mandate during a health crisis." *Klaassen v. Trustees of Ind. Univ.*, __ F. Supp. 3d __, No. 1:21-CV-238, 2021 WL 3073926, at *21 (N.D. Ind. July 18, 2021). Before the current pandemic, courts have upheld mandatory vaccination requirements as within the State's police power under *Jacobson*. *E.g.*, *Phillips v. City of New York*, 775 F.3d 538, 543 (2d Cir. 2016) (citing *Jacobson*, 197 U.S. at 25-27 and *Zucht v. King*, 260 U.S. 174, 176 (1922)). In advocating for the application of strict scrutiny, Dr. Kheriaty simply ignores this body of controlling precedent.

As more recently explained by the Seventh Circuit, the COVID-19 vaccine requirement implemented at universities is <u>easier</u> to resolve than *Jacobson* because the vaccine requirement upheld in *Jacobson* was more restrictive. *Klaassen*, 2021 WL 3281209 (denying request for injunction pending appeal of denial of preliminary injunction; subsequent application for injunction pending appeal at the Supreme Court was denied without comment by Justice Barrett). Like the Indiana University policy, the UC Policy includes medical and religious exemptions, neither of which were provided for in the *Jacobson* vaccine requirement. *Id.* at *1. And like the Indiana University policy, the UC Policy is a condition of attending UC, and does not seek to vaccinate every adult, unlike the requirement before the Supreme Court in *Jacobson*. *Id.* at *1. UC's Policy, requiring vaccination of its employees and students against SARS-CoV-2 as a condition of physical access, and with specified exceptions, falls squarely within the rational basis blueprint that the Supreme Court established in *Jacobson*.

### b. Dr. Kheriaty's asserted rights of bodily integrity and privacy are not fundamental rights that are impinged.

Dr. Kheriaty first argues that the UC Policy violates his right to bodily integrity under *Cruzan v. Director, Missouri Department of Health*, 497 U.S. 261, 277 (1990). But *Cruzan* is inapposite. In that case the Supreme Court considered whether an individual had a constitutional right to require a medical provider to withdraw life-sustaining treatment under certain circumstances. *Id.* at 269. UC is not forcing vaccination, nor acting as a medical provider under the Policy; rather, proof of vaccination is a condition of physical access to UC locations, subject to limited exceptions. Similarly, Dr. Kheriaty's reliance on *Sanchez v. City of Fresno*, 914 F. Supp. 2d 1079, 1111 (E.D. Cal. 2012) is misplaced. The plaintiff in *Sanchez* invoked the state-created danger doctrine, wherein the state was alleged to have affirmatively placed the plaintiff in a position of danger with deliberate indifference to his physical safety. *Id.* at 1101. In that case, the city had deliberately destroyed

homeless shelters in freezing winter conditions, knowing that this threatened plaintiff's continued survival. *Id.* at 1111. This case presents the opposite scenario. UC adopted its Policy to protect the health and safety of the community, and the vaccines have a robust safety profile. Drake Decl. ¶ 13-14, Ex. A at 6; Crotty Decl. ¶¶ 10-19. The record does not support any deliberate indifference by UC to a known or obvious danger. *See Am.'s Frontline Doctors v. Wilcox*, No. 5:21-cv-01243 (C.D. Cal. July 30, 2021) (denying temporary restraining order brought by previously infected students requesting enjoinment of the UC Policy under the state-created danger doctrine), attached as Kuwahara Decl., Ex. 5.

*Jacobson* controls. And *Jacobson* makes clear that the "rights of the individual in respect of his liberty may at times, under the pressure of great dangers, be subjected to such restraint, to be enforced by reasonable regulations, as the safety of the general public may demand." *Jacobson*, 197 U.S. at 29. The Court "d[id] not perceive" that the state legislation before it, which required citizens to be vaccinated against smallpox, had "invaded any right secured by the Federal Constitution." *Id.* at 38.

Dr. Kheriaty next argues that he has a fundamental right to informational privacy that UC has violated by compelling him to disclose his vaccination status. The right of informational privacy "is not absolute; rather, it is a conditional right which may be infringed upon a showing of proper governmental interest." *Endy v. Cty. of Los Angeles*, 975 F.3d 757, 768 (9th Cir. 2020) (quoting *In re Crawford*, 194 F.3d 954, 959 (9th Cir. 1999). This limited right of privacy is based on "the individual interest in avoiding disclosure of personal matters." *Endy*, 975 F.3d at 768 (quoting *In re Crawford*, 194 F.3d at 958 ) (rejecting claim that right of informational privacy was violated where Plaintiff provided "no evidence that his information has been publicly disseminated or disclosed"). To prevail, Dr. Kheriaty must show that (1) UC is publicly disclosing his personal information and (2) UC's important interest in preventing the spread of COVID-19 is outweighed by the risk

of disclosure of his vaccination status. Dr. Kheriaty fails on both counts. The Policy makes clear that "vaccination-related information is private and confidential" and "the University will not disclose vaccine status…except on a need-to-know basis." Drake Decl., Ex. A at 18-19 (FAQ 11).

And, as discussed more thoroughly below, UC's interest in maintaining the health and safety of its community far exceeds the minimal risk that Dr. Kheriaty's individual vaccination status might be released (beyond what he has already publicly disclosed himself). The legitimate government interest expressed in the Policy, combined with its express protections against public dissemination, foreclose a constitutional violation. *Endy*, 975 F.3d at 768 ("Legitimate governmental interests combined with protections against public dissemination can foreclose a constitutional violation.") (citing *Nat'l Aeronautics & Space Admin. v. Nelson*, 562 U.S. 134, 138 (2011)). Of course, like with vaccination, disclosure is a condition of physical access, and he may also simply decline to disclose his status.

## 2. The Policy easily survives rational basis review.

The question before this Court is therefore whether UC's vaccination Policy is rationally related to UC's legitimate interest. Under rational basis review, "legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *San Francisco Apartment Ass'n v. City & Cty. of San Francisco*, 881 F.3d 1169, 1179 (9th Cir. 2018) (quoting *City v. Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985)). The Policy easily meets the rational basis test. *See Erotic Serv. Provider Legal Educ. & Rsch. Project v. Gascon*, 880 F.3d 450, 457 (9th Cir. 2018) ("Rational basis review is highly deferential to the government, allowing any conceivable rational basis to suffice").

*First*, the vaccine Policy is plainly directed at achieving UC's legitimate and compelling objective of "maintain[ing] the health and well-being of the campus community and that of the general public." Drake Decl., Ex. A at 3 (President's

letter). The Supreme Court has already recognized that "[s]temming the spread of COVID-19 is unquestionably a compelling interest." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. __, 141 S. Ct. 63, 67 (2020). UC's Policy squarely addresses that imperative in the context of safely returning hundreds of thousands of students and employees to in-person learning, working, and living across 10 campuses, 5 medical centers, and a national laboratory.

In addition, heightened safety concerns are at play in UC's medical centers. Dr. Kheriaty is a doctor with an active clinical practice. In the healthcare setting, requiring the staff to be vaccinated is crucial to preventing transmission from patients to healthcare workers and between healthcare workers, and allows UC's health centers to maintain a healthy, stable workforce. de St. Maurice Decl. ¶. 8. Vaccination of healthcare workers is also important to protect patients who might be especially vulnerable to severe COVID-19 disease. *Id.* at 9.

*Second*, the overwhelming evidence of the efficacy and safety of the available vaccines establishes that the Policy is rationally related to UC's legitimate interest. *See Klaassen*, 2021 WL 307326 at *26-38, 45 (denying preliminary injunction seeking to enjoin Indiana University's COVID-19 vaccine requirement). The three vaccines available in the United States have impressive safety records and are highly efficacious, including for previously infected individuals. Crotty Decl. ¶¶ 9-19. In response to the COVID-19 surge, UC is not the only university to implement such a policy, in an effort to keep their communities safe during the pandemic, while still resuming on-campus operations and classes. *See* Kuwahara Decl., Exs. 7-16 (attaching policies from Johns Hopkins Univ., Georgetown Univ., Harvard Univ., Morehouse College, Univ. of Pennsylvania, Univ. of Virginia, Vanderbilt Univ., Wake Forest Univ., Yale Univ., and Duke Univ.).

Currently, the COVID-19 vaccine remains effective in stemming the spread of COVID-19 and providing protection against COVID-19. Crotty Decl. ¶¶ 20-23. Today, the Delta variant is responsible for a high proportion of SARS-CoV-2

infections and is more readily transmitted and produces, on average, more severe illness. Reingold Decl. ¶ 10. COVID-19 cases began to climb against in July 2021, including in California. *Id.* ¶ 13. Against this surge, the data support that vaccination remains an effective —perhaps the single most effective—strategy for preventing severe disease, hospitalization, and death from COVID-19. *See* Reingold Decl. ¶ 25. Dr. Kheriaty's argument fails because it is based on the flawed assumption that vaccines serve no purpose because they do not prevent infection and transmission at all. *See* Crotty Decl. ¶¶ 42-47.

*Third*, UC considered individuals who have previously had COVID-19 and made a rational decision not to permanently exclude them from the Policy. For his part, Dr. Kheriaty assumes that infection-induced immunity will confer perfect immunity, that he will not transmit SARS-CoV-2, and that everyone who has had COVID-19 will consistently have a high level of immunity, against all variants for all of their lives. But there is no scientific consensus to support such a bold and definitive claim. *See generally* Crotty Decl. and Reingold Decl. UC's Policy is evidence-based. Byington Decl. ¶ 27. The research and underlying data as of today regarding infection-induced immunity for individuals who had COVID-19 previously, particularly in light of the new and highly transmissible Delta variant, is not sufficiently mature to justify permitting individuals in this group to unilaterally opt out of COVID-19 vaccination and doing so would put the greater UC community at risk. *Id.* ¶ 30.

In seeking to challenge the Policy's rational basis, Dr. Kheriaty posits that unvaccinated individuals are unpopular and concludes that UC's purpose in issuing the Policy must be to punish them. That conclusion is utterly insupportable. As set forth above, the evidence is that UC has issued its Policy based on the safety and efficacy of the vaccines and the serious risks that COVID-19 presents to individual and public health. *Lockary v. Kayfetz*, 917 F.2d 1150 (9th Cir. 1990), cited by Dr. Kheriaty, is distinguishable. The *Lockary* plaintiffs were able to present a fact issue

whether the state's interest in a water moratorium was in fact to address a water shortage. *Id*. at 1155. There is no question but that UC's interest in its Policy is to address the serious health and safety risks presented by the COVID-19 pandemic. In any event, Dr. Kheriaty's suppositions do not demonstrate that he is likely to succeed on the merits of his claims.

*Finally*, to the extent Dr. Kheriaty takes issue with the scientific underpinnings of UC's decisions, the courts should not intervene to second-guess UC, especially as the pandemic rolls on, data continue to accumulate, studies continue to be published every day, and scientists continue to evaluate the data. Policy decisions should be left to the policymakers, not the courts nor any individual objector. *Klaassen*, 2021 WL 3073926 at *38. "Plaintiffs argue that a growing body of scientific evidence demonstrates that vaccines cause more harm to society than good, but as *Jacobson* made clear, that is a determination for the legislature [i.e., policymaker], not the individual objectors." *Phillips v. City of New York*, 775 F.3d 538, 542 (2d Cir. 2015). When UC "'undertake[s] to act in areas fraught with medical and scientific uncertainties,' their latitude 'must be especially broad.'" *S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613 (2020) (Roberts, C.J., concurring in denial of application for injunctive relief) (citing *Marshall v. United States*, 414 U.S. 417, 427 (1974)).

If the court were to weigh the competing declarations in this case, respectfully, it is far from clear that any of Plaintiff's experts are qualified to opine on immunology, epidemiology, or infectious disease under the *Daubert* standard. Dr. Kheriaty is a psychiatrist. Dr. McCullough is a cardiologist (McCullough Decl. ¶ 5). The various doctors who signed onto a joint declaration are an internist and HIV researcher (Dr. Ladapo, Dkt 15-4, at 30-31), a pediatric rheumatologist (Dr. Whelan, Dkt 15-4, at 63), a retired professor of pediatrics, endocrinology and metabolism (Dr. Boros, Dkt 15-4, at 25, 68), another psychiatrist (Dr. Browner, Dkt 15-4, at 108), an obstetrician and gynecologist (Dr. Bhargava, Dkt 15-4, at 151),

and another cardiologist (Dr. Vorobief, Dkt 15-4, at 168). Their conclusions are subject to healthy skepticism and scrutiny. *See, e.g.*, Crotty Decl. ¶¶ 30-52 (rebuttals). In contrast, UC Defendant's declarants include Dr. Shane Crotty, a world-renowned immunologist who studies infection-induced immunity and SARS-CoV-2 (Crotty Decl. ¶¶ 2-6 & Ex. A), and Dr. Arthur Reingold who is the head of Epidemiology at UC Berkeley, Chair of the Western States Scientific Safety Review Workgroup on COVID-19 vaccines, and who has dedicated his research to the prevention and control of infectious diseases (Reingold Decl. ¶¶ 2-6 & Ex. A).

Dr. Kheriaty's proposed injunction illustrates why such public health decisions should be left to the policy makers and not the courts. UC must consider the existing and developing scientific evidence and translate that into a workable Policy applicable to over 500,000 people. Any change to the Policy would have to be evidence-based and follow an in-depth consideration of risks to the health and safety of the UC community. As a policymaker, UC must answer questions and draw lines that will no doubt fail to satisfy everyone: How long does immunity last, and what should the duration of any exception be? Would an individual such as Dr. Kheriaty qualify for such an exception, if his bout of COVID-19 occurred over a year ago? What evidence should UC accept to establish a prior COVID-19 case? *See* Reingold Decl. ¶ 20 (describing 4 groups who may be described as having had COVID-19). How should the UC Policy account for all that is unknown about how infection-induced immunity will hold up against variants? *See* Crotty Decl. ¶ 28 (describing study of reinfections from the Gamma variant). Are there certain settings, such as in the health care setting, where any exception for infection-induced immunity should not apply?

Under the current circumstances, so long as UC's decisions are rationally related to its legitimate goals of maintaining the health and safety of the community, UC, rather than the courts, must be permitted to draw these lines in deciding how to protect its community. What is known is that vaccines are safe and

effective for those who have previously had COVID-19, that vaccines provide an additional benefit of increased hybrid immunity for previously infected individuals, and that the benefits of vaccination outweigh the risk. There is no reason to exclude individuals with prior COVID-19 infection from the vaccination Policy, and it is reasonable to include them. The Policy passes the rational basis test.

### 3.    The Policy also satisfies strict scrutiny.

Applying anything other than rational basis would upend a century of precedent regarding the state's powers with respect to vaccination. Nonetheless, should this court apply strict scrutiny, the UC vaccine Policy would survive.

Under strict scrutiny, any restriction of a fundamental right must be "narrowly tailored to serve a compelling state interest." *S. Bay United Pentecostal Church v. Newsom*, 985 F.3d 1128, 1142 (9th Cir. 2021) (quotations omitted). The Supreme Court has recognized a compelling interest in stemming the tide of COVID-19, and UC's interest in maintaining the health and safety of the community should certainly meet this test. *See id*. Narrow tailoring requires that the State employ the least restrictive means to advance its objective of stemming the virus's spread. *Id*.

The UC Policy is narrowly tailored. It applies only to those employees and students who seek physical access to a UC location, where they could transmit the virus. The Policy also provides three exceptions based on medical exemption (including a 90-day temporary exemption for individuals recovering from COVID-19), disability, and religious objection, as well as a deferral for the duration of pregnancy. There exists no less restrictive means for UC to carve out the previously infected due to the lack of scientific consensus on key questions relating to infection-induced immunity, that would allow UC to meet its objective of maintaining the health and safety of the community. *See Whitlow v. California*, 203 F. Supp. 3d 1079 (S.D. Cal. 2016) (holding that conditioning K-12 school enrollment on vaccination and removal of opt-out for parent's personal beliefs

satisfied strict scrutiny because no less restrictive means existed to meet state's compelling interest of achieving total immunization).

The question of immunity from COVID-19 is a "dynamic and fact-intensive matter." *S. Bay United Pentecostal Church*, 140 S. Ct. at 1613. (Roberts, C.J. concurring). Even under strict scrutiny, policymakers must be given "especially broad" latitude when considering "areas fraught with medical and scientific uncertainties." *Id*. Under the current circumstances, permitting a large group of individuals to return to campus, without vaccination and without assurance that Dr. Kheriaty's theory is correct, is not a narrow tailoring—it is a dangerous gamble.

**D.   The Balance of Equities Tips Heavily in Favor of the Public Interest and Continuing to Require Vaccination.**

**1.   UC and the public's interest in maintaining the health and well-being of the campus community and that of the general public cannot be overstated.**

As an individual, and notwithstanding his clinical profession, Dr. Kheriaty's challenge to the Policy focuses on his individual choices and the effect of the Policy on him alone. By necessity, UC's concerns are broader. The vaccination requirement seeks "to maintain the health and well-being of the campus community and that of the general public." Drake Decl., Ex. A at 6. Public health is first and foremost about promoting the health and wellbeing of the community. Boden-Albala Decl. ¶ 7. Enjoining the enforcement of the Policy against previously infected individuals—where the data are not clear on the degree of risk that entails—could put thousands of students, faculty, staff, and vulnerable patients at a higher risk of COVID-19 infection. These communities are heavily interdependent, with frequent contact among faculty, students and staff. *Id*. These campus communities are comprised of individuals who may be at more or less risk of acquiring infections such as COVID-19, and may have more or less risk for poor prognostic outcomes from said infections including hospitalizations, ICU care and death. *Id.* The Policy seeks to protect not only the vaccinated but also those who

cannot be vaccinated, who are among the most vulnerable. Vaccines protect individuals from infection and, as importantly, high vaccine coverage in a community protects the community at large. *Id*.

After over a year of emergency remote operations, COVID-19 vaccinations on college campuses and at medical centers serving the most vulnerable patients is especially important. Following the advent of the vaccines, the UC system is now welcoming more than 280,000 students and more than 227,000 faculty and staff to return to campuses and other locations. *See* Boden-Albala Decl. ¶ 8. The Policy is the linchpin of UC's long-planned efforts for a safe and healthy return this fall.

Many courts faced with challenges to COVID-19 vaccine requirements have similarly concluded that the public interest in the community's health and safety weighed heavily in favor of denying such challenges and requests for injunctions. *Wilcox*, No. 5:21-cv-01243, attached as Kuwahara Decl., Ex. 5 (denying temporary restraining order challenging UC's Policy because it does not exempt the naturally immune); *Harris v. Univ. of Mass.*, No. 21-cv-11244-DJC, 2021 WL 3848012 (D. Mass. Aug. 27, 2021) (denying motion for preliminary injunction and granting motion to dismiss in challenge to university student vaccine requirement); *Klaassen*, 2021 WL 3073926 at *45–46 (denying plaintiffs' motion for a preliminary injunction and upholding university's COVID-19 vaccine mandate); *Bridges v. Houston Methodist Hosp.*, No. CV H-21-1774, 2021 WL 2399994, at *2 (S.D. Tex. June 12, 2021) (dismissing case challenging COVID-19 vaccines for employees).

### 2. Concerns about safety are heightened because Dr. Kheriaty is a psychiatrist, serving patients at UC Irvine Health.

Dr. Kheriaty is a practicing doctor. His duties include treating patients and training residents and medical students. *See* Declaration of Aaron Kheriaty ¶ 4 (Dkt. 15-2 at 2-3). If Dr. Kheriaty is allowed to exempt himself from the Policy while he continues his duties at UC Irvine, and infection-induced immunity proves

not to be as robust as he believes, the life-threatening impact on UCI Health patients and the operational impact on UCI Health cannot be overlooked.

The concerns about safety protocols surrounding COVID-19 are particularly acute in a medical environment, where efforts to reduce transmission are crucial and vaccination is the key to that effort. *See* de St. Maurice Decl. ¶ 8. Vaccination of healthcare workers is important to protect patients who might be especially vulnerable to COVID-19. *See id.* ¶ 9; *see also* CDPH Order, attached as Kuwahara Decl., Ex. 1. Per the American Psychiatric Association, people with substance abuse disorders and serious mental illness are at increased risk for contracting COVID-19 and more likely to be hospitalized. Kuwahara Decl., Ex. 21 (American Psychiatric Association COVID-19 pandemic guidance) at 173.

Indeed, major health care organizations, including the Association of American Medical Colleges, the American Medical Association, and the American Psychiatric Association have all called for healthcare workers to be vaccinated as part of a physician's ethical commitment to put patients first. *Id.*, Exs. 18-21 (attaching statements and ethical guidance from Association of American Medical Colleges and American Medical Association). Psychiatrists in particular serve as the "single, trusted point of contact between people with mental illness and the general medical system." *Id.*, Ex. 21 (American Psychiatric Association COVID-19 pandemic guidance).

More broadly, COVID-19 cases among healthcare personnel have a cascading, and therefore significant, operational impact in the healthcare setting. Ensuring that the healthcare staff is vaccinated allows for the maintenance of a healthy, stable workforce. de St. Maurice Decl. ¶ 8. A similar operational impact extends beyond the healthcare setting. Boden-Albala Decl. ¶ 10. Such staffing shortages put a strain on campus operations and impact UCI's ability to provide services for all who use campus facilities. *Id*.

Dr. Kheriaty does not consider these important public interests in his

analysis, confining himself to the point that a vindication of his individual constitutional rights weighs in favor of the public interest. In the balancing of the equities, those weighty public interests overwhelmingly favor UC's Policy.

### 3. Dr. Kheriaty has not demonstrated irreparable harm if he refuses to get vaccinated.

Dr. Kheriaty asserts that he alone will be irreparably harmed by UC's Policy, which is designed to protect his own patients and students, pointing to a loss of constitutional freedoms and "an impending loss of employment and of professional reputation." First and foremost, as explained above, none of Dr. Kheriaty's fundamental rights are at risk. Thus, the argument that the deprivation of constitutional rights will generally constitute irreparable harm has no application. *Associated Gen. Contractors of Cal., Inc. v. Coal. for Econ. Equity*, 950 F.2d 1401, 1412 (9th Cir. 1991) ("We need not determine whether [Plaintiff's] allegations [of constitutional infringement] would be entitled to such a presumption of harm…the organization has not demonstrated a sufficient likelihood of success on the merits of its constitutional claims to warrant the grant of a preliminary injunction.").

Moreover, the additional harm that Dr. Kheriaty alludes to is not irreparable harm that requires the extraordinary relief of a preliminary injunction. Dr. Kheriaty claims that his "practice and roles at UC will be drastically and adversely affected" and that he faces "an impending loss of employment and of his professional reputation." (Mot. at 24).

*First*, Dr. Kheriaty's statement that he currently faces an "impending loss of employment" is incorrect. The Policy provides that he may experience consequences "up to and including dismissal from educational programs or employment." Drake Decl., Ex. A at 20 (FAQ 18). His dismissal, however, is not "impending." At present, Dr. Kheriaty faces a possibility of dismissal and the inability to come to campus to fulfill many of his duties. And, "[i]n general, the hardships caused by temporary loss of employment does not constitute irreparable

-23-

harm". *Graphic Commc'ns Conference-Int'l Bhd of Teamsters Local 404M v.*

*Bakersfield Californian*, 541 F. Supp. 2d 1117, 1125 (E.D. Cal. 2008).

*Second*, Dr. Kheriaty does face a choice with respect to his clinical activities and seeing his patients and training residents in-person. But, even if Dr. Kheriaty could demonstrate that he cannot fulfill his clinical duties (Mot. at 24), he cannot attribute that to the Policy alone, as the CDPH Order also applies to Dr. Kheriaty and requires vaccination. In other words, if Dr. Kheriaty declines to be vaccinated and does not request (and is not approved for) one of the available exceptions to the Policy, any injunction of the Policy would not result in Dr. Kheriaty being able to see patients and residents in person. The CDPH Order currently has no exemption for healthcare workers who have recovered from COVID-19, other than to delay for up to 90 days mandatory asymptomatic testing of those who obtain a medical or religious exception.

*Third*, Dr. Kheriaty fails to present any evidence supporting his assertion of reputational harm. Irreparable harm cannot be based on "pronouncements [that] are grounded in platitudes rather than evidence.'" *Titaness Light Shop, LLC v. Sunlight Supply, Inc.*, 585 F. App'x 390, 391 (9th Cir. 2014) (quoting *Herb Reed Enters., LLC v. Florida Entm't Mgmt., Inc.,* 736 F.3d 1239, 1247 (9th Cir. 2013)). Without more, such a claim is speculative and not enough to demonstrate that he will be irreparably harmed. *Id*. ("To establish a likelihood of irreparable harm, conclusory or speculative allegations are not enough.").

*Finally*, even if Dr. Kheriaty could show an irreparable harm, on balance, the public interest in protecting hundreds of thousands of people, including medical personnel and patients, far outweighs the alleged burden to Dr. Kheriaty—who, again, is not being forced to take the vaccine against his will by UC—such that the Court should deny this motion for a preliminary injunction. *See Bridges v. Houston Methodist Hosp.*, No. CV H-21-1774, (S.D. Tex. June 4, 2021) (denying TRO sought against hospital policy requiring COVID-19 vaccination for employees due

to weighty public interest: "The plaintiffs are not just jeopardizing their own health; they are jeopardizing the health of doctors, nurses, support staff, patients, and their families."), attached as Kuwahara Decl. Ex. 17 at 148.

In sum, Dr. Kheriaty has failed to meet all of the requirements for obtaining extraordinary relief in the form of a preliminary injunction.

**E.     The Scope of the Injunction Sought by Plaintiff Is Inappropriately Broad and Not Narrowly Tailored to the Alleged Harm.**

The injunctive relief sought reaches far beyond what is necessary to address any alleged harm or concerns of Dr. Kheriaty. If any preliminary injunction is granted (which Defendants do not concede is appropriate), that relief should be narrowly tailored to address the individualized concerns of this one professor, at one specific campus and not apply to other parties who are not before this Court. *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1140 (9th Cir. 2009) (holding district court abused its discretion in failing to tailor the injunction to remedy the specific harm alleged). The alleged harm could be addressed by the equivalent of a Policy exception for Dr. Kheriaty while the matter is pending. Under any such order, Dr. Kheriaty must be required to follow the requirements of masking and testing, as laid out in the Policy for unvaccinated employees who receive exceptions.

## IV.     CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court deny this motion for preliminary injunction in its entirety.

DATED:  September 3, 2021          CROWELL & MORING LLP

By:  */s/ Emily T. Kuwahara*
_____
Emily T. Kuwahara
Kristin J. Madigan
Suzanne E. Rode
Uri Niv

Attorneys for Defendants
THE REGENTS OF THE UNIVERSITY
OF CALIFORNIA and MICHAEL V.
DRAKE

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-25-                    DEFS.' OPP. TO PRELIMINARY INJUNCTION MOT.;
                        CASE NO. 8:21-cv-01367-JVS-KES